```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                            12 CR 934 (RA)

FENG LING LIU, VANESSA
BANDRICH, SHURAN LIU, YUCHANG
MIAO, SUNNY LANG, WEN TING
ZHENG, GUO QIN MIAO and KEVIN
LNU,

            Defendants.

------------------------------x
                                          New York, N.Y.
                                          January 28, 2014
                                          1:00 p.m.

Before:

                    HON. RONNIE ABRAMS ,

                                          District Judge


                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
REBECCA MERMELSTEIN
ROBERT BOONE
     Assistant United States Attorneys

ZUCKERMAN SPAEDER
     Attorneys for Defendant Feng Ling Liu
PAUL SHECHTMAN

SEAN MAHER
     Attorney for Defendant Vanessa Bandrich

CESAR DE CASTRO
     Attorney for Defendant Shuran Liu
```

APPEARANCES CONTINUED

CHARLES HOCHBAUM
    Attorney for Defendant Yuchang Miao

STANISLAO GERMAN
    Attorney for Defendant Sunny Yang

HUGH HU MO
    Attorney for Defendant Wen Ting Zheng

PAUL McALLISTER
DONALD DUBOULAY
    Attorneys for Defendant Guo Qin Miao

JOSHUA DRATEL
    Attorney for Defendant Kevin LNU

ALSO PRESENT: PATSY ONG, Mandarin interpreter

1               (In open court)
2               DEPUTY CLERK:  Matter of the United States versus Liu,
3     docket number 12 CR 934.
4               Counsel, please identify yourselves for the record.
5               MS. MERMELSTEIN:  Good afternoon, your Honor, Rebecca
6     Mermelstein and Robert Boone for the government.  With us is
7     Special Agent Christopher DeGraff.
8               THE COURT:  Good afternoon.
9               For defendants?
10              MR. DRATEL:  Joshua Dratel for Kevin LNU, Shu Feng
11    Xia.  He's in the courtroom in the third row.
12              THE COURT:  Good afternoon to both of you.
13              MR. MO:  Good afternoon, your Honor, Hugh Mo for
14    defendant Wen Ting Zheng, seated on the left side with the
15    black coat.
16              THE COURT:  Good afternoon to both of you.
17              MR. SHECTMAN:  Paul Shectman for defendant Feng Ling
18    Karen Liu who is seated in the stands.
19              THE COURT:  Good afternoon.
20              MR. DECASTRO:  Cesar DeCastro, good afternoon, for
21    Shuran Liu, who is in the first row.
22              THE COURT:  Good afternoon.
23              MR. GERMAN:  Stanislao German for Sunny Yang standing
24    in the second row.
25              THE COURT:  Good afternoon.

1            MR. HOCHBAUM:  Good afternoon, your Honor, Charles
2    Hochbaum for Yuchang Miao.
3            THE COURT:  Good afternoon.
4            MR. MAHER:  Good afternoon, Sean Maher for Vanessa
5    Bandrich.
6            THE COURT:  Good afternoon.
7            MR. McALLISTER:  Good afternoon, your Honor, Paul
8    McAllister for Guo Qin Mao.
9            MR. DUBOULAY:  Good afternoon, your Honor, Donald
10   Duboulay also appearing for Guo Mao.
11           THE COURT:  Good afternoon to all of you.
12           I wanted to touch base about logistics and where we
13   are.  As you all know, trial starts on March 17.  In my order
14   dated November 6, 2013, I scheduled a final pretrial conference
15   for Wednesday, March 12 at 2:00 p.m.  I also set a schedule for
16   in limine motions and other pretrial submissions.
17           In light of how many defendants we have in the case,
18   unless I hear an objection, I'm going to move the filing dates
19   of the in limine and other pretrial submissions a little bit
20   earlier, but I'm going to keep the final pretrial conference
21   where it is.  I would propose that in limine motions be filed
22   by February 4, responses by March 3rd, and proposed voir dire
23   questions, jury instructions and verdict forms by March 3rd as
24   well.  As I noted, the date and time of the final pretrial
25   conference will remain the same.

1          Does anyone have an objection to that schedule?

2          So we have that.

3          As I stated in my order, I also wanted to discuss the
4    procedure and schedule for my consideration of defendants'
5    claims of attorney-client privilege, and I suggested that the
6    parties talk about procedures.  So why don't you tell me your
7    thinking on what you propose.

8          MS. MERMELSTEIN:  The government reviewed the limited
9    set of documents at issue here.

10         THE COURT:  We're talking about 28 from one law firm,
11   is that right?

12         MS. MERMELSTEIN:  That's right, your Honor, the
13   Bandrich documents at issue are the Bates range number 934407
14   through 434, and the Moslemi documents are 934435 through 456.

15         THE COURT:  So it's a total of almost 50 documents.

16         MS. MERMELSTEIN:  Some multiple page documents, but
17   that is the correct number of pages.

18         THE COURT:  And what would you propose in terms of my
19   review of those documents?

20         MS. MERMELSTEIN:  The government has sent them out for
21   translation.  We have not received them back yet.  They are
22   primarily in Mandarin.  There are a few in English or blank
23   pages that are significant for certain reasons.  We will
24   provide them to defense counsel as soon as we have them back.

25         THE COURT:  Do you have a sense of timing on that?

1          MS. MERMELSTEIN:  I think we'll have them back in the
2    next two weeks.  It's the government's view that none are
3    protected by privilege.  They fall into roughly three
4    categories, there are documents on their face simply not
5    covered by privilege, that includes things like, for example,
6    blank letterhead from a church in China which, in the
7    government's view, was going to be used to create documents.
8          MR. SHECTMAN:  I'm having trouble hearing.
9          THE COURT:  At acoustics are not very good in this
10   courtroom or in many courtrooms in this courthouse, so if you
11   could speak into the mic, please.
12         MS. MERMELSTEIN:  Is that better?  So the categories,
13   I think, of the documents fall into three categories.  There
14   are documents that, in the government's view, are simply not
15   covered by any privilege because they're not attorney-client
16   communications, they're not attorney work product.  Those
17   include, for example, blank letterhead from a church in China
18   which, in the government's view, was going to be used to create
19   a document attesting to an applicant's belonging to a church,
20   but it's simply a blank letterhead; copies of distinctive paper
21   which the law firm handed out to applicants to have them write
22   false stories, and that same paper appears in applicant files
23   filed in the filing office, so you could track that letterhead
24   came from a law firm, but that's just the distinctive blank
25   paper.  That's category one.

1    THE COURT:  Do you have a sense of how many papers
2 fall into that category?
3    MS. MERMELSTEIN:  I could count it up, your Honor.
4    THE COURT:  Sure.
5    MS. MERMELSTEIN:  419 is blank paper, that falls into
6 that category, 428 through 434 is a birth certificate lacking
7 it's photo which could have a fraudulent photo affixed, I think
8 it roughly falls within that category, 440 through 441 is a
9 blank medical form, 442 is a blank receipt, 443 is a blank
10 receipt, 444 is the blank letterhead from the church, which I
11 mentioned, 445 and 446 are blank letters, 447 and 448 and blank
12 envelopes, and 454 through 456 is blank paper.
13    Category two constitutes documents which on their face
14 were part of the fraud, that includes, for example, Q and A
15 study guides concerning Christianity, Falun Gong and family
16 planning that would be given to applicants to help them prepare
17 their stories, and handwritten notes indicate which South
18 American countries have a good relationship with the United
19 States or not such that travel through those countries can be
20 verified.  That would have been used to guide applicants in
21 crafting a story as to how they came to the United States in a
22 way that the government wouldn't be able to verify or dispute.
23 So those things are, on their face, part of the fraud.
24    The last category are pages that appear to be asylum
25 application stories, not that have been directly tracked that

1    they were actually submitted to the asylum office.  Somehow the
2    name of the applicant was blanked out.  Those were likely
3    distributed to asylum applicants at the law firm as guidance as
4    to what kind of stories could you tell, and some appear to be
5    individual stories of the applicants.  Given the pervasive
6    nature of the fraud in this law firm, and the government's view
7    there were essentially no legitimate asylum applications, the
8    government views these stories as part of the fraud itself and
9    subject to the crime of fraud exception.
10             So given the burden is on the defendants to assert a
11   privilege here, the government would propose that we provide --
12   unless the defendants have had these documents translated,
13   which I don't think they have, we will provide the translations
14   to them.  I'm happy to indicate in providing them which of
15   these categories we think they fall into, and then they will
16   need to make a determination which, if any, they want to assert
17   privilege.
18             THE COURT:  I'm happy to hear from defense counsel,
19   whoever would like to speak.
20             MR. MAHER:  I think what the government is proposing
21   at this point is fine.  I think we need to have the
22   translations that the government is going to actually use.
23   Particularly some of us that are CJA appointed, I think it is
24   also more cost efficient for our translators to see what the
25   government has produced, it goes faster for the translation of

1    those documents.  But I think for us to make a determination,
2    we need to see what the government is asserting is actually
3    said in the documents.  I think it makes sense for us to spend
4    the next two weeks coordinating that and drafting a joint
5    letter or otherwise conferring with the Court which documents
6    we think we need the Court's guidance with.
7              THE COURT:  Good.  The government produces the
8    translations in the next two weeks, you said, is that right?
9              MS. MERMELSTEIN:  That's our understanding, yes.
10             THE COURT:  And then did you indicate you need another
11   two weeks after that?
12             MR. MAHER:  I think that would be fine.
13             THE COURT:  Why don't we set that as a schedule.  So
14   two weeks from the time the government produces the documents,
15   which should be within the next two weeks, I will get a joint
16   letter of some sort proposing how you would like me to handle
17   and review the documents.
18             MR. MAHER:  Thank you.
19             THE COURT:  When does the government intend to turn
20   over 3500 and Giglio?
21             MS. MERMELSTEIN:  If I could return for one moment --
22             THE COURT:  Yes, absolutely.
23             MS. MERMELSTEIN:  The government did not send out
24   every document for translation.  The government, because it's
25   so expensive to do these translations, has not sent out at this

point the asylum stories because we think we're less likely to offer them at trial. We nonetheless think they're not subject to any privilege, but we haven't sent them out for translation.

THE COURT: How do you know they're stories as opposed to application notes from -- I don't know what they look like, so I'm speculating, but notes from an interview with an actual client or a draft of what the client had intended to say? How could you tell that at this point?

MS. MERMELSTEIN: We sat with a Mandarin speaker who summarized the documents for us. There is no real way to know that. They don't appear to be notes. Some of them are typewritten. They don't indicate a conversation or a date on which a conversation took place. That isn't to say that they couldn't be that. We don't have, with regard to each of these documents, a witness who is going to say I wrote this, I saw someone write it, that's me, and I don't know where this came from. But I think we have witnesses, multiple witnesses, who will establish at trial that the entire law firm was essentially a fraud, that there were no real meetings in which people were telling real asylum stories and lawyers were helping to craft sort of a written document and summarize that, so that all of these stories are essentially -- are part of the crime.

I don't know that the government is intending to offer the particular stories in part because, as your Honor says,

1    because they're not traceable in such a direct way.  I think
2    they're not sort of the core of the evidence we're considering,
3    which is why we haven't had them translated.  So to the extent
4    the determination needs to be made if the defendants want to
5    assert the privilege, they will have to have them translated or
6    we'll have to have them translated.
7             THE COURT:  I think it could be helpful -- I will let
8    defense counsel speak for themselves -- if you intend to use
9    the documents, if you could tell them now look, there are these
10   documents, we don't intend to get them translated but we don't
11   intend to use them, that will be helpful in their determination
12   as to whether to get them translated themselves.
13            MS. MERMELSTEIN:  It's not the government's current
14   intention to use them, which is why we haven't got them
15   translated.  But we don't want to commit to not using them
16   because you don't know how the trial will unfold, because it's
17   possible something could come out at trial could make them
18   relevant and we would seek to offer them at that point.  So
19   although we are not intending to offer them now, which is why
20   we haven't had them translated, but I don't know that there's
21   no circumstances that we couldn't seek to have them admitted.
22            THE COURT:  You should outline in your letter to
23   defense counsel which documents you did not have translated and
24   if it is your intention at this time not to have them
25   introduced.

E1STLIUC

        MS. MERMELSTEIN:  We'll do that.

        THE COURT:  Is there anything else on this issue?

        MS. MERMELSTEIN:  No.

        THE COURT:  Is there anything else defense counsel would like to say regarding these documents?

        When does the government intend to turn over Giglio and 3500 material?

        MS. MERMELSTEIN:  Your Honor, the government intends to produce 3500 and Giglio on the Friday before the trial date.

        THE COURT:  How many documents are we talking about in this case?

        MS. MERMELSTEIN:  In terms of Giglio and 3500?

        THE COURT:  Yeah.

        MS. MERMELSTEIN:  It varies by witness, but there are multiple 302s, and there are for some of the cooperating witnesses who made recordings, multiple recordings of those witnesses made.  Obviously many of those have already been produced and/or are available.

        THE COURT:  Are the recordings in English or in Mandarin?

        MS. MERMELSTEIN:  They're primarily in Mandarin.  We produced summaries of the recordings and will be producing finalized transcripts of the ones that will be actual evidence at trial.  We're not going to transcribe recordings that are not going to be offered at trial but are merely 3500.  But we

E1STLIUC

produced -- or we have made available the recordings themselves and produced any summaries we have.

This came up in a related case before Judge Pauley, so just to be clear, where, for example, a cooperating witness made recordings against a dozen law firms, there are many recordings that were never transcribed.  The government is not going to transcribe every recording that the witness made.  As 3500, it's available to defense counsel, it's been available through discovery from the get go, and we produced the summaries that we have, but we're not going to transcribe them for the purpose of 3500.

THE COURT:  When are you going to inform defense counsel which exhibits you intend to use at trial?  And I'm curious about the asylum applications which you know were an issue in the pretrial motions.

MS. MERMELSTEIN:  We're not prepared to do that yet.  I anticipate that, to the extent we are offering many asylum applications, it will be in part through a witness who will have reviewed them all and will testify about similarities or overlapping language demonstrating that they are fraudulent on their face, and we will produce both that demonstrative exhibit and applications marked as exhibits when we produce all the exhibits I anticipate likely a week before trial.

THE COURT:  I would like you to do that beforehand.  I don't want there to be any adjournments.  I want to give the

1   defense an opportunity to investigate if they need to.  I want
2   to at least inform them, if you give them all the other
3   exhibits that you intend to use at trial a week before, if you
4   could give them the applications two or three weeks before, I
5   think that would be helpful for everybody.
6             MS. MERMELSTEIN:  We will do that no later that two
7   weeks before trial.
8             THE COURT:  Thank you.
9             Any other issues?
10            MR. GERMAN:  Your Honor, I believe you asked the
11  government how many pages of 3500 and Giglio.  I don't know if
12  we're talking about a thousand pages or 300.
13            THE COURT:  Right.  Could we get a more direct answer
14  to that, to the extent you know the answer?
15            MS. MERMELSTEIN:  I don't know the number of pages.
16  I'm trying to think back to what has been marked in related
17  trials.  I would think that it is, as a matter of pages,
18  certainly more than 300 pages.  A lot of it will be the entire
19  A file.  I think we're in the thousands of pages, more than a
20  thousand but less than 5,000.
21            THE COURT:  I think if we're talking about -- I think
22  if we're talking about the thousands, you really just have to
23  give it to them earlier than the Friday before.
24            MR. SHECHTMAN:  I left that whole weekend open.
25            THE COURT:  So you can give it to everyone but

1    Mr. Shechtman.
2             MR. SHECHTMAN:  But that's a lot of pages, your Honor,
3    and if we could get it a week or two would before that, I --
4             THE COURT:  I agree.
5             MR. SHECHTMAN:  It's a case about witnesses, and not
6    having it makes it very difficult to prepare.
7             THE COURT:  This is not a case, as I understand it,
8    where there are any concerns about violence or anything else.
9    I don't know what the harm would be to give 3500 material and
10   Giglio to defense counsel at least a week before.
11            MS. MERMELSTEIN:  We're happy to do it the week
12   before.
13            THE COURT:  Good.  Any other issues?
14            MR. GERMAN:  I want clarification, you said at least
15   the week before, we have -- I would like to get a specific
16   date.
17            THE COURT:  At least a week means a week, but I will
18   let the government speak for itself.
19            MS. MERMELSTEIN:  That's our intention.
20            MR. GERMAN:  Is that the Monday?
21            THE COURT:  Can you do a week before the Friday, the
22   Friday before?
23            MS. MERMELSTEIN:  Absolutely.
24            THE COURT:  So talking about ten days before.  Plan
25   accordingly.  Thank you.

1        And as to the asylum applications, you'll get that two
2   weeks before, so you'll have the opportunity to know which
3   asylum applications the government intends to admit at trial.
4        MR. GERMAN:  Your Honor, with regard to potential
5   motions for severance based on antagonistic defenses, does the
6   Court have a date in mind?
7        THE COURT:  The sooner you can do things the better
8   given, as I noted already, how many defendants we still have in
9   the case.  So right now the in limine motions are due by
10  February 24th.  If you have a severance motion and you can make
11  it beforehand, I would appreciate it, but no later than
12  February 24th.
13       Anything else?
14       MS. MERMELSTEIN:  Two small points, your Honor.  Just
15  first I think it might make sense to set a motion severance
16  schedule a little earlier than that.  Obviously some defendants
17  may come out of the case and people's severance motions may in
18  part depend on who is going to be in, but if people want to
19  make sort of motions in the alternative, if defendant A is
20  still in the case then I want a severance, if not, then not,
21  we're happy to respond in that fashion.  But I think to the
22  extent there may be two trials, it would be good to know that
23  sooner.
24       THE COURT:  I think that's a good idea.  What's the
25  soonest you could be in a position to make a severance motion?

1     I'm pushing the government on the rest of it, so now I'm going
2     to push you a little bit.
3             MR. GERMAN:  Probably about 2/15, February 15 -- the
4     14th, excuse me.
5             THE COURT:  Does that give you enough time, do you
6     think?
7             MS. MERMELSTEIN:  I think the sooner the better.  It
8     won't take us long to respond, I would think, but how about
9     February 10, is that enough time?
10            MR. MAHER:  Sorry, Judge, we're bickering among
11    ourselves whether that's too early already.
12            THE COURT:  We'll leave it at February 14 for
13    severance motions.  And when can the government submit its
14    response?
15            MS. MERMELSTEIN:  We'll do it mid week, response.
16            THE COURT:  So response by February 21st, and I will
17    make any reply due by the 26th.  So that's the severance motion
18    schedule.  Any other issues?
19            MS. MERMELSTEIN:  One last thing, your Honor, the
20    government wanted to put on the record in light of the fact
21    there have not yet been pleas, and I understand there may be
22    some open --
23            THE COURT:  Use the mic a little more.
24            MS. MERMELSTEIN:  We wanted to make clear on the
25    record that the government would be opposing the third point

1   for acceptance of responsibility for any defendant who has not
2   plead guilty after February 14.
3           THE COURT:  February 14.
4           Okay, did everybody hear that?  The record is made.
5           Any other issues?
6           MR. GERMAN:  Just timing, assuming -- well, there are
7   eight defendants left at this point, how long does the
8   government anticipate trial taking?
9           MS. MERMELSTEIN:  I think it's likely to be about two
10  weeks if all defendants stay in, and shorter depending on how
11  it comes out for the government's case in chief.
12          THE COURT:  I will tell you my trial schedule, I
13  usually sit 10 to 5.  I meet with the lawyers at 9:30, but the
14  jury sits from 10 to 5 each day.  I don't usually sit on
15  Fridays, but I do either with short trials or during
16  deliberations.  But if looked like a trial was likely to end, I
17  would hold it on Friday.  Otherwise I don't, because I have a
18  lot of other things scheduled.  But that's my schedule, so you
19  know it.
20          Any other issues?
21          MR. GERMAN:  Your Honor, in terms of peremptory
22  challenges, assuming the group stays as large as it is, I know
23  I recently did a trial before Judge Oetken and the government
24  consented to expanding the number of peremptory challenges
25  given the number of defendants.  In that case, I think we

E1STLIUC

1  agreed to 14 and 9, 14 for the defense and 9 for the
2  government.
3              THE COURT:  Why don't you propose a number.  If you
4  want to talk about it first, you can, and the government can
5  respond.  And if you can, let me know maybe in whatever in
6  limine motions or whatever joint letter you submit, you can let
7  me know if there's consent, that's great, but if there isn't, I
8  do want to know proposed numbers on each side.
9              MR. GERMAN:  Okay.
10             THE COURT:  Anything else?
11             Okay.  Good.  Thanks.  Have a nice afternoon.
12                                o0o