E3o0liu1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                 v.                        12 CR 934 (RA)
4
     FENG LING LIU,
5    VANESSA BANDRICH,
     and RUI YANG,
6
                 Defendants.
7    ------------------------------x
                                           New York, N.Y.
8                                          March 24, 2014
                                           10:00 a.m.
9    Before:

10                    HON. RONNIE ABRAMS,

11                                         District Judge
                                           and a jury
12
                         APPEARANCES
13
     PREET BHARARA
14        United States Attorney for the
          Southern District of New York
15   ROBERT L. BOONE
     PATRICK EGAN
16   REBECCA G. MERMELSTEIN
          Assistant United States Attorneys
17
     RONALD P. FISCHETTI
18   PHYLLIS A. MALGIERI
     ERIC FRANZ
19   ALEX KOVACS
     MARYAM JAHEDI
20        Attorneys for Defendant Liu

21   SEAN M. MAHER
          Attorney for Defendant Bandrich
22
     STANISLAO A. GERMAN
23   JASON RICHLAND
          Attorneys for Defendant Yang
24
     ALSO PRESENT:  JOHN LAU
25                  JEAN YAP, Interpreters (Mandarin)


                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E3o0liu1

1          (Trial resumed)

2          THE COURT:  Please be seated.  We're still waiting for

3    a few jurors.

4          Do defense counsel waive their client's presence at

5    all sidebars?

6          MR. FISCHETTI:  Yes, the waiver is in effect, unless

7    one of the attorneys says they wish to have that.  I have other

8    clients there.

9          MR. MAHER:  I join in that.

10          THE CLERK:  Yes.

11          THE COURT:  Thank you.

12          MR. MAHER:  Can I ask an administrative question?

13          THE COURT:  Yes, of course.

14          MR. MAHER:  As far as when we are using exhibits with

15    the witnesses, I think while almost everything here is

16    electronic, will it be sufficient if we ask the court deputy to

17    display it to the witness and counsel, as far as showing it to

18    the witness without having a hard copy?

19          THE COURT:  Sure, that's fine.  Just make sure that it

20    doesn't go up on the screen before it is admitted into

21    evidence, because the jurors have the screens, as well.

22          MR. MAHER:  I believe that courtroom deputy actually

23    has to hit a button before it goes to the jury.

24          THE COURT:  And you have discussed this with her?

25          MR. MAHER:  I have discussed it.

E3o0liu1

1              THE COURT:  Okay, that's fine.

2              As I noted earlier, you don't need to ask to approach

3      or anything of that sort.

4              MR. MAHER:  Okay.

5              THE COURT:  It's my understanding that no one is using

6      any demonstratives in their openings?

7              MR. EAGAN:  Yes.

8              MR. MAHER:  Yes.

9              MR. FISCHETTI:  Yes.

10             MR. GERMAN:  Yes.

11             We're still waiting for one juror.

12             Do you want to tell me the order of opening

13     statements, who intends to go first, second, third.

14             Mr. Fischetti, second?  Mr. Maher and Mr. German.

15             Mr. Egan, you'll be doing the opening statement for

16     the government, is that correct?

17             MR. EGAN:  That's correct, your Honor.

18             THE DEPUTY CLERK:  All rise.

19

20

21

22

23

24

25

E3o0liu1

1                  (In open court)

2                  (Jury present)

3                  THE COURT:  Good morning, everyone.

4                  THE JURORS:  Good morning.

5                  THE COURT:  I hope you had a nice weekend.  You may be

6      seated.

7                  I'm just going to ask you, once again, please try to

8      get in at 9:30.  If one person is late, then everybody has to

9      wait, so I'm going to ask you again just going forward please

10     try and come promptly.

11                 I'm going to have Ms. Cavale swear in the jury.

12                 THE DEPUTY CLERK:  Jurors rise and raise your right

13     hands.

14                 (Panel sworn)

15                 THE DEPUTY CLERK:  Thank you, you may be seated.

16                 THE COURT:  Now, we're going to hear opening

17     statements.  As I mentioned on Thursday, opening statements are

18     not evidence nor argument, but I'm still going to ask you to

19     play close tension.

20                 Mr. Egan.

21                 MR. EGAN:  This is a case about lies, plain and

22     simple.  Lies told by these three defendants and their

23     co-workers at two immigration law firms not far from this

24     courtroom down in Chinatown.  Lies aimed at cheating this

25     country's immigration system, and making literally millions of

1   dollars doing it.

2          The firms where these defendants worked were in the

3   business of filing fraudulent applications for asylum.  And

4   they filed hundreds and hundreds and hundreds of them over the

5   course of this fraud.

6          These applications contained stories of religious

7   persecution, forced abortions, savage beatings at the hands of

8   the Chinese government.  They provided details of unjust

9   arrests, prolonged detentions under unspeakable conditions.

10  They were detailed.  They were powerful.  They were often very

11  moving.

12         They were also fake.  Made up.  All of those details

13  from the number of kicks the victim received to descriptions of

14  day after day after day in a dark prison cell, all of it came

15  from the imaginations of these defendants.

16         Feng Ling Liu, was the head lawyer at one of these law

17  firms.  And you'll hear that she helped the applicants come up

18  with fake stories, and helped them gather fake evidence drawing

19  on her experience in the industry.

20         Vanessa Bandrich, opened up a spin-off firm with Feng

21  Ling Liu's brother, so that the fraud could continue without

22  drawing as much attention to Feng Ling Liu' firm.

23         THE COURT:  Stand near the microphone.  It is a little

24  hard to hear.

25         MR. EGAN:  And Rachel Yang, she worked at Bandrich's

1   firm.  And you'll hear how she guided the applicants through

2   the process, helping them gather fake evidence to support their

3   claims.

4          They, along with their clients, taught these

5   applicants not only how to lie, but what lies to tell in their

6   applications, in their appearances in front of the asylum

7   officers, and even in front of the immigration judge.

8          And all of these lies were aimed at one very specific

9   goal, exploiting the best intentions of the asylum process to

10  get their clients applications approved.  Because these

11  defendants, ladies and gentlemen, a successful application

12  meant literally thousands of dollars in their pockets.

13         As I said, it was a business, a big business.  And one

14  they were very good at.

15         Now, you're going to hear a lot about asylum over the

16  course of this trial, so I want to take a moment to describe

17  what it is and how it works.

18         As some of you may know, asylum is an immigration

19  benefit offered to people in the United States, to citizens

20  from a foreign country who can demonstrate that they were

21  persecuted in their home country on account of things like race

22  or religion or political beliefs.  It is an important tool to

23  protect people who are legitimately persecuted.

24         Now, when someone is granted asylum in the United

25  States, they are given a document, a card really, that allows

e3o0liu1                         Eagan – Opening

1   them to remain in this country indefinitely.

2           People who are granted asylum can bring family members

3   over and, with time, can apply for a green card, or even apply

4   for U.S. citizenship.  So it is a very powerful immigration

5   benefit.

6           The process for applying for asylum is pretty simple.

7   It is a two-step process.  The applicant has to fill out a form

8   with some personal biographical details and provide a personal

9   statement that describes how the they were persecuted.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. EGAN:  They then send that, along with any

2     evidence that corroborates their claim, into the asylum.

3     That's step one.  Step two is an interview in front of an

4     asylum officer who tries to determine if the case meets the

5     legal standard for asylum and, most importantly, if it's true.

6     If the asylum officer denies the application, the applicant can

7     appeal to an immigration judge.  That's basically the process.

8          Ladies and gentlemen, the evidence will show that

9     these defendants manipulated that process at every single step

10     along the way, from creating fake stories of persecution to

11     manufacturing evidence, all the way through coached testimony

12     in front of an immigration judge.  The evidence will show that

13     under the guise of law firms helping asylum applicants navigate

14     this process, these defendants were essentially running nothing

15     more than a fraud factory, churning out false application after

16     false application, and each of these defendants had their place

17     along the assembly line, helping to turn any hopeful Chinese

18     immigrant or aspiring asylum seeker into a persecuted or

19     oppressed refugee worthy of protection.

20          So how did it work?  You'll hear that there are a

21     couple of categories of persecution that these firms

22     specialized in.  First of all, persecution based on

23     Christianity; second of all, persecution based on falun gong,

24     which you'll hear is a spiritual discipline practiced by some

25     people in China, and, finally, based on China's family-planning

 1  policy which regulates who can have children and when.

 2          The evidence will show that applicants first met with

 3  an office manager, sometimes even Feng Ling Liu herself.  These

 4  managers would get information from the applicants such as

 5  name, date of birth, place of birth, the basics.  Then one of

 6  these managers would just choose one of these categories for

 7  them.  Now, you'll hear that the office manager didn't ask if

 8  the applicant had a valid basis for asylum, didn't ask about

 9  the applicant's experiences or beliefs in China, didn't ask for

10  any of that information, but the manager just told them, Here,

11  this is how you were persecuted, trust me.

12          For instance, you're going to hear that if an

13  immigrant was young, female, and unmarried, a family-planning

14  claim might be the best option.  If the person was highly

15  educated, maybe Christianity would work because it has lot of

16  very specific details to remember.  If, however, the client was

17  not as educated, maybe falun gong would be the best option as

18  that didn't have quite as many details to remember.  Not

19  planning on having kids, didn't matter.  Not a practicing

20  Christian, didn't matter.  Don't know the first thing about

21  falun gong, did not matter.  The only thing that mattered to

22  these defendants was what was likely to be successful because,

23  as I said, when applications were successful, the defendants

24  got paid.

25          After the applicant was told what persecution they had

suffered, the next stop was the storywriters.  Now, as the name

suggests, that's what these people did.  They wrote stories,

fake stories, to put the meat on the bones, so to speak, of the

claim the person had been assigned.  Now, if the manager came

to them and said family planning, they wrote a story about a

young couple on the run from family-planning authorities.  If

the folder came to them and it said Christianity, they might

write about underground churches and police raids.  All of the

things you will hear were well tested formulas, and you'll hear

that, for the most part, these storywriters wrote these stories

without actually talking to the applicant.  After all, these

writers had much more experience with these stories than the

applicants did.

     When it was decided that the storywriters should

actually let the applicants write their stories first, you

know, in case someone started looking or someone got

suspicious, the storywriters simply handed the applicants

samples that had been successful in the past for them to modify

and copy.  The firms even helped the applicants get fraudulent

evidence.

     Now, you may ask, how do you get evidence for a story

that never happened?  It's easy.  You make it up.  People at

these firms, people like Rachel Yang, told the applicants what

kind of fake evidence they would need, and the storywriters

went to work writing.  They wrote letters that were supposed to

1    be from friends, family members, maybe even a boyfriend who had

2    gotten the person pregnant, just restating the lies they put in

3    the story but, this time, over someone's name just to make the

4    story seem legitimate.  All the applicant had to do was send

5    that letter back to China for a friend to recopy it and send it

6    back in an envelope with a Chinese postmark.  You'll even hear,

7    however, that these firms kept a supply of Chinese-sized paper

8    in the firm in case there was an emergency and someone needed

9    to have a friend here in the United States write a letter

10   pretending to be in China.

11           After these stories and the evidence letter were

12   written, they would be reviewed by Feng Ling Liu or one of the

13   other lawyers at the firm.  She had to make sure they were good

14   enough.  If the beating that was discussed in the story was not

15   severe enough, maybe she'd add a couple extra details, a couple

16   extra kicks, a black eye, a broken bone.  Maybe the length of

17   time that the story said the applicant had been in detention

18   wasn't quite long enough, so seven days became two weeks,

19   whatever it took, whatever little extra details they felt they

20   needed to push the story over the edge.  Then the defendants

21   submitted everything to the asylum office and started preparing

22   applicants for the next step, teaching the applicants to lie

23   and lie convincingly, both in their interviews and, if

24   necessary, in front of the immigration judge.  Coaches drilled

25   them on their stories and other things that they might be

 1    expected to know if they had actually been persecuted.  The

 2    firm even prepared a cheat sheet designed to turn someone who

 3    knew nothing about Christianity into someone who could pass for

 4    a devoted believer in one of these interviews, sort of like

 5    CliffsNotes for religion.  Except just like CliffsNotes, it

 6    wasn't designed to get you to really learn the material; it was

 7    just designed to get you to pass the test.  If the applicant

 8    failed the interview, however, they prepared even more

 9    rigorously for the appearance in front of the immigration

10    judge.  Multiple rounds of prep, two, three rounds, this time,

11    with lawyers, lawyers like Feng Ling Liu, lawyers like Vanessa

12    Bandrich, again, drilling the applicants on their stories.

13            So it went application after application, lie after

14    lie.  As I said, a factory for fraudulent asylum applications.

15    And an efficient one at that.  You'll hear that the

16    storywriters often had caseloads as high as 50 cases at a time.

17    And you will hear that the firms run by Feng Ling Liu and

18    Vanessa Bandrich filed close to 2,000 of these applications

19    during the course of the fraud, and you'll hear that almost

20    every one of them contained lies.  Whatever it took to get the

21    application approved, and that's, as I said, what mattered most

22    to these defendants, because if it got approved, they got paid.

23    At least $10,000 for each applicant who was granted asylum.  As

24    I said, hundreds and hundreds and hundreds of applications, a

25    big business, ladies and gentlemen, literally millions of

E3oWliu2                    Opening – Mr. Egan

1    dollars over the course of the fraud, all for helping

2    immigrants file a form that doesn't cost a dime to file.

3            They were so successful, as a matter of fact, that you

4    will hear that they started to worry that people might get

5    curious, people like the FBI.  After all, if the government was

6    going to investigate this, they were likely going to start with

7    the biggest players.  You'll hear that as word trickled out

8    about law firms around the country who had been arrested for

9    precisely this sort of fraud, the defendants kicked into

10   action.  Feng Ling Liu tried to cover her tracks.  She warned

11   employees, don't talk on the phone, in case they're tapped.

12   You'll hear she said not to have clients bring any of the

13   materials outside of the firm.  She then went and changed the

14   firm name.  Feng Ling Liu's name came off the door.  You'll

15   hear Troy Moslemi's name went right back up.  Then Feng Ling

16   Liu helped her brother open another firm right across the

17   street, this time with Vanessa Bandrich's name on the door.

18   And they brought on Rachel Yang to help the applicants through

19   the fraudulent process.  And while they pretended to be

20   separate firms, you'll hear, the evidence will show, that in

21   many ways it remained one firm.  Same business, same factory,

22   same fraud.  That's what the evidence will show.

23           Let's talk about the kinds of evidence you'll see and

24   hear in this case.  First you're going to hear live testimony

25   from a number of witnesses.  You're going to hear from a couple

1    of storywriters who worked at this firm.  As people who did

2    this for a living, they'll be able to tell you exactly how the

3    fraud worked at these firms and the roles of each of the

4    participants in the fraud.  You'll also hear from an asylum

5    applicant who actually used the firm to file a fraudulent

6    asylum application.  He'll describe how they moved him through

7    the process, how they helped him gather fraudulent evidence,

8    how they helped create a fake story for him.

9          You'll also see a couple different types of

10   documentary evidence at the trial.  First, you'll see some

11   examples of the fraudulent applications that were filed by the

12   firm, and you'll hear the lies that they contain and you'll

13   hear how the firms manufactured them.  Then you'll see evidence

14   that was taken right off the desks and out of the drawers of

15   these firms and you'll hear how that evidence was used to

16   manufacture false asylum claims.

17         But you won't just hear witnesses' descriptions of how

18   it worked or see documents that they used to corroborate what

19   they said.  You will hear the actual words of the defendants

20   themselves as they guided applicants through this process.  You

21   see, several of the witnesses you will hear from, including two

22   of the witnesses who went to these firms to file applications,

23   were working for the FBI.  As part of that cooperation, they

24   agreed to wear recording devices that captured each of these

25   defendants discussing the fraud.  You'll see translations of

E3oWliu2                          Opening - Mr. Egan

1    these recordings, and you'll hear how the applicants were given

2    asylum claims, coached to be more believable, and how they were

3    taught to get fraudulent evidence.  In short, how to lie.

4    These recordings will make it clear that everyone at these

5    firms knew exactly how this game was played.

6              To be clear, many of the witnesses I just described

7    committed a crime.  The applicants submitted applications with

8    lies in them.  The storywriters will testify that they prepared

9    false asylum applications for people.  That's asylum fraud in

10   both cases.  Now, the government has agreed not to prosecute

11   the applicants who will testify at this trial for immigration

12   fraud.  The storywriters, on the other hand, have already pled

13   guilty for their involvement in the scheme and are testifying

14   here in hopes of getting leniency at their sentencing.  When

15   you consider their testimony, you should also consider how that

16   testimony is corroborated by other evidence in the case, by

17   documents and by the recordings.  You will see that these

18   witnesses are able to take you inside this process like no

19   other witness can.  In short, you will hear and see many

20   different kinds of evidence in this trial, and that will

21   confirm that the defendants are guilty of conspiracy to commit

22   immigration fraud as charged in the indictment.

23             Once you've heard all the evidence in this case and

24   used your common sense, the same common sense that you use in

25   your everyday lives as New Yorkers, you will reach the only

1    conclusion, the only verdict, that is supported by that

2    evidence, and that's that the defendants are guilty.

3              Thank you.

4              THE COURT:  Thank you.

5              Mr. Fischetti.

6              MR. FISCHETTI:  Yes, your Honor.  Thank you.

7              Good morning, everybody.  I get to talk to you now.

8    Let me reintroduce myself.  I'm Ron Fischetti.  I'm an

9    attorney, and I represent a client.  My client is here,

10   Ms. Feng Ling Liu, and I've got some notes, but I want to talk

11   to you a little bit about what the government said also.

12             This is a criminal case, as you know, and my client,

13   as you know, is presumed innocent.  They've told you that, the

14   judge has told you that, and it's very important.  See, here in

15   America, in the United States, we have a system of justice, and

16   it is a fair one.  As fair as it possibly can be.  And one of

17   the things that is really important in our system of justice is

18   that every person is presumed innocent when they're charged.

19   Right now, so while you're looking at my client, she is

20   presumed innocent and even after you heard this opening by the

21   government, there's no evidence against her whatsoever.  And

22   that presumption of innocence is going to stay with her

23   throughout this entire trial, and even when you walk in to that

24   jury room to decide her fate, she still will be presumed

25   innocent and presumed innocent through that entire process

unless and until each and every one of you is convinced that
the government has proved her guilt beyond a reasonable doubt.

I'm not going to describe what those words mean.  The
judge will tell you when she charges you.  But one thing you
must know, how does that happen, well, it happens this way.
There's a burden of proof.  The government must prove to each
and every one of you that my client is guilty beyond a
reasonable doubt.  Now, that's important because that burden
rests at this table.  It never leaves that table.  It never
shifts to my client whatsoever.  We need do nothing.  We need
not present any evidence.  We need not even have to give this
opening statement.  I could just sit there and say you brought
these charges, now prove them beyond a reasonable doubt, and
that's very, very important for you to remember.

One of the other things you must remember is whether
or not my client will testify in this case.  Now, remember you
were given those booklets before we selected you, and there was
a question on that that said would you feel a little bit like
my client was guilty because she did not testify, and each of
you swore an oath.  The oath said that you would not consider
that.  You would not consider it at all, not even a little bit,
if she did not testify.  That will be a decision that we'll
make at the end of the government's case, to decide whether she
will or not.  But if she doesn't, you can't say, Well, you
know, if it were me and I were sitting over there and somebody

1   charged me with those crimes, you can bet your bottom dollar

2   I'd get on that stand and say it's a lie, I never did it.  But

3   you can't do that.  You swore an oath that you can't do that,

4   and, quite frankly, I'm going to hold you to it.

5          Now, she's been charged with an indictment.  Okay?  A

6   piece of paper comes in, it says the United States of America

7   against Feng Ling Liu.  But that's not evidence.  It's nothing

8   more than a piece of paper.  It just accuses her of this, so

9   you can't consider that as evidence at all.  And it says very

10  officially, the United States of America.  Well, the United

11  States of America is not against my client.  I'm part of the

12  United States of America, so are you.  It's just a method of

13  pleading.  And when you weren't here on another day, she stood

14  up before this judge and said I am not guilty of these charges.

15  And that's why we're here, for you to see if you can follow the

16  evidence that way.

17         So what is this case really about?  Well, my client's

18  a lawyer.  She's married.  She has two children, one in high

19  school, one in Harvard, and she formed a law firm here.  Now,

20  you know about this case that many people try to come here into

21  the United States.  You know, it's where a person like probably

22  your ancestors and certainly mine can come and find a new life

23  for their family.  And not surprisingly, in some countries,

24  like China, they'll do anything they can to get in here, so

25  they do it illegally, get smuggled in.  They pay people that

E3oWliu2                    Opening - Mr. Fischetti

 1    are called snakeheads, I think -- I don't know what the word

 2    is -- to smuggle them in here because of the persecution there.

 3              I'm going to talk about that a little bit now.  I

 4    really wasn't going to, but when the government says fake, fake

 5    prosecutions, fake, that people from China say fake, that

 6    there's dark prison cells there, it's a fake, that's a lie.

 7    There's persecution there.  Horrible persecution.  People are

 8    beaten.  People are put in prison for their religious beliefs.

 9    People are put in prison for their political beliefs.  You

10    can't talk over there.  There's no freedom of speech, no

11    freedom of religion.  And people would do anything to get out

12    of there, to get here.  And that's why we, in this great

13    country, have provided a way that once they're here, no matter

14    how they got here, if they were smuggled in, if they came on a

15    visa and overstayed it, no matter how they got here, we provide

16    a method so that they don't have to go back.  And if they do go

17    back, ladies and gentlemen, they're tortured, they're put in

18    prison, because they fled their country.  That's what we do

19    here and I think it's a very, very fair thing to do.

20              Now, my client was involved in that.  As I told you,

21    she's a lawyer.  She has a firm.  She was here for ten years

22    working in this firm, but the interesting thing is that at 27,

23    she left China and she left China because of the oppression.

24    She left China because of the persecution, and she came here

25    and she started a firm that you've heard about.  That firm was

E3oWliu2                          Opening – Mr. Fischetti

1    to help Chinese people who were persecuted stay here in the

2    United States.  They formed that firm not only to make money

3    for her husband and her two daughters, one at Harvard, she did

4    it because she wanted to help.  She did it because she wanted

5    to help those people who were persecuted in China not have to

6    go back there.  And that's what she did for ten years.  And

7    after ten years, after working very hard, she decided that she

8    was going to leave the firm, maybe do a little insurance

9    business on the side, but she was out of it.  She went there

10   and she needed somebody to take it over, and that somebody that

11   she found, I think you heard the name, was Troy Moslemi.

12          Troy Moslemi is a lawyer, immigration lawyer, and she

13   spoke to him.  She knew him.  He had experience, he was

14   well-known, and she turned the firm over to him and it became

15   the Moslemi firm.  She kept her hand in, it wasn't that she was

16   just walking out, because she had a number of clients that were

17   still pending.  And indeed because of the work that she did,

18   the good work that she did, helping these people who were

19   persecuted, she got calls from China, from family members,

20   where she helped one person to get another person in.  So to

21   that extent, she was there.  It wasn't her firm anymore, it was

22   Moslemi's firm.  And she did that for ten years and then turned

23   it over.

24          Now, one of the important things in this case is she

25   is a Chinese citizen who came here to help these people.

1           Now, you heard the government's opening that they

2   intend to call witnesses who are cooperators, and I want you to

3   listen to their testimony very carefully, because he said this

4   is a case about lies, and that's the one thing I agree with you

5   about.  It is about lies, the lies you're going to hear from

6   that witness stand, from people who are attempting to save

7   their own lives.  Every one of those people who will testify

8   will tell you, and you will believe, that they're trading their

9   crime to get freedom by lying about my client.  And there is

10  absolutely no doubt about that.  And I'll prove it to you.  And

11  that's what we'll do during this trial.

12          Something else I wrote down.  The government said that

13  we're going to produce applications.  These are the asylum

14  applications that they say are fraudulent, that they say that

15  these witnesses who are going to testify and worked at that

16  firm prepared them at my client's direction, to keep them here.

17  Okay?  You will find that each and every one of them have pled

18  guilty to massive crimes, and what they're doing is gaining

19  their freedom from one day in jail for those crimes as long as

20  they take that witness stand, swear an oath to tell the truth,

21  and say exactly what they're telling them to say.  And if they

22  deviate from it, if they lie, that they're going to prosecute

23  them.  That's the kind of lies you'll hear.  And they'll call

24  the cooperators, people who are cooperating with the

25  government, and I want you to listen to their testimony and

1   judge their credibility.

2          You know, each of us has a role in this courtroom.

3   Okay?  The government's job is to prosecute.  I will defend my

4   client to the best of my ability because I believe in her

5   innocence.  The judge has a role, and she is the guardian of

6   the law.  She will tell you what you can do, what you can't do.

7   We'll make objections, she'll rule on them, and she will run

8   this courtroom, as she should.

9          But you, every one of you here has the most important

10  role in this trial because you, and only you, will judge the

11  credibility of these witnesses.  That's a lawyer's word.  It

12  means believability.  Do you believe them?  And I think when

13  you hear the judge's charge, she will even tell you that people

14  who are cooperating and getting the benefit from their

15  cooperation, the chance to walk out here and not do a day, you

16  should listen to their testimony with caution and great care,

17  and that's what I want you to do, to decide that.

18          The government says you will hear evidence,

19  transcripts of people, people will testify, not the people who

20  are cooperating, but honest people, testify about my client and

21  how she did this.  I tell you, that's false.  You will never

22  hear such testimony.  The government says they will put in

23  recordings of people testifying here as to what they said

24  during this time.  You will hear transcripts, read them,

25  hundreds of conversations.  See how many you find, as the

government's told you, where my client admits she was in a

fraud.  I tell you you will hear none.  None.

        You will hear testimony about what they did.  You'll

hear testimony about the deals they made, but you won't hear

any about my client admitting her guilt.  You will hear

testimony of a witness here who was sent in under cover by the

government wearing recording devices, recording secret

conversations to try and prove my client is guilty.  You will

hear that she made over 40 conversations, recorded.  You'll

hear that she was there 18 times, 20 times, trying to talk to

my client, trying to prove that she was there during that time.

You will see that she never even met my client.  Never mind

talk to her, never mind record her.  Never even met her.  And

that's the evidence the government wants you to believe.

        You know, there's one quote here in one of the

conversations, I want to find it for you.  Listen to this.

This is a conversation between that woman and a witness who is

going to testify here, Mr. Victor, another cooperating witness

that they have.  We've got a lot of them.  This is the

conversation, "Don't worry about it, everybody will push the

responsibilities on Liu Feng Ling because she is the boss.  In

case there's legal trouble, they can push it on Liu."  That's

the conversation they're going to play for you.  And that's

exactly what they're doing here.

        Other conversations you'll hear say basically the same

E3oWliu2                    Opening - Mr. Fischetti

1    thing.  There's one conversation, just one, with my client from

2    one of the witnesses in this case, attorneys who tried to

3    entrap her into saying certain things about being involved in

4    this fraud.  She never says anything about it.  So when the

5    government says that you're going to hear conversations,

6    conversations, of people with my client, hear them, not their

7    testimony, hear them, where you have proof of it, not just

8    their lies, proof of it, see if they do.  Hold them to that.

9            The applications that they're going to put into

10   evidence, let me tell you, they say that these witnesses are

11   storytellers.  They wrote up these fake applications, but they

12   wrote them up for these individuals.  All right?  And these

13   individuals were interviewed by asylum officers, they're

14   interviewed by people above asylum officers, and they go in,

15   according to the government, and they lie.  They raise their

16   right hand and they lie and they say that this story that was

17   theirs was a lie, and they say, as the government says, it was

18   my client who interviewed them, prepared this, told them to say

19   it, and they have these applications.

20           Well, let me tell you something.  Okay?  I've been a

21   lawyer for a long time.  They want to prove my client's guilty?

22   I'll tell you how to do it.  They have all the names of these

23   applicants, every one of them.  Okay?  Every one of these

24   applicants committed a crime.  Every one of these applicants

25   spoke to my client, told them how to do it, every one of them.

1   I challenge them to put one person on the stand, one, and say

2   that's true.  One.  One person to get on that stand, swear an

3   oath, and say:  Yeah, they gave me to a storyteller, I went to

4   the storyteller, I reviewed everything they said, I said

5   exactly what they wanted me to say.  I went, I swore an oath, I

6   met with Karen, she told me to do it.  That's why we're here,

7   because she didn't, because she's innocent.

8          What do I want from you?  All I ask is that you keep

9   an open mind.  All I ask is that you be fair in this case,

10  listen to the judge's charge, and then decide the case.  You

11  know, when we picked each of you in this case, remember you

12  were all sitting back there, and then we'd come up and talk to

13  the judge and one of you would come up and you'd go back and

14  you'd go forth, you know what we were trying to do?  We were

15  trying to pick a fair jury.  We weren't trying to pick a jury

16  of women, men, old, young, just a jury who is going to be fair.

17  And that's all I ask of you.

18          I ask of you to listen to the evidence, be fair.  Use

19  your same common sense and listen to the judge and be as fair

20  with the presumption of innocence, reasonable doubt, burden of

21  proof, that you would want if a loved one was sitting over

22  there.  Wouldn't you want a jury to do that, that doesn't make

23  up its mind until they hear the testimony, that they abide by

24  the judge's rules of presumption of innocence, reasonable

25  doubt, that you will look at these people who are testifying to

```
 1    gain their freedom, that you'll take that into consideration?
 2    That's all I'm asking you.
 3              I'll have one more opportunity to come back after the
 4    case is over to sum up.  But I thank you for your attention.  I
 5    thank you for your service.  I mean, as some judges say, and I
 6    agree, this is the most important thing you can do for your
 7    country other than military service.  Because each of you are
 8    going to be here, and you are going to judge the fate of a
 9    fellow human being.  All I ask is that you do that fairly.
10              Thank you for listening to me.
11              THE COURT:  Thank you.
12              Mr. Maher.
13              MR. MAHER:  Thank you.
14              Good morning.  Vanessa Bandrich is absolutely not
15    guilty of joining any conspiracy to commit immigration fraud.
16    Falsely accused of a crime that she didn't commit, Vanessa has
17    been caught up in a web of deceit spun by a woman named Meng
18    Fei Yu and other fraudsters who are doing everything they can
19    to avoid going to prison for up to 15 years and being deported
20    back to Communist China.
21              How did this happen?  I'd like to tell you.
22              Vanessa Bandrich is the daughter of Cuban immigrants.
23    Her parents and grandparents both fled the tyranny of Cuba.
24    Her father came here in the early 1960s.  She was raised in
25    Miami, went to school there, and she did well.  She worked hard
```

 1    for success and is the first one in her family to go to law

 2    school.  Vanessa earned the equivalent of a full scholarship to

 3    go to the University of Miami.  And while she was at the

 4    University of Miami, she worked.  She worked as a paralegal as

 5    well as her studies.  She kept that job after graduating and

 6    worked another two years, trying to figure out what she was

 7    going to do with her life.  She's done with college, what am I

 8    going to do.  So she's working and she decides she wants to be

 9    a lawyer, and she applies to go to law school.  She applies to

10    Nova law school in Miami and is accepted and enrolls.

11            Vanessa enrolls in the four-year program, the night

12    program, because she needs to work full time during the day in

13    order to pay for tuition.  But Vanessa does that.  She enrolls

14    in the night program.  She works full time to pay her bills and

15    she still graduates half a year early.  And that's in 2005.

16    But before becoming a lawyer, you have to do more than just

17    graduate law school.  You have to pass the bar exam, and the

18    bar exam is a difficult test.  It's quite difficult.  Even

19    Hilary Clinton didn't pass it the first time.  Vanessa,

20    unfortunately, didn't pass it the first time.  But she didn't

21    quit her dream of becoming a lawyer.  She studied more and she

22    took it again, a second time.  And, unfortunately, she didn't

23    pass the second time.  So what does she do?  She says I am

24    going to keep studying and work and study and work, and she

25    does that.  And then the third time she passes the bar.  She

passes, and she gets accepted as a member of the bar of the

State of Florida.  And that's in 2007 is, two years after she

had graduated from law school.

            Now, Vanessa wants to get a job now, obviously, as an

attorney.  She wants a full-time attorney position.  She

doesn't want to be a paralegal anymore, because she's done

that.  But like many young lawyers, she thinks the

opportunities will be plentiful.  I mean, hey, you have a law

degree, people will tell you society says you've got a law

degree and you've got it made, and a lot of people think that.

But the reality is it's not that simple.  It's not that simple.

2007, if you recall, was not a great year for our economy.  The

stock market's tanking.  Law firms are laying people off left

and right, downsizing, and there are not many opportunities for

Vanessa to get a full-time job in Miami as a lawyer.  But she

tries, and after about a year, she opens up her own small law

firm.  Vanessa Bandrich, P.A., and she tries to get some

business, generate some business with the contacts she has.

She is helped with her contacts from her father, a retired

Miami police officer.  But, let me tell you, it's extremely

difficult for someone with a lot of experience to create a law

firm from the ground up.  It's almost impossible for someone

just out of law school, just passing the bar, to start their

own firm and to keep it financially viable, and it just wasn't

working.  It just wasn't working financially, despite her hard

E3oWliu2                         Opening - Mr. Maher

1    work.

2              So around May of 2009, Vanessa is presented with an

3    opportunity to potentially have an attorney position, a

4    full-time position.  Through a mutual friend in Miami, she's

5    introduced to a man named Troy Moslemi.  He's an immigration

6    lawyer from Miami, but he's working in New York.  And he tells

7    her about a position at the firm he's at and how she should

8    apply for it, that she might be a great person to work there.

9              Vanessa though is torn about this.  She loves Miami,

10   her family is there.  Not just her family, her husband's family

11   is there.  All of her friends are there.  But she also wants to

12   give her career a chance.  Can I make it, can I actually do

13   this?  And so she's thinking of this.  She knows that things

14   are tough in Miami to get a job, and she's going over this, and

15   she's also drawn to the firm's practice.  It's an immigration

16   practice.  Okay?  And that's special because as a child of

17   first-generation immigrants, parents and grandparents who all

18   fled the repressive regime in Cuba and who built a new life

19   free from tyranny in the United States, Vanessa knows that is

20   not just pie in the sky, that freedom in the United States is

21   not just words.  But it is a real thing that can transform the

22   life of a young girl and can transform the lives of her family.

23   She knows this.

24             So she agonizes over the decision, but she decides

25   with her husband, Luis, that she is going to move to New York

1    and take the job.  And she comes up and interviews for the job

2    in New York which is with the firm called Moslemi & Associates,

3    and she's hired for the position and she and her husband move

4    up from Miami.  She's quickly thrown into a bustling immigrant

5    practice that focuses on helping immigrants from China, helping

6    them navigate our complicated immigration laws.

7             Now, Vanessa learns, again, she is basically right out

8    of law school, that this law firm, like many in the immigration

9    law field and probably most law firms that have more than one

10   person, has a division of labor.  Right?  People split up their

11   roles and do different things.  The clientele is almost

12   exclusively immigrants from China who don't speak English.

13   They speak the main language in China, which is called

14   Mandarin.  Okay?  Now, the paralegals and the administrative

15   staff at the law firm are from China, speak Mandarin fluently,

16   and they have the role of meeting with the clients for the

17   first meetings, the first interviews, and helping the clients

18   prepare the paperwork.  And they assist the clients in filling

19   out the paperwork, and that's the paperwork to begin the asylum

20   process.

21            Now, one part of the asylum application process is

22   submitting a client's statement, as you heard earlier,

23   explaining what the person went through in their former

24   country, how they were persecuted, what happened, and why

25   they're afraid to go back.  Okay?  The statement must be

1      submitted to the U.S. immigration officials in English.  You

2      can't submit a Mandarin form to the U.S. Government.  They

3      won't accept it.  They'll mail it back to you, they just won't

4      accept it.  Okay?  It has to be translated.  It has to be

5      submitted fully in English.  All right?  So to address this

6      language barrier, the firm had support staff, administrative

7      staff, who spoke Mandarin, again, who would translate these

8      statements into English, and put it in the file to then be

9      forwarded to the immigration office.

10             Now, Vanessa's role was very specific.  She was not a

11     paralegal.  She was an attorney who was to be in immigration

12     court.  Okay?  The initial client interviews and the paperwork

13     was for the paralegals and support staff.  All right?  Her job

14     was to go when the case eventually got to court.  Okay?  Now,

15     you're going to learn the process of immigration law -- and

16     probably by the end of this trial, you're going to know it

17     better than most lawyers -- the thing is this.  When a person

18     applies for asylum, they don't just go to immigration court.

19     There's basically a process where first they go to an interview

20     with a person who is called an asylum officer.  This interview

21     is an informal interview.  It's not adversarial, and by

22     adversarial I mean this.  This courtroom here is adversarial.

23     You've got the government, we have the defense.  We are both

24     arguing for our positions.  Okay?  That's adversarial.  The

25     asylum interview is just the officer, usually, and the person,

1    and maybe a translator that the person has to bring with them.

2    And they discuss the person's application.  Okay?

3              Vanessa is not involved in going to those interviews.

4    That's with the person themselves and maybe a translator

5    meeting with the asylum officer.  If the asylum officer hears

6    that person's story -- and by story, let's be clear.  When you

7    hear the word "story," story can mean many things.  It doesn't

8    mean lies.  Okay?  I can say I'm going to tell you my life

9    story.  Does that mean I'm going to tell you a lie?  No.  It

10   means I'm telling you the story of my life.

11             So when these people tell the story of their lives

12   with the asylum officer, if the asylum officer agrees they

13   qualify for asylum because they either have been persecuted or

14   they have a legitimate fear of future persecution, the asylum

15   officer can grant asylum and that person basically gets all the

16   benefits you heard about.  They can stay in this country, they

17   can get a job, and they can stay here indefinitely.  Most cases

18   though, however, the asylum officers don't grant asylum.  They

19   deny it.  And then what happens is this.  All right?  The

20   person now who voluntarily came to the government -- remember

21   this, this is a person who is here undocumented.  Now, there

22   are some who might be on student visa, but let's talk about the

23   people who come who don't have documents.  They have

24   voluntarily come to the U.S. Government and said I want asylum.

25    If the asylum officer says no, what position is this person at

E3oWliu2                           Opening – Mr. Maher

now?  They have told the government, Hey, here I am, here I am,
I have no papers, I'm in this country.  So what happens at that
point, once asylum's denied?  The officers forward the
information along and the person is called "referred," and that
means they're now sent into immigration proceedings which are
called removal proceedings.

            Removal, you can call it a euphemism, I suppose.  It's
the changed language from the old days called deportation
proceedings.  Okay?  Removal means now this person who tried to
get asylum, because it's denied, is now being faced
involuntarily with being deported from this country.  All
right?  And then once you're deported, forcibly, by the U.S.
Government, you're usually considered what is called
inadmissible.  Inadmissible means we kick you out, you may not
come back.  And if you come back, you're going straight to
prison.

            So now these people are in the position, and by these
people, I mean people who have applied to asylum, they've been
interviewed and it's been denied, now they're in immigration
court, and they get a notice, you must appear in immigration
court for removal proceedings, that is the stage that Vanessa
Bandrich gets involved in as the lawyer in an adversarial
proceeding.  Okay?  That is when.  And at that point, then, is
the preparation, like any lawyer does for a client who is going
to go into court, of understanding what the case is about,

1   looking at the file that's already been prepared by the

2   paralegals and support staff.  Okay?

3          Now, again, except for basically Vanessa and maybe one

4   or two people here and there, everyone at these law firms

5   speaks Mandarin, and the cultural ties within the office are

6   very strong, very strong.  The Lawyers, paralegals, support

7   staff speak Mandarin almost exclusively during the day, and I

8   don't mean just with clients in their interviews.  I'm talking

9   about with each other.  All right?  They order lunch together

10  with the food that they like.  Okay?  There are strong family

11  ties within the office.  A number of the people in the office

12  are related, either by blood or marriage.  Okay?  And in many

13  ways, Vanessa feels that she's an outsider both at Moslemi and

14  at the firm you'll hear later called Bandrich & Associates,

15  again, where she is trying to gain legal experience and learn

16  her way in these firms.

17         So, you have heard now the government talk about all

18  this fraud, and Mr. Fischetti touched on it.  I think the

19  government said 2,000 cases of fraud by these firms and people

20  applying for persecution.

21         I want to digress for just half a second and express

22  to you this is a difficult process that you all are about to go

23  through, one, because of the tremendous responsibility that you

24  all have, having the lives of people in your hands.  The other

25  difficult part is we're asking you to follow the information in

 1    this trial, and it's very disorienting.  You can imagine the

 2    trial you're about to go through, getting information for you

 3    as a juror, it's kind of like all the information we had was a

 4    novel and we took each chapter and we ripped each chapter into

 5    five different sections and then we shuffled them and started

 6    reading that book to you, you might have difficulty following

 7    the story.  A trial is kind of like that because you have to

 8    hear one witness at a time.  They might talk about different

 9    periods of time and it can be confusing until everything starts

10    to sync together.  So all of us, I'm sure, join in asking that

11    you just defer judgment until you hear everything in this case

12    because something at the front of the case, you might think,

13    Oh, wow, I really think this, but you haven't heard everything

14    and it might not follow the way you might expect and you're not

15    going to see the whole picture until the end.

16            But the issue about the persecution, you're going to

17    hear and the government's own witnesses are going to agree,

18    persecution in China is absolutely real, absolutely real.  And

19    why is it, why is it that immigration judges in our country,

20    from 2007, '8, '9, '10, '11, '12, until probably three blocks

21    away from us today are granting asylum to immigrants from China

22    on probably a daily basis?  Why are they doing this?  Because

23    China -- and by China, I mean the Communist government of

24    China -- persecutes Christians.  A Christian may not practice

25    their religion in any way that a Christian in this country can.

1   They are told who their pastor or reverend has to be, they have

2   to be approved by the government, and they can't teach anything

3   in Christianity which is incompatible with the ideology of a

4   Communist government, and you can imagine there's quite a lot.

5   If you try to start an underground church, perhaps like back in

6   Roman days, and they find out about it, it's over.

7          China persecutes women.  They persecute women through

8   what's called the one-child policy and what they call family

9   planning.  That sounds like a great idea, but family planning

10  in China means, the laws that have been there for a while, that

11  it was illegal for anyone to have more than one child, more

12  than one.  A married couple, if you're single, you're not

13  supposed to have any kids.  But a married couple were not

14  permitted to have more than one child.  In recent years, it's

15  been expanded a bit.  Some people may have two, depending on

16  which province or which state you live in.  What happens if a

17  woman gets pregnant either the second time if it's against the

18  law in their province or they get pregnant the third time if

19  it's against the law in the province?  What do you think

20  happens?  They are forced by the state to have an abortion.

21  Forced.

22         The state will also sterilize women against their

23  will.  The state will also sterilize men against their will for

24  the violation of the one-child policy or the family-planning

25  policies.  China persecutes members of an organization or

1    movement called falun gong.  If you've seen it on TV or

2    anything before, if you've ever seen people doing t'ai chi in

3    the park, a lot of people draw analogies from falun gong and

4    people who do movements like that, the Chinese government

5    considers it a subversive group and again a target for

6    persecution.  And by persecution, again, Mr. Fischetti, I

7    think, made it clear.  We're not just talking about no, no,

8    that's bad, we're going to give you a ticket.  We're talking

9    about imprisonment, we're talking about potential

10   disappearance, physical abuse, everything in between.

11          This persecution is real.  The government's witnesses

12   will concede it.  Immigration judges in our country grant

13   asylum to Chinese immigrants every day because of it.  And

14   because of these exact forms of oppression.  Okay?

15          Now, remember, China has over a billion people, the

16   most populace country on this planet.  So if they have a policy

17   such as this one-child policy, how many people do you think

18   that's affecting at once?  Ten, 11?  No.  Thousands, hundreds

19   of thousands, millions potentially.  So if a lot of people have

20   the "same" story of being persecuted as Christians, you know

21   what, that's because they are being persecuted as Christians,

22   because there are so many in China being persecuted as

23   Christians, and they're being persecuted the same way by the

24   government.  So these stories are not fake that are being

25   granted by these judges every day.

1          Turning back to Vanessa Bandrich, she worked at the

2     firm of Moslemi & Associates for about a year.  About 2010, the

3     leadership of Moslemi, of the firm, decided for various reasons

4     the firm needs to split apart.  Vanessa's told that if she

5     wants to open up a firm under her name, they will take care of

6     all the staffing, the administration, and the client referrals.

7     Again, Vanessa's just been practicing really for about a year

8     at this point.  Vanessa also will be able to earn some more

9     money than she had as an entry-level attorney.  Vanessa is not

10    told that she is going to be joining some conspiracy to commit

11    immigration fraud.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. MAHER:  And she has no reason to think that she is

2       doing anything illegal, no reason, whatsoever, to think so.

3            So around May of 2010, a firm called Bandrich &

4       Associates is created.  And just like other immigration law

5       firms, there is a Division of Labor.  Vanessa continues to

6       represent clients in immigration court, but she is bay an

7       employee of the firm.  The nuts and bolts of this firm, the

8       day-to-day business, all right, is being run by a man named

9       Harry Liu.  A number of the support staff and family members

10      from Moslemi &  Associates move over to the firm, to the

11      Bandrich firm and directed directly to Harry.

12            Harry has worked at Moslemi & Associates.  Now he was

13      not the office manager there, but at the new firm, Harry, for

14      the first time, is in charge of running the entire office.  And

15      unfortunately, Harry turns out to be a very controlling man who

16      was mean and manipulative to his staff and colleagues.

17            And just like at Moslemi & Associates there is a huge,

18      huge cultural divide, huge cultural, linguistic, and familial

19      divide, between the support staff and other -- and other

20      employees, administrative, and Vanessa.  All the firm's client

21      interactions, again, are done in Mandarin, the staff speaks to

22      each other in Mandarin, and many of the staff members are

23      actually family.  All of the clients have their initial

24      interviews with either her or one of the Mandarin-speaking

25      support staff, okay.

1              Now, these paralegals and support staff are not

2      necessarily the best translators in the world.  There is no

3      requirement that they are court certified.  And trust me, I

4      don't think that they were.  But they are responsible for

5      translating everything that the client says and writes.

6              And, again, Vanessa does not get involved in meeting

7      with clients until after the clients' initial paperwork has

8      already been prepared by Harry and his staff.

9              Now, unbeknownst to Vanessa, while she is representing

10     clients in immigration court, the FBI, and the government, the

11     prosecutor's office, begins sending fake potential clients to

12     the firm.

13             These fake potential clients are wearing recording

14     devices, little cameras with recordings, okay.  Little mics.

15     What do they pick up on these hidden microphones?  Well, none

16     of these fake clients working for prosecutors ever tape Vanessa

17     doing anything illegal.  Nothing.  Why?  Simple.  Because she

18     was not involved in anything illegal.

19             The prosecutors and their agents are also meeting with

20     former disgruntled employees of Moslemi and the Feng Ling Liu

21     law firm from before.  One of these people is a woman named

22     Meng Fei Yu, who tries her best to get Vanessa to admit to

23     something that is not true.  Meng Fei does everything she

24     can -- and you will hear this, and see this yourself -- to get

25     Vanessa to say that she is part of some conspiracy to commit

1      fraud.  But you are going to see those tapes, and you're going

2      to see that Vanessa is not a part of any cospiracy to commit

3      immigration fraud.

4              So why does Meng Fei try to trick Vanessa?  Why is she

5      doing this, trying to her to admit to a crime that Vanessa

6      didn't commit?  I'll tell you why.  Because Meng Fei is facing

7      15 years in prison and deportation to Communist China and all

8      of the policies that we have been talking about.

9              And in order for Meng Fei and the other fraudsters

10     that are going to be paraded in front of you to avoid prison

11     here -- and, again, you don't get deported until after you do

12     your prison here, all right.  So after they get deported.  To

13     avoid that, they have to give the government something that is

14     legalese.  This is a legal phrase, okay, it's call substantial

15     assistance.

16             What do you think substantial assistance might mean?

17     I tell you what Meng Fei believes it means, is that if she can

18     bring down a lawyer and hand it to the government, then she

19     gets her get out of jail card, for free, and she gets to stay

20     in this country forever.  And not just her.  Her husband, who,

21     coincidentally, also has an asylum claim before the government.

22     So just like Meng Fei, you're going to hear from some other

23     fraudsters who have every incentive you can imagine to shade

24     the truth and to outright lie and manipulate.

25             Their words are going to ring hollow, because the

1    reliable evidence is gonna show that Vanessa did not join any

2    criminal cospiracy to commit immigration fraud and that she is

3    absolutely innocent of these charges.

4              Thank you.

5              THE COURT:  Thank you.  Mr. German.

6              MR. GERMAN:  Good morning, ladies and gentlemen.

7              My name is Stan German.  And, myself, along with my

8    young colleague, Jason Richland, represent Rui Yang in this

9    case.  I have come to learn that, in Chinese, R–U–I is spelled

10   Ray.  And so I'm going to call Ms. Yang by her Americanized

11   name, which is Rachel Yang.

12             You have heard from the government, you have heard

13   from Mr. Fischetti, you have heard from Mr. Maher.  Because I

14   promise you, I'm going to be brief because, really, as the

15   evidence will show, the story of Rachel Yang is a simple one.

16             In 2010, Rachel came to the United States from China,

17   a country that we have heard quite a bit about this morning.

18   About six months later, she was joined by her husband who also

19   emigrated from China.

20             In 2011, Rachel moved and settled into Queens, New

21   York in Flushing.  She was living with her husband.  And there

22   came a point where Rachel gave birth to little baby girl named

23   Emily.

24             Now, the three of them were living in a single room in

25   Flushing, New York.  They shared a house with four other

E3OOLLIU3                    German - Opening

1    families, but her whole world was, literally, one bedroom.

2            She was out of work.  Her husband was out of work.

3    She had a baby girl.  And she was looking for work.  She was

4    not on public assistance, was not asking for anything.  She was

5    looking to the classifieds, trying to get a job.

6            And that, ladies and gentlemen, is why Rachel Yang is

7    here today.  She answered an ad.  The advertisement said

8    something along the lines of:  Looking for Chinese-speaking

9    office worker.

10           Rachel called the ad, they gave her an interview.  She

11   took the bus, two hours from Flushing, came to Chinatown and

12   had an interview.  She went home.  She hoped she had gotten the

13   job.  The office was nice, seemed like nice people.  And two

14   days later, she received a phone call that they were going to

15   hire Rachel Yang.

16           Now, that phone call came in late October of 2011, not

17   2007 when the government contends this whole alleged conspiracy

18   starts.  Not 2008.  Not 2009.  Not 2010.  Late 2011 is when she

19   begins to work.  Late October of 2011 which, as you will hear,

20   is a little more than a year before the worst day of Rachel's

21   life when she was arrested in connection with this case.

22           But let's go back to late 2011.  Rachel was going to

23   start working in a respectable American law office, working for

24   American-trained lawyers, helping Chinese immigrants with their

25   immigration status in the United States.  So she went to work

E3OOLLIU3                    German - Opening

1    at the Bandrich law firm.

2            Let's be clear about something.  Rachel is not a

3    lawyer.  Rachel is not a paralegal.  Rachel has never had any

4    sort of legal training.  She was hired to be an office worker.

5    And why?  Use your common sense.  We know what that means.

6    Organize files, answer the phones.  Assist the Chinese-speaking

7    clients in organizing these asylum applications, based on the

8    information that was already in the client files which she did

9    not create.  And that will be evident in the testimony in this

10   case.

11           She helped draft their statements of persecution.  She

12   translated some of these documents in the office.  That's what

13   she was hired to do.  And that's what she did.  She never went

14   to court.  She never went to an asylum interview.  She never

15   performed any translations at the immigration office.  She

16   simply performed her office duties.

17           And let's talk about the office.  You are going to

18   hear that there were the lawyers in the office, there were the

19   office managers, there were different staff members.  Rachel

20   Yang was not a boss.  Rachel Yang was not a manager.  Rachel

21   Yang never received a single cent from a single client.  Rachel

22   Yang supervised nobody.  Rachel Yang.  You have heard about

23   some familial relationships and relatives.  She is related to

24   no one.  She was the lowest person in the totem pole.  She

25   didn't even have keys to the office.

```
 1              The government has spoken about millions of dollars.
 2      Well, I have news for you.  Rachel Yang was basically paid
 3      minimum wage.  She didn't have healthcare benefits.  She didn't
 4      vacation.  No paid vacation.  If you were sick and you couldn't
 5      come to work, they didn't get paid; no paid sick days.  She
 6      commuted three hours a day to go to work.  And she was only
 7      paid for the time she was there.
 8              As far as her training for this job, who trained her?
 9      Her boss trained her.  The other women who were in the office
10      pool, they trained her on what to do and what was expected of
11      her.  And that's her story.
12              She was a person who immigrated from China
13      approximately four years ago, went to work in an office, and
14      was just doing office work.  Not a single person is going to
15      get on that witness stand and say she conspired to do anything,
16      that she had a conversation with them.  You are going hear from
17      witness after witness.  They won't even know who Rachel Yang
18      is, never seen her, never spoke to her.  Just one of these
19      obscure people who worked at the law firm, minded her business,
20      and went home to her husband and young baby every night.
21              At no time did she conspire, did she agree, did she
22      knowingly assist anyone in committing immigration fraud.  And
23      that's what the evidence is gonna show.  And the judge will
24      tell you, not just the evidence, look at the lack of evidence
25      in this case.  There will be witnesses where I may not ask
```

E3OOLLIU3                          German - Opening

1   questions, because they don't know her, they never dealt with

2   her.  So the lack of evidence, together with the evidence, is

3   going to show that Rachel Yang had nothing to do with a

4   conspiracy to commit immigration fraud.

5          As you are listening to your testimony over the next

6   few weeks, ladies and gentlemen, just use your common sense.

7   You have heard that theme throughout this trial.  You know your

8   common sense doesn't leave just because you walk into this

9   ornate courthouse.  You know what office workers do.  You know

10  what people at the bottom of the totem pole do.  So use your

11  common sense.  Look who she spoke to.  Look who she knew and,

12  just as importantly, who she didn't know in this case.  Look at

13  what Rachel Yang actually did.  And when you apply your common

14  sense, you only come to one conclusion, and there is only one

15  just verdict for Rachel Yang.  And that is that Rachel Yang

16  never ever conspired to commit immigration fraud.

17         Thank you.

18         THE COURT:  Thank you.  Now we're going to take a 15

19  minute break.

20         So I'm going to ask you not to speak about the case

21  either with each other or anyone else, and keep an open mind.

22         Thank you.  Please rise.

23         (Jury excused)

24

25

E3O0LLIU3                    German — Opening

1              (In open court)

2              THE COURT:  All right, I'll see you all at five of

3      twelve.   Thanks.

4              (Recess)

5              THE COURT:  May I see counsel at side bar for a

6      moment)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3OOLLIU3                         German - Opening

```
1              (At the side bar)

2              THE COURT:  So, as we discussed earlier, the revised

3    subpoena to the Eastern District, to the human resources

4    manager, looks fine.  So you can give that to my deputy.  And I

5    don't think I can prevent you from calling the magistrate's

6    chambers.  So I leave that to your discretion.

7              MR. FISCHETTI:  Thank you, Judge.

8              THE COURT:  And this particular colloquy should be

9    under seal, please.

10             MR. KOVACS:  Let the Court know we did speak with Mr.

11   Howell.  He advised that he will accept the subpoena via fax,

12   which will help facilitate this.  However, once he gets it, he

13   sends it to Washington, D.C. because they have people there

14   that deal with this.  So I'm not sure what their turn-around

15   time will be, but I just wanted to give you a heads up that

16   we'll get this out, with all haste, but we can't predict how

17   long D.C. will take to get back to us.  We may not have it by

18   the time Mr. Yu is done testifying, which means we might need

19   him to remain available for recall, if necessary.

20             THE COURT:  And is that something you intend to inform

21   the government about?

22             MR. KOVACS:  Not yet.  Let's wait to see what

23   happened.  Maybe they do comply when we get the information

24   tomorrow.

25             THE COURT:  Okay, thank you.
```

E3OOLLIU3                    German - Opening

1              MR. FISCHETTI:  Can I have a minute with counsel?

2              THE COURT:  Yes.  Tell me when you are ready.  Just a

3      minute.

4              (Continued on next page)

5              (Pages 107-109 SEALED by order of the Court)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3OOLLIU3                    German – Opening

1              (In open court)

2              THE COURT:  Why don't we go until about 1:15 and take

3    our lunch break since we got a late start okay?

4              THE DEPUTY CLERK:  All rise.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3OOLLIU3                          German – Opening

 1                (In open court)

 2                (Jury present)

 3                THE COURT:  You can be seated.

 4                Now, we've come to the portion of the trial where the

 5      government is going to present its case.  Since we got a late

 6      start today, we're going to go for about an hour and 15

 7      minutes, until around 1:15 or 1:20, and we'll take a lunch

 8      break at that point.

 9                Call your first witness.

10                MR. BOONE:  Government calls Ashley Caudill-Mirillo.

11       ASHLEY CAUDILL-MIRILLO,

12           called as a witness by the government,

13           having been duly sworn, testified as follows:

14                THE DEPUTY CLERK:  State and spell your name for the

15      record.

16                THE WITNESS:  Ashley, A-S-H-L-E-Y, Caudill,

17      C-A-U-D-I-L-L, hyphen.  M-I-R-I-L-L-O.

18                THE DEPUTY CLERK:  Thank you.  You may be seated.

19                THE WITNESS:  Thank you.

20

21                MR. BOONE:  May I proceed, your Honor?

22                THE COURT:  You may.

23      DIRECT EXAMINATION

24      BY MR. BOONE:

25      Q.  What is your educational background?

E3O0LLIU3                    Caudill-Mirillo - direct

1    A.  I have a bachelors degree in religion and political

2    science, masters in Islamic studies, and a law degree in law.

3    Q.  Are you currently employed.

4    A.  Yes, I am.

5    Q.  Where do you work?

6    A.  I work at U.S. Citizenship and Immigration Services.

7    Q.  Is that a part of a government agency?

8    A.  Yes, it is.  It's part of the Department of Homeland

9    Security.

10   Q.  Where is your office located?

11   A.  Our office is located in Rosedale, Queens.

12   Q.  And how long have you worked there?

13   A.  I worked there for a little over five years.

14   Q.  And, generally speaking, what is your office responsible

15   for?

16   A.  Our office is responsible for adjudicating petitions for

17   asylum in the United States, that are filed in our

18   jurisdiction.

19   Q.  Do you have a particular title or position?

20   A.  Yes.  I am the Deputy Director of the New York Asylum

21   Office.

22   Q.  How long have you held that position?

23   A.  A little over two years.

24   Q.  And what are your responsibilities as the Deputy Director?

25   A.  I assist the director of the office in overseeing both the

1    management aspect of the office, seeing that the officers

2    are receiving the sufficient amount of cases.  Also the

3    operational side, which is making sure that cases are processed

4    in a timely fashion.

5    Q.  What other positions have you held in the office?

6    A.  I was a supervisory asylum officer and an asylum officer.

7    Q.  And when did you hold those positions?

8    A.  I was an asylum officer from 2008 to 2010, and supervisory

9    asylum officer from 2011 to 2012.

10   Q.  And what were your responsibilities in each of those

11   positions?

12   A.  As asylum officer, my responsibility was to review evidence

13   for applications for asylum.  Also to interview individuals

14   seeking asylum to investigate their credibility, ask them

15   questions, and see if they fully qualify for immigration

16   benefit and, ultimately, to make a decision on the case.

17           As a supervisory asylum officer, my job was to oversee

18   a team of four to five asylum officers and, also, review

19   decisions for legal sufficiency, and also to make sure they

20   were following the appropriate procedures and policies.

21   Q.  What is political asylum?

22   A.  Political asylum is an immigration benefit that is

23   available in the United States.  It is essentially available to

24   individuals who are present in the United States, who are

25   unable or unwilling to return to their country of origin

E3OOLLIU3                      Caudill-Mirillo - direct

1    because of past persecution or a well-founded fear of future

2    persecution.

3    Q.  Are there any restrictions on who can apply?

4    A.  Yes.  The people have to be physically present in the

5    United States to apply for asylum.

6    Q.  And may someone who has entered the country illegally

7    apply?

8    A.  Yes.

9    Q.  Can someone who has been convicted of a crime apply?

10   A.  Yes.  They can apply.  Depending upon what that crime is

11   they may, in fact, not be eligible to receive the benefit.  But

12   they can apply.

13   Q.  Does the length of time one has spent in the United States

14   affect their ability to apply?

15   A.  Yes.  As a general rule, the individuals are supposed to

16   apply within a year of their arrival.

17   Q.  What types of evidence is typically submitted to prove that

18   a person has been in the country for less than a year?

19   A.  Okay.  Well, the most direct piece of evidence would be

20   actual evidence of their entry, which would be maybe a stamp on

21   their passport, or some type of stamp on what's called an I 94

22   which is a document that is given to individuals when they

23   enter the country by Customs and Border Patrol.  Also, indirect

24   evidence could be evidence that they've traveled and have

25   stamps in their passports from other countries on their way to

1    the United States.  And lastly, the most common piece of

2    evidence is some kind of documentation indicating that they

3    were in their home country within the last year.  And that can

4    be a variety of forms, anything we see, typically from bills to

5    receipts, on-the-job wages statements; that type of

6    documentation.

7    Q.  Does the evidence sometimes include information about a

8    route a ticket applicant took to get to the United States?

9    A.  Yes, it can.  That can be in the form of either airline

10   tickets sometimes, or as I said, stamps in their passport

11   indicating a path of travel.

12   Q.  And do asylum officers ever attempt to verify that

13   information?

14   A.  We do attempt to verify.  We are limited to the type of

15   information.  The United States has agreements with certain

16   countries to share travel records and documentation.  We don't

17   have those types of agreements with every country.  So we do

18   attempt to verify it through the sources that we have access

19   to.  And if we're unable to, then we are unable to.

20   Q.  Who determines whether someone qualifies for asylum?

21   A.  Well, the determination would be made by, in our case with

22   our agency, by the individual officer that interviewed the

23   applicant and made a decision on the case.

24   Q.  And how do they make that determination?

25   A.  Well, they will review the evidence, both before and after

1    the interview.  Based on the evidence they receive, they will

2    conduct an interview designed to, in a nonadversarial manner,

3    elicit testimony from the applicant about what happened to them

4    in their home country, who committed acts of harm against them

5    in their home country, why they feel they are unable to return,

6    and what type of harm they might fear that they would

7    experience if they were to return.

8           With that information, they would make a credibility

9    determination and, ultimately, analyze the facts to see if

10   it meets the requirements under the law.

11   Q.  What do you mean by credibility determination?

12   A.  Well, the officers are required to make a determination

13   whether they think the person is telling the truth or not.

14   Essentially, that's what credibility is.  They would do so

15   through a variety of means.  First, of course they would

16   compare the documents that they are receiving to see if they

17   are consistent with what the applicant's telling them occurred.

18   They also will examine the applicant's testimony, internally,

19   which means they would look at what the applicant is testifying

20   to at one point in the interview and, later, to see if it is,

21   on the whole, consistent.  And, lastly, the major source would

22   be testing to see if they think this testimony is both detailed

23   and also consistent with known country conditions.

24   Q.  Who sets the eligibility criteria for asylum?

25   A.  That is set by Congress.  Through statute.

E3O0LLIU3                    Caudill-Mirillo - direct

1   Q.   Now, what benefits come along with being granted asylum?

2   A.   Once a person is granted asylum, they are allowed to live

3   in the United States for an indefinite period of time.  They

4   are also eligible to include other family members, such as

5   their spouse or unmarried children under the age of 21, to also

6   live and work in the United States for an indefinite period of

7   time.  They, depending upon the state and what they have

8   available, they may be eligible to receive certain types of

9   assistance, whether it be educational grants or job training.

10  Ultimately, they have the ability to apply for a green card

11  after a year and, possibly, sometime later, citizenship.

12  Q.   Is there a limit on how many people can be granted asylum

13  in a given year?

14  A.   There is no limit.

15  Q.   Now, you testified earlier that you work in the asylum

16  office located in Queens.  How many other asylum offices are

17  there in the United States?

18  A.   There are eight offices, total.

19  Q.   And where are they located?

20  A.   They are located in New York, Newark, Miami, Arlington

21  Virginia, Chicago, San Francisco, Los Angeles.  I think -- and

22  I think that's it.  Oh, I'm sorry, Houston, Texas.

23  Q.   Are different offices responsible for different geographic

24  regions?

25  A.   Yes, they are.

E3O0LLIU3                        Caudill-Mirillo - direct

Q.  And what geographic region is the Queens office for?

A.  For applications filed within 12 counties in and

surrounding the New York City area.  That would include xxx

Dutchess, King's, Nassau, Orange, Putnam, Queens, Rockland,

Richmond, Suffolk, Sullivan, Ulster, and Westchester.

Q.  Does that mean that someone applying to the Queens office

must live in one of those areas?

A.  Yes, it does.

Q.  How does a person apply for a political asylum?

A.  We have -- our agency has a website.  It is www.uscis.gov.

And there is an application form that is located on that

website.  They can download the application and fill it out and

then they send it to one of our service centers.

Q.  And what materials must be filed with the application?

A.  Technically, all that is required is the actual completed

application, and some statement, either in the application

itself or a separate statement, indicating why the person is

seeking asylum.

        We also ask that the applicant provide any documentary

evidence that they have at the time of filing.  It just assists

us in reviewing the applications in advance.  But sometimes

that information is provided on the day of the interview.

Q.  You mentioned the statement.  What information must be

contained in that statement?

A.  Well, the applicant, either in the I 589 -- sorry, the

1    application itself, or in a separate statement, must indicate

2    what happened in their home country and why they feel that they

3    are unable to return.

4    Q.  And you mentioned that, in addition to the statement,

5    sometimes other documents are provided?

6    A.  Yes.

7    Q.  Can you give an example of what types of documents are

8    typically provided?

9    A.  Sure.  Often copies of passports, either to establish

10   identity, where the person is from, or as I mentioned evidence

11   of travel.  Sometimes medical reports.  If the person was

12   physically harmed in their country.  Or psychological reports,

13   if they have some continued psychological trauma as a result of

14   the harm.  If they received fines or some type of other

15   administrative penalties in their home country they may submit

16   some type of receipt or notice of conviction for that.

17   Q.  Are the statements made, in an application for asylum, made

18   under oath?

19   A.  Yes, they are.

20   Q.  Can someone submit an asylum application on behalf of

21   someone else?

22   A.  They can.  Another person can assist the primary applicant

23   in completing the application, but the actual applicant is

24   responsible for filing the application themselves.  Yes.

25   Q.  And if someone assists another person in applying for

1   asylum, is that fact indicated somewhere in their application?

2   A.  Yes, it is.

3   Q.  Are there organizations that routinely assist individuals

4   in applying for asylum?

5   A.  Yes, there are.

6   Q.  And what kind of organizations are those?

7   A.  Law firms.  Often, there are nonprofit organizations that

8   have either a general focus on asylum or perhaps focus on

9   certain countries and communities to provide immigration

10  assistance.  Law school clinics, or pro bono attorneys,

11  typically.

12  Q.  How much does it cost for an applicant to apply for asylum?

13  A.  There is no fee to apply for asylum.

14  Q.  I want to show you what's been marked for identification as

15  government exhibit number 1.  Do you recognize that document?

16  A.  Yes, I do.

17  Q.  What is it?

18  A.  This is the asylum application.  It is also called an I 589

19  application.

20  Q.  And is it a fair and accurate representation of the asylum

21  application, the form that must be submitted by someone seeking

22  asylum?

23  A.  Yes, it is.

24          MR. BOONE:  Your Honor, the government offers

25  government exhibit 1 into evidence.

1              MR. FISCHETTI:  No objection.

2              MR. MAHER:  No objection.

3              MR. GERMAN:  No objection.

4              THE COURT:  It will be admitted.

5              MR. BOONE:  Permission to publish.

6              THE WITNESS:  Yes.

7              (Exhibit published)

8              (Government's Exhibit 1 received in evidence)

9     BY MR. BOONE:

10    Q.  Starting with page 1 of the application -- my screen went

11    off, I don't know if the jurors' went off.

12             THE COURT:  If any jurors screens are not working,

13    please raise your hand.

14             THE DEPUTY CLERK:  Might take a second.

15             THE COURT:  Give us one minute, please.

16             MR. BOONE:  We'll attempt to use the electronic

17    program.

18             THE COURT:  So raise your hand again if you don't see

19    anything on your screen.

20             A JUROR:  It is blurry.

21             THE COURT:  Okay.  Is that better?

22             A JUROR:  Now it went off.  When you try to enlarge

23    something, it goes off.

24             THE COURT:  Okay.  Do we have hard copies we might be

25    able to show the jury?

 1              MR. BOONE:  We do.

 2              THE COURT:  And we'll work on the technology over

 3    lunch, I apologize.

 4              MR. BOONE:  Maybe easier to use the Elmo.

 5              THE COURT:  I see myself.

 6              MR. BOONE:  Making sure we're all here.

 7              A JUROR:  Okay.

 8              THE COURT:  Raise your hand if you have a problem.

 9    Okay, we still have two.

10              A JUROR:  It is only ours that is blurry, everybody

11    else's is fine.

12              THE COURT:  Just lean over and look at the screen in

13    front of you.  Thank you.

14              MR. BOONE:  Okay.

15    BY MR. BOONE:

16    Q.  Focusing on the first half of page 1, what information is

17    generally provided in that section?

18    A.  On the first half of page 1, this is where the applicant

19    would provide basic biographic information on themselves,

20    specifically:  Their name or any alternate variations of their

21    name that they have used in the past; their address here in the

22    United States; if they have, if they are choosing to use a

23    different address for mail.  And, then, it would move down to

24    gender, their marital status, their date of birth, and the

25    country of their birth.

1    Q.  And the second half of page 1, what information is

2    generally provided in that section?

3    A.   In this section, the beginning of the section is where the

4    applicant would list their nationality, because that may in

5    fact be different from the country of their birth.  If they

6    practice a religion or associate themself with any particular

7    race, ethnic, or tribal group.  And the bottom half of this

8    screenshot is basically where the applicant would indicate if

9    they have ever been in immigration proceedings before, what

10   their date and manner of last entry into the United States was.

11   And, also, they provide information about their passports.  And

12   then, lastly, at the very bottom, they would indicate what

13   their native language was, what level of England fluency they

14   have, and whether they speak any other languages fluently.

15   Q.   Okay.  Now, looking at the first half of page 2, what

16   information is generally provided in this section?

17   A.   Okay.  In this section, if the applicant is married, they

18   would indicate that they are married by providing information

19   about their spouse.  Specifically their name, the date of their

20   marriage, their spouse's date of birth, and place of birth, as

21   well.  They would indicate, similarly, their nationality, what

22   their gender is, whether they are in the United States, and

23   what their manner of entry and place of arrival in the United

24   States was.

25               And then, also, they're asked to indicate if they have

1    ever been in any type of immigration proceeding before.

2    Q.  Okay.  Focusing on the second half of page 2, what

3    information is provided in this section.

4    A.  If the applicant has any children, they are asked to

5    indicate that they do.  And, also, the number of children they

6    have.  And similar to their spouse, they are supposed to

7    provide basic biographic information on all of their children,

8    including their marital status, their name, date of birth,

9    place of birth, nationality, gender, whether, again, the child

10   is in the United States, how they how they entered the United

11   States, when they arrived, and what their current immigration

12   status is, or any involvement they have had in immigration

13   proceedings.

14   Q.  Looking at the first half of page 3, what information is

15   generally provided in this section?

16   A.  The entirety of page three are just additional blocks for

17   the applicant to provide information on any additional children

18   they have.  So if they have more than just the one child, then

19   they would enter information about all of their children on

20   this page.

21   Q.  Okay.  And just for the benefit of the jury, I'll show the

22   second half of page 3.  We have already discussed –– now

23   turning to page 4, looking at the first half of that page, what

24   information is generally provided on this page?

25   A.  This information is more background information on the

1     applicant.  It gives us a better sense of who the applicant is

2     and where they are from.  So the first question is asking them

3     to provide the address where they lived immediately before they

4     arrived in the United States, including the street, the

5     country, and the dates that they lived there.

6              Question two asks them to provide information on all

7     of their residences for the last five years.  Again, this

8     assists in giving the asylum officer some indication of where

9     they have lived and what country they may have traveled

10    through.

11             Number 3, you can start to see information where the

12    applicant is supposed to provide a comprehensive overview of

13    their education, every level, indicating what type of school it

14    was and, also, where that school was and, also, the states of

15    attendance.

16             Number 4, they are asked to provide information about

17    their employment over the last five years, indicating the

18    employer, where the employer was located, and their occupation,

19    again, providing the dates that are relevant to those

20    positions.

21             And then the bottom section is where they will

22    indicate, identify their parents and any siblings they have.

23    Also where those individuals were born.  And, lastly, where

24    they currently reside if they, in fact, are not deceased.

25    Q.  Okay.  Top half of page 5, what information is provided in

1    this section?

2    A.   This is the section where the applicant will actually start

3    to provide information to my agency about the basis for their

4    case, why they are seeking asylum in the United States.

5            So, question one, here is where the applicant

6    indicates why, what are the five grounds that they are seeking

7    asylum protection for.

8            I mentioned earlier that the person must have

9    experienced past persecution or fear of persecution in the

10   future.  That harm has to occur for one of five protected

11   reasons, which are race, religion, nationality, political

12   opinion, or membership in particular social group.  Also

13   something called torture convention listed here.  That is

14   actually a separate type of immigration benefit, so that's not

15   specific to asylum.

16           Question two, here is where the applicant would start

17   to provide information about the past harm or threats of harm

18   that they have experienced, both themselves, family, or close

19   friends and associates.  And they are supposed to detail those

20   incidents and what types of threats may have occurred.

21   Q.   And what about the last section?

22   A.   In the last section, this is where the applicant is looking

23   forward to the future and saying whether they, in fact, fear

24   harm in their home country in the future.

25           So they are supposed to explain what type of fear,

1    what type of harm they fear would occur if they would return,

2    who they think would actually mistreat them, and whether and

3    why they think that that would happen.

4    Q.  Okay.  Now, looking at the top half of page 6, what

5    information is provided on this section, generally?

6    A.  So, again, this information again starts to go into some of

7    the legal criteria for asylum, and whether the person is in

8    fact eligible to receive asylum.

9           So the first question is whether the applicant, or any

10   family members, have ever been accused or charged or detained

11   in any way within any country.  So this could both go to why

12   they are afraid to return to their home country and it also

13   could indicate whether they have, in fact, committed a crime

14   that would make them not eligible to receive asylum protection.

15   This second -- well, I guess it is 3(a)on this.  In this view,

16   is where the applicant indicates whether they have been

17   involved in any type of organizations.  This could be political

18   parties, labor unions, religious organizations, or some type of

19   military or guerilla organization.  Again, this is both to

20   address whether they may be involved in some type of political

21   activities that makes them need asylum.  It also could indicate

22   that they are a member of some type of organization that would

23   make them ineligible for asylum.

24   Q.  And looking at the second half of that same page, what

25   information is generally provided here?

1   A.   3(b).  This is where the applicant would indicate if they

2   continue to participate with any type of organization that was

3   addressed in the previous question.

4          They also will indicate whether any family members are

5   involved in those organizations.  Again, both the answers to

6   those questions could both go to whether they in fact are

7   eligible for asylum, or if they have some type of association

8   or activity that would make them ineligible for asylum.

9          Oh, I think there was one more, sorry.

10         So, the last question, number 4, is where it discusses

11  whether the applicant fears that they would be tortured in

12  their home country.  Torture is a form of persecution, so that

13  would go to establishing their case.  It also goes to the other

14  type of immigration benefit that I mentioned earlier.

15  Q.   Okay.  Looking at the first half of page 7, what

16  information is generally provided in this section?

17  A.   Question one is where the applicant will indicate whether

18  any close relatives of theirs have ever applied for asylum or

19  received some type of similar protection in the United States.

20  Again, this could go to establish that they, in fact, also are

21  at risk of some type of harm in their home country.

22         Question 2(a) indicates where they are supposed to

23  indicate whether they traveled through other countries on their

24  way to the United States.

25         Question 2(b) goes to whether the applicant or any

E3OOLLIU3                    Caudill-Mirillo - direct

1  close family members have received any type of immigration

2  status in another country.

3          And in that next block, that is where they would list

4  the immigration status they had, in what countries they were

5  offered some type of status, too.  And then, lastly, this

6  number 3 asks whether the applicant, spouse, or children have

7  ever basically committed an act or assisted in an act of

8  persecution.

9          Under the law, if someone has either assisted or

10 committed an act of persecution and another person was harmed

11 and, in fact, persecuted, they automatically are no longer

12 eligible to receive asylum protection.

13 Q.  Turning to page 8, and focusing on the top half of that

14 page.  What information is generally provided in this section?

15 A.  At the top, it asks if the applicant, when they, after they

16 left their country, did they ever return.  This is just to

17 indicate whether, in fact, if the applicant returned, it gives

18 the officer an opportunity to ask why they returned, what were

19 the circumstances of the return.  Sometimes it may lead to

20 questions, either whether the person is credible or maybe in

21 fact, though they actually are afraid that something might

22 happen in their country, they may in fact just be wrong,

23 because those things have not happened to them, despite having

24 returned.  So this is where they would indicate if they

25 returned, how long they returned, and what was the purpose of

1    that trip was.

2              The next question asks the applicant to indicate

3    whether they are filing for asylum a year after their arrival.

4    That is because they are supposed to, under the general rule,

5    apply within a year of their entry, though there are some

6    exceptions.

7    Q.  And looking at the last question on that page, what

8    information is generally provided in response?

9    A.  Question 6 asks whether the applicant, or any family member

10   included on the application, has ever committed a crime, been

11   arrested for a crime, charged or convicted or sentenced for a

12   crime in the United States.  Though, generally speaking,

13   committing a crime does not make someone ineligible for asylum,

14   there are certain types of crimes that would make someone

15   ineligible to receive asylum if they are very serious crimes.

16   This is where the person would indicate if there are any

17   situations applicable to that.  And they would be expected to

18   provide additional documentation to establish whether, in fact,

19   that would bar them from a grant of asylum or not.

20   Q.  Okay.  Focusing on the top part of page 9, what information

21   is being explained on this form?

22   A.  What's being explained on the top part of this form is

23   essentially that this application is being submitted under some

24   type of oath.  And that there are both criminal and civil

25   penalties that are applicable, if someone is found to have

E3O0LLIU3                    Caudill-Mirillo - direct

submitted false information or an entirely fraudulent

application.  So this, in fact, just is essentially the oath

that applicant would be taking.  It cites the law that is

applicable.  And, also, notifies them that if they are found to

have filed some type of frivolous application, that they may no

longer be eligible for certain types of immigration benefits.

The applicant is supposed to print their name and also

write their name in their native alphabet, if it is other than

an English-type alphabet that is used, indicating that they

have read that warning.  And then the next part, it says did

your spouse, parent, or children assist you in completing this

application.

If a spouse, parent, or child did, they are supposed

to check yes and also provide information on that individual,

including identifying their relationship.  And then it goes on

to ask if someone other than the spouse, parent, or child

helped him fill out the application, they are supposed to

identify that person.  And then, also, if it is, for example,

an attorney, they would sign their name here -- I'm sorry, no,

they would not.  The applicant would sign their name,

indicating, yes, that they are aware.

Q.  And focusing on section (e) of that page, what information

is being explained here, and what information is generally

provided here?

A.  Okay.  Here, if the applicant -- I'm sorry.  If the person

E3OOLLIU3                    Caudill-Mirillo - direct

1    assisting the applicant in filing the application is someone

2    other than a spouse, child, or parent, they also are supposed

3    to read this declaration, which is essentially an oath, that

4    they provided assistance in completing the application, to the

5    best of my knowledge all of the information that was provided

6    on the form is accurate and correct, that they in no way were

7    involved in assisting knowingly completing and submitting a

8    fraudulent application.  Then they are supposed to identify

9    themselves and to provide contact information.

10   Q.  Are they also supposed to sign the form?

11   A.  Yes, they are, I'm sorry, yes.

12   Q.  Where is that indicated?

13   A.  That is right in the very first block.  It says:  Signature

14   of preparer.

15   Q.  Now, look at page 10, top half of that page.  What

16   information is being explained, and what information is

17   typically provided in this section by the applicant?

18   A.  So part(f)actually is completed after the asylum interview

19   with the asylum officer.  At the beginning of asylum interview,

20   the applicant and the officer will go through this application,

21   through most if not all of the information blocks, to verify

22   that this information is correct.  Sometimes it could be just a

23   mistake that was made, or maybe the person moved and the

24   address needs to be updated.  They will go through making any

25   additions, corrections, or edits, as necessary.

1          At the end of the interview, the officer is supposed

2     to number all of those changes, have the applicant indicate

3     that those changes are accurate and they are being made with

4     their permission.  So they indicate the yes that they are all

5     true, and then they put, if are three changes, one through

6     three were made at the applicant's request to make the

7     application correct and accurate.  And then they are supposed

8     to sign and date, with the officer also signing that they

9     understand that these corrections are made under oath and that

10    the entire application is accurate and complete.

11    Q.  Okay.  And part(g), what information is being explained in

12    that section?

13    A.  In this Section, if the applicant were submitting an

14    application in immigration court, or if our office did not

15    grant the case and the case is being heard by the immigration

16    judge, again, they will go through the application to make sure

17    that the application is complete and correct.

18          For example, if the applicant again moved, they might,

19    again, need to update the address.  So they will go through the

20    application making sure there are no final mistakes or errors

21    and, again, the applicant will take an oath indicating that any

22    changes are accurate, are made at their request, signifying

23    that the application is complete and accurate.

24    Q.  Now, does the entire asylum application have to be

25    completed in English?

E3OOLLIU3                    Caudill-Mirillo - direct

1   A.  Yes, it does.

2   Q.  Can any portions of the application be completed in a

3   language other than English?

4   A.  The actual application itself, the form that we just looked

5   at, that has to be completed entirely in English.  The

6   applicant, though, in providing evidence in support of their

7   case, may be bringing documents from their home country or may

8   be bringing documents in other languages.  And that is fine.

9   If that is the case, they are required to provide a certified

10  translated copy into English.

11  Q.  Once an application is completed, how is it filed with the

12  asylum office?

13  A.  It would be mailed to one of our service officers.  And in

14  our case, in my office, it would be specifically a location in

15  Vermont.  The Service Center's job is basically just to receive

16  the application, to input it into our computer data bases, to

17  make sure all of the required information in the blocks are

18  completed, and then submit it to the office with jurisdiction

19  over the applicant's case.

20  Q.  How many asylum applications were filed in the Queens

21  office in 2012?

22  A.  In 2012, it was approximately 11,100.

23  Q.  And approximately what percentage of those applications

24  were granted?

25  A.  I think approximately 20 percent.

1   Q.  How many of those were granted by an asylum officer after

2   having interviewed an applicant?

3   A.  All applicants have to have an interview, so all of those

4   would have been granted after an interview.

5   Q.  Well, let me ask it differently.

6           How many were initially denied by an asylum officer,

7   but were later granted after a hearing before an immigration

8   judge?

9   A.  I'm sorry, I actually don't know that data.  I knew the

10  immigration court's grant rate is higher than our office, but

11  I'm not sure what the discrepancy is between our grant rates.

12  Q.  What country were most of the applications filed in 2012

13  from?

14  A.  From 2012, the country that, in our office, submitted the

15  country of origin of the individuals who submitted the highest

16  number of applications would have been China.

17  Q.  And do you know approximately what percentage of the

18  applications were from China?

19  A.  It was seven -- roughly 7,000 applications; so about

20  63 percent.

21  Q.  What are the most common reasons asserted by Chinese

22  citizens for requesting asylum?

23  A.  Some of the most common would be, for example,

24  participation in what's considered to be unregistered or

25  unsanctioned government church.  Sometimes they are called

E3OOLLIU3                    Caudill-Mirillo - direct

1    family churches.  In China, people are supposed to attend

2    churches that have been approved by the Chinese government.  If

3    they attend churches that are not considered to be sanctioned,

4    they could be subjected to some kind of harm.

5            The one child policy.  Generally, in China, only

6    married people can have children.  And unless there is some

7    type of exception that is applicable, they are only allowed to

8    have one child.  Individuals who violated that, or who oppose

9    it, may be singled out with harm ranging from imprisonment, to

10   fines, to some type of forced abortion or sterilization.

11           Falun gong participation, a movement or a cultivation

12   or lifestyle that's sometimes referred to as falun gong is also

13   another common thing that may occur.

14           And lastly, some type of political opinion.  If

15   someone, for example, is activating for democratic reform or

16   some other type of laws that are seen to be against what is the

17   Chinese Communist party's interests, then they could be subject

18   to some type of harm for that reason, as well.

19   Q.  Has there been an increase in the number of asylum

20   applications your office has received over the past five years?

21   A.  Yes, there has.

22   Q.  And do you know, how has that number increased?

23   A.  In 2006, our office received approximately 3200

24   applications, total.  And as I just mentioned, in 2012, it was

25   11,100.

E3O0LLIU3                         Caudill-Mirillo - direct

Q.  And has there been an increase in the number of

applications from Chinese citizens, in particular?

A.  Yes.  And in 2006, it was approximately 1700 applications.

In 2012, it was approximately 7,000 applications.

Q.  After an application for asylum is filed, what happens

next?

A.  The applicant would then be sent to get fingerprinted.

They also will receive a notice of their interview date.  And

will be told which office to appear for their interview at that

time.  They would report on that time and date.  They would

report to our office.  Their case would be randomly assigned to

one of our asylum officers who would review the file, conduct

the interview, trying to elicit testimony to determine if the

applicant is eligible under the law.  Then, ultimately, the

asylum officer would make a decision.  They would write an

actual written decision to support whatever outcome they think

is appropriate.  And then the case would be processed.

Q.  Are the interviews conducted by the asylum officer

conducted under oath?

A.  Yes, they are.

Q.  How many asylum officers work in the Queens office?

A.  Currently, 47.

Q.  Do asylum officers receive any type of training to help

them conduct the interviews?

A.  Yes, they do.

1   Q.  What type of training is that?

2   A.  Asylum officers are required to attend two different

3   residential trainings which, essentially, means they are sent

4   to the location and go to school full-time for a period of

5   time.  One of those is something called Basic which is a.

6   five-week course where the asylum officer learns all of the

7   different types of immigration that our office and that other

8   agencies handle, from asylum just basic overview, to

9   naturalization, to green cards, and other type of immigration

10  petitions.

11          The more substantive course for asylum officers is

12  roughly a seven-week course.  At that course, they will learn

13  specific details on asylum law, policy, and procedure.  They

14  also receive training on interview techniques.  And, lastly,

15  they receive training on how to write written legal decisions.

16  Q.  How is it determined which asylum officer will interview

17  which applicant.

18  A.  In our office, it is randomly assigned.  So the morning of

19  the interview, it is just assigned in order that the applicants

20  appear.

21  Q.  And when do the applicants learn who will be conducting

22  their interview?

23  A.  They do not learn who is going to interview them until the

24  officer actually comes out and introduces themselves.

25  Q.  Now, where do the interviews take place?

1    A.   Each asylum officer has their own office that is large

2    enough to conduct the interview.  So it's actually in the

3    officer's individual offices.

4    Q.   How long does an interview typically last?

5    A.   I would say, on average, they are about an hour and a half.

6    Q.   In what language are the interviews conducted?

7    A.   The officer will ask questions in English.  If the

8    applicant does not understand English fluently, those questions

9    will be translated into their native language.  After when the

10   applicants respond in their native language, those answers

11   would then be translated into English for the asylum officer's

12   benefit.

13   Q.   Who is doing this translation?

14   A.   In asylum, the actual applicants are supposed to bring

15   their own interpreters.

16   Q.   Okay.  Who is allowed to be present for the asylum

17   interview?

18   A.   The asylum applicant, certainly.  They are supposed to

19   bring any spouse or children that they are including on the

20   application.  They may sit outside during the interview and

21   only come in for brief periods of time.  If they are

22   represented by an attorney, their attorney is welcome to come,

23   and they have a right to be at the interview.  And, also, any

24   interpreters that they bring with them.

25   Q.   Okay.  Is an applicant required to bring anything with them

1   to the interview?

2   A.   They are required to bring original documents.  So often

3   when they submit their application, they will submit a copy of

4   their passport because, obviously, they don't want it to get

5   lost.  So they are supposed to bring any original documents

6   that they have in support of their case.

7   Q.   And what is the purpose of the interview?

8   A.   The purpose of the interview is, first, to verify that the

9   application, as I said, is complete and correct.  That's the

10  most important thing.  In terms of understanding the case for

11  the officer and making sure that our records are complete, the

12  interview also is supposed to serve as an opportunity for the

13  applicant to identify and explain, in their own words, what

14  happened to them in their country, and why they are afraid to

15  return to their country.  It is not expected that the asylum

16  applicant understands all of the nuances of asylum law.  That's

17  why the interviews are not adversarial.  It is supposed to be

18  the duty of the officer to ask questions to try to elicit

19  testimony from the applicant to make sure that they are, or are

20  not, eligible.

21  Q.   What happens after the interview is completed?

22  A.   After the interview is completed, the officer would then,

23  again, review their notes.  They are supposed to take notes

24  contemporaneous with the interview.  They would review their

25  notes, they would review the documentary evidence.  They might

E3OOLLIU3                         Caudill-Mirillo - direct

1    do some more country condition research if they feel that they

2    need some more information about what is actually going on in

3    that country.  And, then, they are supposed to make a decision

4    on the case.  When they make a decision, they need to write an

5    assessment that explains why they, in fact, found that the

6    person was eligible, or why they found that the person was not

7    eligible, going through the legal requirements under the law.

8         That case is then submitted to their supervisor for

9    review.  All cases to have be reviewed and concurred upon by

10   their supervisor.  The standard is not that the supervisor

11   agrees with the decision, it is that the decision is legally

12   sufficient.

13        What that means, is that the officer asked all of the

14   relevant questions, addressed all of the pertinent areas of the

15   law, and did not lead to any erroneous conclusions.

16   Q.  What factors does the asylum officer consider in evaluating

17   an applicant?

18   A.  They have to consider credibility.  They have to look at

19   the evidence that's being offered in terms of both whether it

20   is internally consistent, whether it is detailed and consistent

21   with country conditions.  They have to consider the law and

22   apply any agency policies or procedures that are applicable in

23   certain cases.  And, then, that's ultimately the only factors

24   that they should be considering.

25   Q.  You mentioned credibility.  How is credibility assessed?

1    A.  Credibility is assessed in many ways.  Essentially, the
2    officer is looking at the testimony and the applicant's
3    credibility as a whole.  What that means is they will be,
4    during the interview, asking questions, asking for details from
5    the applicant about what happened to them in their country,
6    asking for details on specific acts of harm, or who perpetrated
7    those acts of harm, both to get details but, also, to see if,
8    essentially, that the overarching story is consistent
9    throughout the testimony.
10          They also should be looking at documentation.  For
11   example, medical reports or any other type of documentation
12   that the applicant provided, to make sure that their testimony
13   is consistent with that documentation.
14          And then, lastly, just their awareness of country
15   conditions, that essentially what the applicant is stating
16   happened is generally consistent with known conditions in that
17   country.
18   Q.  So is the truthfulness of an applicant's persecution claim
19   material to the asylum officer's decision as to whether or not
20   to grant a person asylum?
21   A.  Yes, it is.  Their truthfulness, with respect to the
22   elements of their case, is relevant and material for that
23   determination.
24   Q.  Are asylum applications reviewed for potential fraud?
25   A.  Yes, they are.

1   Q.  How?

2   A.  Every office has a slightly different process.  In our

3   office, we have some staff.  They are called fraud detection

4   and national security officers.  They review applications

5   before they come into our office.  They also will gather

6   information from the officers to see if there is any types of

7   trends that are, that they see in the types of cases that we

8   get.  They also will make officers aware of any alerts that are

9   going out, whether that be, for example, if someone's

10  travelling through certain countries, there might be an alert

11  set out for that individual or that group of people.  And

12  they'll notify the officers of that.

13  Q.  What is your office's policy if an asylum officer

14  determines that an applicant lied to them during their

15  interview?

16  A.  If an applicant lied during the interview, it would

17  generally -- it would be -- the analysis would be is the lie

18  relevant to their case.  So, for example, if they told a lie

19  that they're a great musician and it's totally irrelevant to

20  their case, nobody cares if they got lied to for that.  If the

21  person is lying to them about the substance of their case,

22  their identity, how they came to the country, things that

23  happened to them, or things that they are afraid will happen to

24  them, that is material to the case and that would be

25  considered.  Ultimately, the officer would be expected to not

1    grant that case.

2    Q.  You mentioned that the decision of asylum officers is

3    reviewed by a supervisory officer.  What standard does the

4    supervisor use when reviewing the decision of an asylum

5    officer?

6    A.  The standard is legal sufficiency.

7    Q.  What does that mean?

8    A.  Essentially what it means is the supervisor reviews the

9    case.  They make sure that all of the applicable policies and

10   procedures were followed.  They look at the notes to make sure

11   that the officer did exercise due diligence in asking all of

12   the appropriate questions following up.  If there seemed to be

13   some confusion by the applicant's part, or if it seems like

14   some of the information may not be consistent, the officer is

15   required to clarify with the applicant.  They are also

16   reviewing the notes to make sure that they addressed, through

17   questioning, all of the different elements that the applicant

18   would be required to show for eligibility.  They also would

19   review the written decision, to make sure that it is in

20   compliance with case law and statutes and regulations, that the

21   asylum officer didn't state, you know, incorrect state law.

22   And then, lastly, that in processing the case, that all of the

23   appropriate paperwork was generated and correctly completed.

24   Q.  So if a supervisor agrees that the asylum officer's

25   decision was legally sufficient, what happens next?

1    A.  If the supervisor agrees, they will sign off on the

2    decision, and the case will be processed, whether it be a grant

3    referral or what's called a denial.  It would just continue to

4    be processed.

5    Q.  And if a supervisor believes that the asylum officer's

6    decision is not legally sufficient, what happens?

7    A.  First, the supervisor is supposed to speak to the officer

8    and set out what their concerns are.  Sometimes it is just a

9    matter of perhaps needing some type of clarification in a

10   written decision, or the issue needs to be addressed a little

11   more clearly.

12         If it is some type of actual substantive disagreement,

13   if the officer still feels their decision is correct, the case

14   would be elevated to me to review as a neutral third party.

15   Q.  How many supervisors work in the Queens office?

16   A.  We currently have 10.

17   Q.  And approximately how many asylum officers are supervised

18   by each supervisor?

19   A.  The ratio is approximately four to five officers per

20   supervisor.

21   Q.  What happens if an applicant later admits that his or her

22   application is fraudulent?

23   A.  Just to clarify, if they admit it is fraudulent before the

24   case is granted, or after the case is granted?

25   Q.  After the case is granted.

1    A.  After the case is granted, it would depend upon, I think,

2    the circumstances.  The case may continue on through the

3    immigration court processing.  If, however, it is determined

4    that we may be able to get some type of additional information

5    from that person, we may put the case on some type of hold to

6    conduct an investigation.  Ultimately, the case will still

7    continue to be processed as a referral, it just would depend

8    upon the circumstances and whether there is some value in

9    talking to the person to get additional information for

10   investigative purposes.

11   Q.  And what happens if they admit their application is

12   fraudulent before they have been granted asylum?

13   A.  Before they have been granted asylum, again, we may have

14   employees that may want to speak to them for investigative

15   purposes but, ultimately, the case would be referred to court,

16   because the case is not credible.

17   Q.  And what court are you referring to?

18   A.  Sorry.  The immigration court.

19   Q.  How would an applicant be informed whether he or she has

20   been granted asylum?

21   A.  They are informed either in person, or the decision can be

22   mailed to them.  In general processing, we make a decision two

23   weeks after the date of interview.  The applicant would come

24   back to our office and they would actually be informed in

25   person what the decision would be.  There are certain

1    indications, either because of security background checks or

2    the officer just was unable to make the decision on time, we

3    may have to mail the decision out.  The applicant would be told

4    that they don't have to return to our office, they would get

5    their decision in the mail.

6    Q.  What happens after an applicant is granted asylum?

7    A.  When an applicant is granted asylum, they are immediately

8    given some type of documentation to evidence that they have

9    immigration status, asylum status specifically.  At that point

10   in time, they are permitted to live and work indefinitely in

11   the United States.  They are informed of the their rights and

12   their ability to petition for spouses or children, unmarried

13   children under the age of 21, if they have not already done so.

14   And then, ultimately, after a year, they can apply for green

15   card and, down the road, several years later if eligible, they

16   can apply for citizenship.

17   Q.  And you said they are given some type of document that

18   signifies they have been granted asylum.  What type of document

19   is that?

20   A.  It's called an I 94 Arrival and Departure Card.  It is a

21   little kind of white, rectangular or square card they would put

22   in their passport.

23   Q.  Can asylum ever be taken away from a person?

24   A.  Yes, it can.

25   Q.  And in what instances?

1    A.  We have a process called termination.  Essentially, if an

2    applicant is found -- it can be invoked for many reasons, but

3    most commonly found that the applicant was not in fact eligible

4    for they granting of asylum, initially either by fraud or some

5    other means.  We would send them a letter indicating to them

6    the reasons that we are seeking termination.  We would have an

7    interview with them, or they would have the opportunity to come

8    to our office and explain the circumstances, presumably why in

9    fact what we are saying that their case can be terminated, that

10   we are in fact incorrect.  And then, after that, we would make

11   a decision, ultimately.

12   Q.  If an applicant's application for asylum has been denied,

13   what happens to the applicant?

14   A.  They are, if they are denied, if they are not in

15   immigration status, if they have no other type of immigration

16   status, they would be put in removal proceeding before an

17   immigration judge.  At that time, they would have an

18   opportunity to present their asylum case again.  If they do

19   have immigration status, for example if they are a student and

20   they have permission to come here as a student, the case would

21   just be denied and they would continue in the immigration

22   status that they already have.

23   Q.  Can the denied applicant apply for asylum again?

24   A.  Yes, they can.

25   Q.  Are there limits on the number of times an applicant can

E3OOLLIU3                            Caudill-Mirillo - direct

1    apply for asylum?

2    A.  No.

3    Q.  For the asylum applications that are denied by your office,

4    where do these review hearings take place, as you mentioned?

5    A.  They take place at New York Immigration Court.  The primary

6    location is at 26 Federal.  There is another location off xxx

7    Verick Street, but most of our cases I think go to 26 Federal.

8    Q.  And who conducts those hearings?

9    A.  They are immigration judges, they are administrative law

10   judges.

11   Q.  Generally speaking, what takes place at these hearings?

12   A.  The environment at immigration court hearing is slightly

13   different.  In the asylum context, affirmative asylum context,

14   it is a nonadversarial interview.  At immigration court, the

15   government is represented by an attorney who is actively

16   seeking to establish that the person does not have immigration

17   status and should be removed from the country.  And during

18   those hearings, there will be several hearings.  They will also

19   get a chance to present their case again to testify about why

20   they need asylum.  The government attorney will cross-examine

21   them and then, ultimately, the judge, similar to an asylum

22   officer, will make a decision on the law and the regulations.

23   Q.  And if, following the hearing, the judge decides to grant

24   asylum, what happens next?

25   A.  The applicant would, and in that circumstance would

1    automatically be entitled to the same benefits that an

2    applicant who filed and was granted at our office would

3    receive.  They would have permission to live and work in the

4    United States indefinitely, to petition for spouse and

5    unmarried children under the age of 21, and they would also

6    eventually be eligible to apply for green card and citizenship.

7    Q.  And if the judge denies a person's asylum claim at the

8    hearing, what happens?

9    A.  If they are denied, at that level, they have the right to

10   appeal.  The first level of appeal would be before an

11   administrative body called the Board of Immigration Appeals.

12   If they, again, are not successful at that level, they have the

13   right to appeal to the federal circuits and then, ultimately,

14   if that also was not successful, they do have the ability to

15   petition to the Supreme Court of the United States.

16   Q.  How often does that happen?

17   A.  That's -- that's pretty rare.

18   Q.  Okay.  I want to now talk about a couple of people in

19   particular.

20   A.  Okay.

21   Q.  Are you familiar with an individual named Huai Guo Wu?

22   A.  I am not familiar with him, personally.  I am familiar with

23   the application that was filed on his behalf.

24   Q.  So do you know whether he filed an application?

25   A.  He did.  He did file an application.

E3OOLLIU3                    Caudill-Mirillo - direct

1   Q.  And do you know what the current status is of his

2   application?

3   A.  That case was not granted by our office.  And it was

4   referred to immigration court.  I am not familiar with what the

5   status is currently in immigration Court.

6   Q.  Okay.  Are you familiar with an individual named Lin Chen?

7   A.  Yes, I am.

8   Q.  And do you know whether or not she has filed an asylum

9   application with your office?

10  A.  Yes, she has.

11  Q.  And do you know what the current status is of her

12  application?

13  A.  That application is on fraud hold.  That case was initially

14  referred to immigration court.  It was brought to our attention

15  that there was some mandatory paperwork missing from that file.

16  After we received the file back from the Court, we were

17  informed by the FBI that there was some concern that the case

18  might have been fraudulent in the first place.  We put the case

19  on a fraud hold, and that is where it currently is, on a fraud

20  hold.

21  Q.  And what is a fraud hold again?

22  A.  A fraud hold is essentially a blanket term.  Essentially,

23  when we become aware there is an application that has some type

24  of fraud associated with it, we will put it on hold while the

25  investigation is pending.  Once the investigation is complete,

1    with all of the information that we have, typically, it would

2    just continue on, on its path, which would be in this case the

3    case would be referred.  If there is additional information

4    that we think might be helpful to our agency in identifying

5    other acts of fraud, we may speak to that person.  But,

6    ultimately, the case would be continued to be processed as we

7    initially determined.

8    Q.  I want to show you what has been marked for identification

9    as government exhibits 505, 507, 508, 513, 517, 518, 519, 521,

10   524, and 525.

11            Do you recognize those documents?

12   A.  Just want to flip through them very quickly.

13            MR. FISCHETTI:  Can we have one minute to get the

14   applications in order?

15            THE COURT:  Do you just need a minute?

16            MR. FISCHETTI:  Just a minute.

17            THE COURT:  Sure.

18            MR. FISCHETTI:  We have them in order, thank you,

19   Judge.

20            THE COURT:  You may proceed.

21   BY MR. BOONE:

22   Q.  And just let me know when you have finished reviewing them.

23   A.  I have just reviewed the first page, yes.

24   Q.  Do you recognize those documents?

25   A.  Yes.

1   Q.  And what are they?

2   A.  These are asylum applications that were filed by

3   individuals with our office.

4   Q.  And are those records records that are normally maintained

5   by your office?

6   A.  Yes, they do.

7        MR. BOONE:  Your Honor, the government offers

8   government exhibits 505, 507, 508, 513, 517, 518, 519, 521,

9   524, and 525 into evidence.

10        THE COURT:  Any objection?

11        MR. FISCHETTI:  No objection.

12        THE COURT:  Mr. Maher, Mr. German.

13        MR. MAHER:  No.

14        MR. GERMAN:  No.

15        THE COURT:  They will be admitted.

16        (Government's Exhibits 505,507,508,513,517,518,519,

17   521, 524, 525 received in evidence)

18   BY MR. BOONE:

19   Q.  Have you heard of the law offices of Feng Ling Liu?

20   Yes, I have.

21   Q.  And do you know whether or not the law firm ever filed

22   asylum applications with your office?

23   A.  Yes, that law firm has filed asylum applications with our

24   office.

25   Q.  And approximately how many asylum applications were filed

1   by that law firm between 2007 and 2009?

2   A.  Between 2007 and 2009, you said?

3   Q.  Yes, 2007 through 2009.

4   A.  I believe it was approximately 900.

5   Q.  And how does that number compare to the number of

6   applications filed by other law firms around that same time

7   period?

8               MR. FISCHETTI:  Objection --

9               MR. GERMAN:  Objection.

10              THE COURT:  Rephrase that.

11              MR. FISCHETTI:  -- to the form of the question.

12  BY MR. BOONE:

13  Q.  In comparing the number of applications filed by that law

14  firm during that time period, is that number, on average,

15  higher or less than law firms you also filed during that time

16  period.

17              MR. GERMAN:  Objection.

18              MR. FISCHETTI:  Objection.

19              MR. MAHER:  Objection.

20              THE COURT:  Overruled, you can answer.

21  A.  It is higher.

22  Q.  Have you heard of the law firm Moslemi & Associates?

23  A.  Yes, I have.

24  Q.  Do you know whether or not that law firm has ever filed

25  asylum application with your office?

1   A.  Yes, that law firm has filed with our office.

2   Q.  And approximately how many applications were filed by that

3   law firm from 2009 to 2012?

4   A.  From 2009 to 2012, approximately 430 applications were

5   filed.

6   Q.  And is that number higher or lower, on average, than the

7   number of applications filed by other law firms during that

8   time period?

9   A.  I would say, in my personal experience, it is higher.

10  Q.  Have you heard of the law firm Bandrich & Associates?

11  A.  Yes, I have.

12  Q.  Do you know whether or not that law firm has ever filed

13  asylum applications with your office?

14  A.  That law firm has filed asylum applications with our

15  office.

16  Q.  Approximately how many asylum applications were filed by

17  that firm from 2010 to 2012?

18  A.  Approximately 480.

19  Q.  And is that number higher or lower, on average, than the

20  number of applications filed by other law firms?

21          MR. MAHER:  Objection.

22  Q.  During that same time period?

23          MR. MAHER:  Objection.  And ask for sidebar.

24          THE COURT:  Overruled.  You can answer.

25  A.  Again, in my personal experience, I would say it was

E3O0LLIU3                         Caudill-Mirillo - direct

1    higher.

2    Q.  Just want to go back to the something you said earlier.

3            You mentioned that in some instances asylum

4    applications are referred to an immigration court for a

5    hearing.  What do you mean when you say they are referred to an

6    immigration court?

7    A.  So that's the actual terminology that we use to basically

8    say the person does not have immigration status so, therefore,

9    we are placing them in removal proceedings.  Essentially, we

10   say we're referring it to the immigration judge for them to

11   make an ultimate decision if this person should be removed from

12   the country.

13           A removal hearing is where the applicant will, again,

14   raise their asylum application and say they should have the

15   ability to remain in the country because they need asylum and,

16   again, they would put that case on again before the judge.

17   Q.  So is it fair to say that an application that is being

18   referred to an immigration court for a hearing, is one that was

19   initially denied by the asylum officer after the interview?

20   A.  Yes, that's generally the case; yes.

21           MR. BOONE:  No further questions, your Honor.

22           THE COURT:  Why don't we take our lunch break.

23           I'll ask you to be back in an hour and 15 minutes, so,

24   approximately 2:25.  All right, thanks.  Please remember keep

25   an open mind, and don't discuss the case.

E3OOLLIU3                        Caudill-Mirillo – direct

1                    Thank you.

2                    THE DEPUTY CLERK:  All rise.

3                    (Jury excused)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3OOLLIU3                              Caudill—Mirillo – direct

1              (In open court)

2              THE COURT:  Step down.  We'll see you at 2:35.

3              (Continued on next page)

E3oWliu4

          MR. FISCHETTI:  Judge, I thought we had an agreement

that if one person objects, we all join so that your Honor

doesn't have to ask each counsel, unless he withdraws.  Unless

your Honor doesn't want to do it that way --

          THE COURT:  No.  That's fine.  You did ask for that

previously, and I'm fine with that.  Now that it's clear for

the record, I'm fine with that.

          MR. FRANZ:  Your Honor, with regard to the objections,

if you're not going to hear us at the side bar at the time to

just put the reason for our objection on the record, my

objection to the elicitation of the testimony about the number

of applications filed by the law firm of Feng Ling Liu compared

to other law firms, one, I'll handle it on cross-examination,

but I don't think it should have come in.  I don't think this

witness has personal knowledge of it.

          THE COURT:  I think she said, I'll look back at the

language she used, she said in my personal experience.

          MR. FRANZ:  Judge, she didn't review these documents.

She got this data from other agents.  It's classic hearsay, and

then she gave an opinion about whether it's higher or lower,

and she hasn't been qualified as an expert witness.  So, on

multiple grounds, her testimony --

          THE COURT:  I don't think you need to be an expert

witness to say whether a number was higher or lower.  You can

cross-examine her about whether or not she had a sufficient

E3oWliu4

1   basis for saying that, but she answered a question about

2   whether the number was higher or lower than other numbers, and

3   she answered based on her personal experience.  But you're free

4   to cross-examine her.  I don't think that was expert testimony.

5            MR. FRANZ:  I don't think, just so you know, her

6   experience, and I'll handle it, her conclusion that it's higher

7   is based upon information that she doesn't have personal

8   knowledge of, so she can say at this point her personal

9   experience, her personal experience of reviewing the hearsay

10   declarations of other officers I don't think would suffice if

11   we were able to challenge that before she elicited the

12   testimony before the jury.

13            THE COURT:  I'll give you leeway to question her on

14   cross-examination.

15            MR. MAHER:  Your Honor, I want to add additionally

16   that I think it's not proper for the argument I think the

17   government is going to make from that testimony that an

18   increase in numbers applications is somehow correlative to

19   fraudulent activity.  There's no correlation at all that this

20   witness can say between the number of applications submitted by

21   a law firm equals fraud, and so that should not have been

22   admitted for that reason as well, and certainly the government

23   should not be able to make arguments later without any showing

24   that there's a correlation between those actual numbers of each

25   client, that that equals fraud.

1          THE COURT:  You should argue that to the jury.

2          MR. MAHER:  But the problem is it's like us grabbing

3     sand because we have an official who has now put forth these

4     numbers that she got somehow and maybe she'll say she looked at

5     a computer screen, or something, but we have no discovery, we

6     have no tangible documents to cross her about those numbers.

7     We have no data spreadsheets on other law firms and what they

8     submitted, but the whole point though, getting past the lack of

9     discovery, you can't say there's a correlation just by the

10    numbers.  It could be that these law firms had better contacts

11    in the community, so they have more clients, that they are more

12    adept at getting the people to actually file the claims

13    compared to other law firms.  Other law firms are smaller.

14         THE COURT:  Those are excellent cross-examination

15    questions and excellent arguments that you're entitled to make.

16         MR. MAHER:  I have to make my record, Judge.

17         THE COURT:  You have.  Thank you very much.

18         One scheduling matter.  I told the jury that I would

19    inform them in advance if we're sitting on Fridays.  My

20    understanding is that we do not intend to sit this Friday.  Is

21    everyone on agreement on that?

22         MR. FISCHETTI:  Yes, your Honor.

23         MR. GERMAN:  What time, Judge?

24         THE COURT:  2:25.  Thank you.

25         (Luncheon recess)

E3oWliu4

                          AFTERNOON SESSION

                              2:30 p.m.

1            THE COURT:  Cross-examination.

2            MR. FRANZ:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. FRANZ:

5    Q.  Good afternoon, Agent.

6    A.  Hello.

7    Q.  My name's Eric Franz.  Have we ever met before?

8    A.  No, we have not.

9    Q.  Prior to coming here today, have you testified in any other

10   proceedings?

11   A.  Yes, I have.

12   Q.  You've testified on behalf of the United States Government?

13   A.  Yes, I have.

14   Q.  Have you met with people from the government in preparation

15   for your testimony?

16   A.  Yes, sir.

17   Q.  And did they go through the types of information they would

18   question you about?

19   A.  Yes.

20   Q.  And did they ask you questions?

21   A.  Yes, they did.

22   Q.  Did they give you answers?

23   A.  No, they did not.

E3oWliu4                          Caudill- Mirillo - cross

1   Q.  I'm sorry.  Did you provide them with answers?  Excuse me.

2   A.  It's okay.  Yes, I did.  I provided them with answers.

3   Q.  And you would meet with them on more than one occasion?

4   A.  Yes, I did.

5   Q.  You would confer with them via phone or e-mail?

6   A.  Yes, I did.

7   Q.  That was all in preparation for your testimony?

8   A.  Yes, it was.

9   Q.  And is it fair to say meeting with the government before

10  testifying, there's nothing wrong with that, is there?

11  A.  No.

12  Q.  Those prep sessions are okay, correct?

13  A.  Yes.

14  Q.  Meeting with witnesses before an interview is okay, right?

15  A.  Yes.

16  Q.  That's what lawyers do?

17  A.  It's my understanding, yes.

18  Q.  And you did that before coming in here today?

19  A.  I did.

20  Q.  Before coming in here today, you met with the government,

21  as we've established, right, and you conferred with other

22  people in your office?

23  A.  Yes, I did.

24  Q.  You testified earlier that approximately 900 applications

25  were filed by the Feng Ling Liu law firm, is that correct?

1    A.   That is correct.

2    Q.   Did you personally gather up all of those applications and

3    review each one of them?

4    A.   No, I did not.

5    Q.   Did you ever have all of those applications in your custody

6    for you to review?

7    A.   Personally to review the actual application?

8    Q.   Yes.

9    A.   Or the computer record?

10   Q.   The application.

11   A.   I did not review the actual paper applications, no.

12   Q.   Did you actually review 900 applications via computer?

13   A.   No.

14   Q.   Okay.  So it's fair to say that you yourself did not

15   compile the data about how many applications the law firm of

16   Feng Ling Liu filed?

17   A.   I requested the data.  I did not compile the data.

18   Q.   As you sit here today, you have no personal knowledge as to

19   the numbers, do you?

20   A.   I have the printout.  I have the information the computer

21   provided back, but I have not personally looked and verified

22   that information.

23   Q.   You didn't make the request of the computer, did you?

24   A.   I instructed a member of our staff to make it, yes.

25   Q.   So what you received is what somebody else did on your

1    behalf?

2    A.   That is correct.

3    Q.   You don't know exactly what data they entered into the

4    computer when they did it, do you?

5    A.   I know there's a command and information that they have to

6    input the name, and that's what comes back.

7    Q.   Were you present when they ran the search?

8    A.   No, I was not.

9    Q.   It's a simple search, right?

10   A.   Yes.

11   Q.   You could have done it yourself?

12   A.   I don't believe I have that kind of access.

13   Q.   All right.  So you don't have the access to data, right?

14   A.   To make that personal, input that request, no, I don't

15   believe so.

16   Q.   So you didn't extract that data?

17   A.   No, sir.

18   Q.   So as you sit here today, you don't have personal knowledge

19   as to those numbers, do you?

20   A.   I'm not sure I understand your question.  You mean

21   personal --

22   Q.   As you sit here today, are you the person that entered the

23   questions into the computer and received the information that

24   you claim you received?

25   A.   No, I'm not.

1    Q.  And you didn't do that for the Bandrich firm?

2    A.  No, I did not.

3    Q.  Nor did you do it for any of the other searches, including

4    Moslemi & Associates, correct?

5    A.  That is correct.

6    Q.  And data that you gave us, is that premised upon just

7    asylum applications at the asylum office interview or also

8    based upon immigration court?

9    A.  It is only based on asylum application filings with my

10   office.

11   Q.  With your office?

12   A.  Yes.

13   Q.  Now, if they file it with your office, that could include

14   also going to immigration court, or no?

15   A.  No.

16   Q.  That's just to file with your office the initial

17   applications?

18   A.  Just with our office.

19   Q.  And those are applications that in order for them to go

20   through the process, they must have an interview, correct?

21   A.  Yes.

22   Q.  And as you sit here today, do you have the information --

23   excuse me.  Withdrawn.

24       As you sit here right now, do you have personal knowledge

25   of any single interview at the asylum office that Feng Ling Liu

E3oWliu4                          Caudill- Mirillo - cross

1   herself attended?

2   A.  I'm not aware of any, no.

3   Q.  Did you look for that information?

4   A.  No, I did not.

5   Q.  And you don't have that information?

6   A.  No, sir.

7   Q.  You mentioned how, by the way, with regard to the computer

8   and the data, where is that underlying data?

9   A.  I'm not sure where it's physically stored.  But it's a

10  national database that's, I'm not sure where that actual

11  database is housed.  I believe it's in Vermont, but I'm not

12  positive.

13  Q.  And that data is subject to what people input into the

14  computer?

15  A.  Yes, it is.

16  Q.  So if there are errors in the actual input of the data,

17  that garbage in gets referred to as garbage out when you get

18  it, correct?

19  A.  There -- yes.  There are some ways to correct that.

20  Q.  Have you done that?

21  A.  Have I done which part?

22  Q.  Have you corrected any of the inaccuracies?

23  A.  I have.  Personally, when I've become aware of them, yes.

24  Q.  With regard to this case, this investigation, did you

25  correct any of the inaccuracies?

1    A.  No.  Not in regards to this case.

2    Q.  You testified earlier that approximately 11,000

3    applications were filed in Queens, right?

4    A.  Yes, in 2012.

5    Q.  In 2012?

6    A.  Yes.

7    Q.  How many applications were filed since 2006?

8    A.  I'm not sure how many total.  In 2006 is, it was 3,200, and

9    in 2012, it was 11,000.  But I'm not sure what the date, the

10   years were in the middle.

11   Q.  So you only can compare 2006 and 2012, you're not aware of

12   2007, 2008, 2009, or 2010?

13   A.  I don't have those facts off the top of my head, no.

14   Q.  The reason you have the 2006 facts is because the

15   government asked you to get that information?

16   A.  Yes.

17   Q.  Did anybody ask you to get 2007?

18   A.  No.

19   Q.  2008?

20   A.  No.

21   Q.  2009?

22   A.  No.

23   Q.  2010?

24   A.  No.

25   Q.  2011?

E3oWliu4                        Caudill- Mirillo - cross

1    A.  No.

2    Q.  They just wanted you to give us the information on what you

3    claim the numbers would reveal with regard to the applications

4    filed on those various firms, correct?

5    A.  I'm not sure why they asked me, but those are the dates

6    that they asked me for, yes.

7    Q.  As you sit here today, you don't know if there were over a

8    million applications filed since 2006, do you?

9    A.  I know each year it went up, the maximum being 1,100, so I

10   can say no, there weren't a million.  But I don't know

11   specifically the range between 3,200 and 11,000, where those

12   numbers fell in those years.  It did go up each year

13   incrementally to 11,100 for 2012.

14   Q.  And that's just limited to the Queens office?

15   A.  Yes, it is.

16   Q.  How many law firms practice immigration law in New York

17   City?

18   A.  I don't know that information.

19   Q.  How many major law firms practice immigration law in New

20   York City?

21   A.  I couldn't say.

22   Q.  How many different law firms filed applications with your

23   office in Queens over the time frame of 2006 to 2011?

24   A.  I'm afraid I don't know that information.

25   Q.  The fact is that you don't know how many applications

E3oWliu4                        Caudill- Mirillo - cross

1   Wilens & Baker filed, do you?

2   A.  No, I don't.

3   Q.  You don't know how many Spar & Bernstein filed, do you?

4   A.  No, I don't.

5   Q.  Or any of the other major immigration law firms in the

6   city, do you?

7   A.  I don't know the number, no.

8   Q.  But your testimony before was that the 900 was more than

9   the average for other law firms, correct?

10  A.  That is correct.

11  Q.  But you don't know if there were other law firms that filed

12  more than that because you never checked that data, did you?

13  A.  I know from personal observation being an officer and

14  supervisor, on each of those applications they list who the

15  attorneys are, and by my personal experience and that shared by

16  other members of my office, that would be, as I said, my

17  personal observation.  But I don't know the data.

18  Q.  You don't know the data?

19  A.  I don't have the specific numbers, no.

20  Q.  So the 11,000 that were filed in 2011 --

21  A.  '12.

22  Q.  '12, excuse me, did you go through each and every one of

23  them?

24  A.  No, sir.

25  Q.  So you don't know which law firms filed those applications?

1    A.  No, sir.

2    Q.  You don't know the breakdown?

3    A.  That is correct.

4    Q.  You just have your personal belief right now?

5    A.  Yes --

6    Q.  Without any data to back that up, correct?

7    A.  Only my personal observations, yes.

8    Q.  No data?

9    A.  That is correct.

10   Q.  You knew you were coming in here to testify today, correct?

11   A.  Yes, sir.

12   Q.  And you knew the government was going to ask you a series

13   of questions, correct?

14   A.  Yes, sir.

15   Q.  And you knew they were going to ask you about the number of

16   applications that were filed during those years from the law

17   firms, right?

18   A.  That is correct.

19   Q.  And you got that information at their request?

20   A.  Yes, sir.

21   Q.  But the underlying data regarding other law firms you

22   didn't get, correct?

23   A.  That is correct.

24   Q.  But you knew they were going to ask you what your personal

25   view was towards how many applications were filed at the Feng

1  Ling Liu law firm, correct?

2  A.  That is correct.

3  Q.  So you were Honor comfortable giving that personal

4  information even though you don't have the underlying data,

5  correct?

6  A.  That's correct.

7  Q.  Thank you.  You said there's a 20 percent grant rate for

8  asylum applications?

9  A.  Yes.  An average, yes.

10  Q.  And that means --

11  A.  I --

12  Q.  -- by math, 80 percent are denied?

13  A.  That is correct.

14  Q.  That doesn't mean that 80 percent are a fraud, does it?

15  A.  Absolutely not.

16  Q.  Doesn't mean 80 percent are fake, does it?

17  A.  That's true.

18  Q.  It just means 80 percent weren't approved because people

19  either failed to show up at a hearing, correct?

20  A.  Yes.

21  Q.  They didn't give a statement that seemed credible, correct?

22  A.  Yes.

23  Q.  They didn't give a statement that complied with the laws

24  for asylum, right?

25  A.  That is correct.

E3oWliu4                        Caudill- Mirillo - cross

1    Q.  Because there are a lot of parameters for what they can

2    apply for and what they have to accomplish in their factual

3    recitation, correct?

4    A.  That is correct.

5    Q.  And so somebody might be telling the truth, but their claim

6    doesn't rise to the level of meeting an asylum application to

7    be granted, correct?

8    A.  That's true.

9    Q.  Now, with regard to an asylum officer's training, you

10   mentioned there's two mandatory training sessions?

11   A.  Yes.

12   Q.  And collectively, you add them all up, they span several

13   months?

14   A.  Yes.

15   Q.  And you went through it, correct?

16   A.  I did.

17   Q.  And going through it, did you learn about how to judge the

18   credibility of a witness?

19   A.  Yes.

20   Q.  Did you learn that you needed to probe for details?

21   A.  Yes, I did.

22   Q.  You needed to compare details?

23   A.  Yes, I did.

24   Q.  And that remains true, that in evaluating somebody's

25   credibility you look at the details behind their story?

1    A.  Yes, that's true.

2    Q.  One of the purposes for the interview is to go beyond the

3    broad strokes of the story, to ask about details, right?

4    A.  Yes.

5    Q.  Because when the details don't match up for a story, it

6    could be a lie?

7    A.  It could be, yes.

8    Q.  And there's a phrase, the devil's in the details.  Are you

9    familiar with that phrase?

10   A.  Yes, I am.

11   Q.  And When you judge somebody's credibility if their details

12   don't match up, it starts to make you think that even though

13   they got the big picture right, because their details don't

14   match up, they have to be lying?

15   A.  It does raise the question.  You still have to continue to

16   probe.

17   Q.  You continue to probe, but it's a subjective decision as to

18   whether or not you find them credible, right?

19   A.  No.  I would disagree with that.

20   Q.  The determination about whether or not to grant asylum, is

21   that subjective or objective?

22   A.  That's objective.

23   Q.  Remember testifying in a matter in this courthouse a couple

24   of months ago?

25   A.  I was not in this courthouse.

1  Q.  I'm sorry.

2  A.  It's okay.

3  Q.  Across the street.

4  A.  Yes, I did.

5  Q.  Give me one moment.  In order for an asylum officer to make

6  a determination, it's like a criminal case where somebody's

7  weighing the credibility of a witness, right?

8  A.  Yes.

9  Q.  And the evaluation, I think you testified earlier, was it's

10  no more subjective than in a criminal case, right?

11  A.  I -- earlier today or previously?

12  Q.  Previously.

13  A.  On a different occasion, yes, I did say that.

14  Q.  So there's a level of subjectivity that goes to weighing

15  somebody's credibility, right?

16  A.  I wouldn't say subjectivity.  I would say that there is,

17  the officer has some independent discretion in terms of how

18  much they need to probe.  But certainly it has to be what they,

19  their expectations are in terms of details and the consistency

20  and the ability of the applicant to provide some kind of

21  explanation for an inconsistency.  It has to be reasonable.

22  They can't place unreasonable expectations on the applicant for

23  details or for consistency.

24  Q.  But in evaluating someone's testimony, I would say if

25  somebody testified that the sky was blue on Monday but they

1  testified another time that the sky was green on Monday, that

2  would be inconsistent, right?

3  A.  That's true.

4  Q.  And objectively, that's an inconsistency, correct?

5  A.  Yes.

6  Q.  And objectively, if that was the issue to be resolved, you

7  might find that person not credible because objectively, their

8  answers differed?

9  A.  Yes.

10  Q.  Now, if a witness, in testifying, you have the opportunity

11  to observe their demeanor, is that right?

12  A.  That's correct.

13  Q.  And in observing their demeanor, their failure to make eye

14  contact could be an issue which could cause somebody to find

15  them not credible?

16  A.  We are generally as a policy as an agency discouraged from

17  using demeanor because in many cultural contexts, for example,

18  the example of looking people in the eyes, in some cultures

19  that's seen to be disrespectful.  So we're often encouraged not

20  to use demeanor in the context of interviews.  But it is

21  available and some officers in extreme circumstances will use

22  it.

23  Q.  It's not forbidden?

24  A.  No.  It's not forbidden, it's just discouraged.

25  Q.  Discouraged?

1    A.  Discouraged.

2    Q.  But if somebody doesn't maintain eye contact, that can be a

3    factor and an individual asylum officer can rely on it, can it

4    not?

5    A.  Not that factor solely, no.  There would, that would be not

6    be legally sufficient.

7    Q.  That would be an individual factor.  We're going to talk

8    about the collective factors shortly, but individual factors,

9    there's the inconsistency in their inherent statement compared

10   to what they say, right?  Then you compare documentary

11   evidence, correct?

12   A.  Yes.

13   Q.  If there's an inconsistency there, that could be a factor,

14   right?

15   A.  Yes.

16   Q.  If somebody doesn't maintain eye contact, that could be a

17   factor, correct?

18   A.  It could be, yes.

19   Q.  If somebody just rattles off what appears to be a rehearsed

20   statement, that could be a factor, right?

21   A.  Can be, yes.

22   Q.  Also, if somebody can only rattle off a statement in a

23   certain time manner as opposed to giving details out of order,

24   that's also a factor, correct?

25   A.  It could be.

1    Q.  Because officers are looking to see whether or not the

2    applicants that are getting interviewed have subscribed to

3    memorization of their story, right?

4    A.  Yes.

5    Q.  So there's no one factor that you look at, but you look at

6    all of it?

7    A.  That's correct.

8    Q.  Including demeanor?

9    A.  Yes.

10   Q.  And you can look at somebody who is twiddling with their

11   fingers or twitching during the interview when they get hard

12   questions, right?

13   A.  You could look at any number of demeanor factors.  Again,

14   it's, you're supposed to look at the picture of the whole, but,

15   yes, if an officer found that that could be some indicator of

16   demeanor, such as whenever they seemed to not know the answer

17   to a question if they seemed to continue to twiddle their

18   fingers or behave in a way that seems abnormal but only when

19   they couldn't answer a question, it might raise some

20   credibility issues, yes.

21   Q.  And it might be more important to some officers than

22   others?

23   A.  Perhaps.

24   Q.  Which means it's somewhat subjective because some officers

25   might evaluate somebody more on their demeanor than another

E3oWliu4                        Caudill- Mirillo - cross

1    officer, is that right?

2    A.  I, I'm not sure I can answer that question because I

3    haven't worked with every officer.  But certainly, some

4    officers may find some evidence of credibility or some factor

5    more compelling than others, certainly, yes.

6    Q.  These interviews, they're thorough interviews, correct?

7    A.  I would say so, yes.

8    Q.  I'm talking about the interview that happens with the

9    asylum officer, correct.

10   A.  Yes.

11   Q.  Those are thorough interviews that go one and a half to two

12   hours?

13   A.  Yes, they should.

14   Q.  Before you get to the interview, before that, the applicant

15   has to fill out paperwork, right?

16   A.  That's correct.

17   Q.  I believe you established it has to be in English, correct?

18   A.  Yes.

19   Q.  And a lot of people, let's just talk about people from

20   China for a moment that come in and they want to apply for

21   asylum, a lot of them are not English-speaking individuals, is

22   that right?

23   A.  Yes.

24   Q.  A lot of them are uneducated?

25   A.  I am not, I'm not certain to say what the percentage is,

1   but some of them are uneducated, yes.

2   Q.  Are some of them peasants?

3   A.  I'm not sure.  What do you mean by peasants?  Who would you

4   include in peasants?

5   Q.  I would include migrant farm workers who haven't received

6   an education formally.

7   A.  Yes.  Many of them are farmers, yes.

8   Q.  And some of them are unsophisticated?

9   A.  Some may be, yes.

10  Q.  And the Chinese culture is a completely different culture

11  than the American culture, would you agree with that?

12  A.  That's true.

13  Q.  So these people that have come from China, some of them are

14  not educated?

15  A.  Some of them, yes.

16  Q.  They come from a completely foreign culture?

17  A.  That's true.

18  Q.  They're here to apply for asylum based upon laws of the

19  United States that you're sure they weren't educated on in

20  China, correct?

21  A.  That's true.

22  Q.  That's also a foreign process to them?

23  A.  Yes, it is.

24  Q.  In fact, it's a foreign process to a lot of people, which

25  is why you're here today?

1   A.   Exactly, yes.

2   Q.   Now, they come in, it doesn't matter how they get here,

3   correct?

4   A.   That is true.

5   Q.   Whether they come in in a shipping container or they come

6   in first class on American Air Lines, it doesn't matter to the

7   asylum officer, right?

8   A.   No, it doesn't matter.

9   Q.   So if somebody comes into the asylum office and they say I

10  snuck into the country by walking through a tunnel underneath

11  the Mexican border and I got here illegally, that doesn't

12  matter for the asylum application, right?

13  A.   No, it doesn't.

14  Q.   Going back, they go to a law firm, or they can apply on

15  their own, correct?

16  A.   I'm sorry?  Repeat.

17  Q.   In order for an applicant to apply, they can do it on their

18  own, they can do it with the use of a law firm, they can do it

19  with a clinic, right?

20  A.   Yes.

21  Q.   A family member can help them if they want?

22  A.   Yes.

23  Q.   No restrictions on that?

24  A.   No restrictions.

25  Q.   But it has to be in English?

1    A.  Yes, it does.

2    Q.  And then after that paperwork is put together, it's not

3    just the application, which they have to sign under oath,

4    correct?

5    A.  Yes.

6    Q.  How many times do they sign under oath in that application,

7    when all is said and done?

8    A.  On the application, they sign twice.  They also were

9    administered an oral oath when they appear for the interview

10   and they also sign a piece of paper at the interview indicating

11   that they were given the oral oath.

12   Q.  That's four oaths to tell the truth, right?

13   A.  That's correct.

14   Q.  And that's before they might even get to an immigration

15   judge?

16   A.  Yes.

17   Q.  Which then another oath would be administered, correct?

18   A.  Yes.

19   Q.  That's five?

20   A.  At least.

21   Q.  And they have to testify before the immigration judge, that

22   would be six?

23   A.  I would assume.  I'm not sure how many times.  I'm not sure

24   what their procedures are.

25   Q.  Well, there is written --

E3oWliu4                          Caudill- Mirillo - cross

1   A.  Yes.

2   Q.  -- oath, that goes before the immigration judge?

3   A.  Yes.

4   Q.  That would be No. 5?

5   A.  I think so.

6   Q.  Then if they testify before the immigration judge, you're

7   not familiar with anybody going before an immigration judge and

8   testifying without being under oath, right?

9   A.  No.

10  Q.  That's six oaths right there?

11  A.  At least.

12  Q.  And that's before we get to the Board of Immigration

13  Appeals or the Circuit Court, right?

14  A.  Yes.

15  Q.  So they have these six oaths and they all warn them not to

16  lie?

17  A.  Yes.

18  Q.  Right?  And, in fact, there's a warning on page --I think

19  it's nine of Exhibit 1.  Do you have Exhibit 1 there?

20  A.  I have, I don't have that exhibit, but I do have an asylum

21  application in front of me and I can look at it.

22      Yes, it is on page nine.

23  Q.  And it says if you file a frivolous application, you will

24  be permanently ineligible for any benefits under the

25  Immigration and Nationality Act, correct?

E3oWliu4                          Caudill- Mirillo - cross

1    A.  Yes.

2    Q.  That says will be.  Is that those words?

3    A.  I'm --

4    Q.  Will be permanently ineligible?

5    A.  Yes, it does.

6    Q.  Not shall, not may be, right?

7    A.  Yes.

8    Q.  Okay.  So if you file a fraudulent application, you can be

9    permanently ineligible from ever seeking asylum benefits again,

10   right?

11   A.  That's correct.

12   Q.  And that says there will, which is mandatory according to

13   this warning what they sign?

14   A.  Yes.

15   Q.  Now, after they sign the documents, the application, they

16   also have to get documentary evidence together to support their

17   application, correct?

18   A.  It's not required, but they are under the law, they are

19   generally expected to provide documentation that's reasonable

20   for them to be able to provide, yes.  Testimony alone is

21   sufficient, unless the officer feels that documentary evidence

22   is available and it's reasonable to expect that the applicant

23   could provide it.

24   Q.  So it's not required?

25   A.  It's not required.

1   Q.  There's no need for anybody to take a risk of falsifying

2   documents because it's not required, correct?

3   A.  That is, that is correct.

4   Q.  If they choose to put in documentary evidence, that

5   accompanies the packet for when it's finally submitted, is that

6   correct?

7   A.  Yes.

8   Q.  And once it's submitted it doesn't go directly to an asylum

9   officer, does it?

10  A.  No.

11  Q.  It goes to your fraud detection unit?

12  A.  I'm sorry?  When it's filed --

13  Q.  Doesn't it get screened for fraud?

14  A.  Yes.  Once it gets to our office, yes, it would be

15  preliminarily screened for fraud.  Yes.

16  Q.  It gets screened for fraud by people that are trained in

17  how to detect fraud in the applications and the documents,

18  correct?

19  A.  Yes.

20  Q.  And including that, in that is looking at documents to see

21  if they appear to be originals or if they were doctored in some

22  way?

23  A.  Well, they are looking for evidence that they could be

24  doctored.  However, in applications, they generally provide

25  copies so they wouldn't be looking at originals at that point

1    in time.

2    Q.  They have the right to ask for originals, don't they?

3    A.  Yes, after.  At the time of the interview, yes.

4    Q.  But there's no limitations, if a fraud detection officer

5    decides he want to investigate whether an application is

6    fraudulent, he can do so, correct?

7    A.  Well, again, he would not have the, he or she would not

8    have the original document at the time to prescreen before the

9    interview.  It would have to be brought to them by the officer.

10   Q.  Well, the screening officer, the fraud detection officer,

11   gets the application before it goes to an asylum officer,

12   correct?

13   A.  Yes, but the originals are not submitted at that time.

14   Q.  But when he gets the application, if the fraud detection

15   officer wants to look into the application, he can do so,

16   correct?

17   A.  Yes.

18   Q.  There's no restrictions on whether or not he can

19   investigate if he suspects fraud, right?

20   A.  No.  He can investigate.

21   Q.  And Washington, D.C. has a lab, a forensic lab, that

22   documents can be sent to by the immigration service to

23   determine whether or not they are accurate and authentic and

24   not fraudulent, isn't that right?

25   A.  Yes, they do.

1   Q.  So if the fraud detection officer wants to send documents

2   down there, he can do that?

3   A.  Yes, he can.

4   Q.  The asylum officer can do that as well?

5   A.  Yes, they can.

6   Q.  An immigration judge can do that?

7   A.  Yes, they can.

8   Q.  So there are a lot of controls in place and resources that

9   the federal government has to investigate fraudulent or

10  suspected fraudulent applications, is that correct?

11  A.  We do have resources available.  However, I would point out

12  that it is a sufficiently understaffed and under-resourced lab,

13  so, practically speaking, we actually are really limited in

14  terms of our use of it because it's one lab that's used for the

15  entire country, and as you can imagine, there are thousands, if

16  not tens of thousands, hundreds of thousands, of immigration

17  applications that are filed each year.

18  Q.  What's your title again, deputy director?

19  A.  Yes.

20  Q.  You supervise how many people?

21  A.  Directly I supervise 12.  Indirectly, roughly 50 or 60.

22  Q.  Have you had occasion to have people under you say, Hey, we

23  have too much work, I think this is a fraud, but let's not

24  investigate it, we'll just let it go?  Does that happen?

25  A.  No.

E3oWliu4                        Caudill- Mirillo - cross

1   Q.  Okay.  So you're working hard and you have a lot of cases,

2   right?

3   A.  Yes.

4   Q.  And you say you're understaffed correct?

5   A.  Yes.  My office specifically, yes.

6   Q.  But you're not letting things go that you think are

7   fraudulent, are you?

8   A.  We are trying not to, no.

9   Q.  So some things slip through the cracks, right?

10  A.  Unfortunately, yes.

11  Q.  So you supervise people like asylum officers and their

12  supervisors, right?

13  A.  Yes, I do.

14  Q.  And sometimes they make mistakes, correct?

15  A.  Yes, it happens.

16  Q.  And sometimes you make a mistake?

17  A.  Yes, it has happened.

18  Q.  Because when you're dealing with a lot of volume, sometimes

19  you don't pick up on every mistake somebody under you might

20  have made, is that correct?

21  A.  That's true.

22  Q.  And that happens in your office, and that's true today,

23  correct?

24  A.  I think that happens in every office, so, yes.

25  Q.  I do, too.  Thank you.

1          Now, as far as the standard for screening for fraud, if

2     there are any issues or any indication that there's a fraud,

3     the assigned officer's notified, isn't that right?

4     A.   They're alerted that there could be an issue and asked to

5     probe, for example, if they think that the document or there

6     might be something suspicious, the officer might be told just

7     ask the questions about this.  But in terms of the actual

8     adjudication, the fraud detection and national security

9     officers do not get involved in the outcome of the case.

10    Q.   My question is if there's any indication of fraud by the

11    screening officers, they notify the asylum officer.  Isn't that

12    right?

13    A.   That's true, yes.

14    Q.   So you don't say I don't care, they point out that

15    information?

16    A.   Yes.

17    Q.   And that's the asylum officer's job as well, right?

18    A.   Yes.

19    Q.   So all along the way, there are multiple mechanisms and

20    personnel in place that are trained to detect fraud, correct?

21    A.   That's true.

22    Q.   But yet sometimes it slips through the cracks?

23    A.   It can happen.

24    Q.   Despite your best efforts?

25    A.   Yes.

E3oWliu4                        Caudill- Mirillo - cross

1   Q.  When somebody who doesn't speak English goes to an asylum

2   interview, do they bring an interpreter with them, or is one

3   provided for them?

4   A.  They bring the interpreter with them, and we also have a

5   monitoring service that will listen in on the interview to

6   ensure that the monitor, the interpreter is of a sufficient

7   quality and that the interpretation is accurate.

8   Q.  So in addition to the applicant being there speaking,

9   there's their translator there with them, correct?

10  A.  That is true, yes.

11  Q.  Then there's the judge, the asylum officer?

12  A.  Yes.

13  Q.  And he calls a monitoring agency whose sole job is to

14  listen and make sure that the translations that are occurring

15  are accurate, correct?

16  A.  Yes.

17  Q.  And that's done whenever an interpreter is used because --

18  withdrawn.

19          The monitoring agency, if they have a discrepancy with

20  something the interpreter translated, they must inform the

21  hearing officer, correct?

22  A.  Yes.

23  Q.  And the hearing officer then makes inquiry about that,

24  correct?

25  A.  Yes.  That's what's supposed to happen, yes.

1   Q.  And this is something that you have a policy and procedure

2   for at immigration?

3   A.  Yes.

4   Q.  And that's because there's been problems in the past where

5   interpreters weren't doing a good job, right?

6   A.  Yes.

7   Q.  And this is the way of safeguarding that all translations

8   are accurate?

9   A.  Yes.

10  Q.  And if there's a problem with the translation, that could

11  cause the interview to come to a grinding halt, right?

12  A.  Yes.

13  Q.  And then, there's discussion to see whether or not there

14  was a mistake, if there needs to be a correction, right?

15  A.  Mm-hmm.  Yes.

16  Q.  And if the issue is resolved with an innocent mistake, you

17  move on, right?

18  A.  Yes.

19  Q.  If the issue's resolved that the interpreter was

20  deliberately lying or saying words that weren't accurate, that

21  interpreter can be disciplined, correct?

22  A.  Yes.

23  Q.  And they can be banned, yes?

24  A.  Yes.

25  Q.  And you've banned, I believe, three to four interpreters a

1    month; you send out a letter saying that these people should no

2    longer be permitted to interpret at these hearings.  Correct?

3    A.  I'm not sure the number, but, yes, I regularly have signed

4    those letters.

5    Q.  Because the safeguards in place detected the translator not

6    doing their job accurately, right?

7    A.  Yes.

8    Q.  And the translators themselves before being interviewed,

9    they have to take an oath?

10   A.  Yes.

11   Q.  They are given warnings and instructions about how they're

12   to interpret?

13   A.  Yes, that's correct.

14   Q.  At the end of the interview, the monitoring agency is asked

15   to basically give their review of whether or not the

16   interpretation was accurate or not, yes?

17   A.  Yes.

18   Q.  The monitoring agency also, if there's any inconsistency in

19   what's translated, they can stop the interview and notify the

20   hearing officer at that moment in time?

21   A.  Yes, that's correct.

22   Q.  And at the very end, there's also another oath by the

23   translator that they did it accurately?

24   A.  Yes.

25   Q.  So there are safeguards in place all along the way to make

E3oWliu4                          Caudill- Mirillo - cross

 1   sure that the translations are accurate, correct?

 2   A.  Yes.  That's what they're designed to do, yes.

 3   Q.  At the end of the interview, the hearing officer will issue

 4   a written report of findings, correct?

 5   A.  The hearing officer being the asylum officer?

 6   Q.  Yes.

 7   A.  They, we call it an assessment, which is basically they

 8   would set forth the facts of the case and go through the legal

 9   requirements of, indicating whether in fact the applicant was,

10   did meet the eligibility criteria or did not meet the

11   eligibility criteria.

12   Q.  And that's in written form?

13   A.  Yes, it is.

14   Q.  And then that gets passed up to a supervisor?

15   A.  Yes.

16   Q.  That's somebody who is below you now?

17   A.  Yes.

18   Q.  You once were --

19   A.  Yes, I was.

20   Q.  You once had all of these positions?

21   A.  Yes, I did.

22   Q.  And when it goes up, it's a hundred percent review of a

23   hundred percent of the data, right?

24   A.  That is correct.

25   Q.  The supervisor goes through everything in the file?

E3oWliu4                    Caudill- Mirillo - cross

1   A.   Yes.

2   Q.   And including all of the notes that the hearing officer

3   took at the time, correct?

4   A.   That is correct.

5   Q.   To make sure that the determination was appropriate?

6   A.   Yes.

7   Q.   By the way, if somebody commits a fraud, right, they come

8   to immigration, they file the application, and they say it's a

9   fraud, you can deny it like that?  Right?

10  A.   If they actually come to us and tell us, yes.

11  Q.   And if you learn later it was a fraud, you can also reopen

12  the case, right?

13  A.   Yes.  We --

14  Q.   And you can terminate their asylum?

15  A.   Yes, we can do that.

16  Q.   Because if it's determined to be a fraud, the United States

17  Government isn't going to allow it to stand, right?

18  A.   That's correct.

19  Q.   And you terminate, right?

20  A.   Yes.  It's not as fast as that, but, yes.

21  Q.   And what happens is that the person who filed the

22  fraudulent application can be subject to criminal prosecution,

23  right?

24  A.   They can, yes.

25  Q.   And if they're not in the country legally, they get

E3oWliu4                          Caudill- Mirillo - cross

1   referred back to an immigration judge for removal proceedings?

2   A.  Yes.

3   Q.  Which is basically a formal way of saying that the

4   government's going to kick them out of the country?

5   A.  It -- yes.  The government's seeking the removal of the

6   individual, yes.

7   Q.  Right.  Kicking them back to China, right?

8   A.  I wouldn't put it that way, but, yes.

9   Q.  Removing --

10  A.  Seeking to have them removed, yes, from the country.

11  Q.  And they go back to the country of origin, right?

12  A.  Presumably, unless they have some type of ability, if

13  another country will accept them.  That does happen from time

14  to time.

15  Q.  But generally speaking, if a Chinese national gets smuggled

16  into the United States and they're caught committing a fraud,

17  they will be deported back to China?

18  A.  Yes.  That's the regular course, yes.

19  Q.  And the country of China, are they sympathetic to people

20  who are returned to their country after filing a false

21  application to try to stay out of their country?

22          MR. BOONE:  Objection.

23          THE COURT:  Sustained.

24  BY MR. FRANZ:

25  Q.  Are the people afraid of going back to China?

1   A.  The --

2            MR. BOONE:  Objection.  Calls for --

3   BY MR. FRANZ:

4   Q.  Based on your experience of being involved in all of these

5   interviews and reviewing documentation and data, are the

6   applicants generally fearful of returning back to China?

7            THE COURT:  You may answer.

8   A.  I, I just want to clarify.  Do you mean the person who's

9   filed fraudulently or anyone generally?

10  Q.  I mean generally speaking.  If a Chinese national comes in

11  and they make an application and they say they are in fear of

12  persecution by the Chinese government, generally speaking, are

13  those people afraid of returning back to China?

14  A.  Yes.  They, they, they say that they are.

15  Q.  Now, with regard to the interview by the hearing officer, I

16  think it's fair to say that credibility is the most important

17  thing to assess, right?

18  A.  Yes.

19  Q.  And the hearing officers, they interview people for a

20  living, right?

21  A.  Yes.

22  Q.  They're like professional jurors to a certain extent?

23  A.  Sure.  Yes.

24  Q.  They do it every day?

25  A.  Sure.  Yes.

1    Q.  And they're like judge, jury, and attorney during that

2    interview?

3    A.  Somewhat, yes.

4    Q.  And there's no other judge in the room, right?

5    A.  That's correct.

6    Q.  And a lot of the times at the interviews, lawyers aren't

7    even there?

8    A.  Yes.  Because if they, in that case they would have chosen

9    not to come.

10   Q.  So you have an applicant, let's say, from China?

11   A.  Yes.

12   Q.  May not be very educated, with their translator in the room

13   with the hearing officer, right?

14   A.  Yes.

15   Q.  The hearing officer has nobody overseeing them at the time?

16   A.  No one else, in our staff, is in the room, no.

17   Q.  And the purpose of the interview is for them to probe the

18   applicant or their witnesses to determine if the claim is

19   credible and if the testimony is credible, correct?

20   A.  Yes.

21   Q.  And they will ask whatever questions they deem appropriate

22   to do so?

23   A.  Yes.  Whatever questions they think are appropriate, yes.

24   Q.  By the way, with regard to Christianity, you don't test

25   people to see whether or not they are actually Christian,

1  right?

2  A.  I'm not sure how that would occur, but, no, we're not, we

3  don't generally administer quizzes on religious knowledge.  No.

4  Q.  That's right.  It's not a quiz for religious knowledge;

5  it's really to determine whether or not they have a credible

6  belief in Christianity?

7  A.  Yes.

8  Q.  Right?

9  A.  That's correct.

10  Q.  So during the interview, it's the asylum officer who asks

11  the questions, right?

12  A.  Yes.

13  Q.  There's nobody there objecting?

14  A.  No.

15  Q.  And the witness has to answer the questions?

16  A.  They can refuse to answer.  However, that might be taken

17  into consideration as part of the ultimate decision because it

18  is the applicant's burden to establish that they're eligible.

19  Q.  You think that just might be taken into consideration if

20  they refuse to answer questions?

21  A.  Well, I would hope so.

22  Q.  When you were a hearing officer, if somebody refused to

23  answer your questions, would you consider that in making a

24  determination?

25  A.  Certainly would, yes.

E3oWliu4                         Caudill- Mirillo - cross

1   Q.  Do you train your staff at times?

2   A.  Do I personally train my staff?

3   Q.  Yes.

4   A.  No, I don't personally train my staff.

5   Q.  Are you aware of anybody in your office that says I don't

6   care if they answer my questions or not, it won't factor into

7   my decision?

8   A.  I'm certainly not aware of anyone, no.

9   Q.  So while you're carefully observing the applicant and the

10  interpreter, you're making sure there's no coaching, there's no

11  cheating, right?

12  A.  Yes.  That's what the system is designed to do, yes.

13  Q.  And most of the times, the reason that an application is

14  denied is for lack of details, right?

15  A.  I would say most of the time it's either denied on some

16  type of credibility, often lack of detail being part of it, or

17  failure to comply with the one-year filing deadline, yes.

18  Q.  With regard to the one-year filing, there are exceptions to

19  that, right?

20  A.  Yes, there are.

21  Q.  Somebody could have been in jail and they couldn't have

22  filed at the time?

23  A.  Yes.

24  Q.  They could have been sick?

25  A.  Yes.

E3oWliu4                          Caudill- Mirillo - cross

1    Q.   There are a number of reasons why somebody may not be able

2    to file within one year of arrival in the United States and

3    those are recognized exceptions, correct?

4    A.   Definitely, yes.

5    Q.   By the way, you worked in the Queens office, right,

6    Rosedale?

7    A.   Yes.

8    Q.   I think you listed about 12 counties that you supervise?

9    A.   Yes.  We have jurisdiction over those counties, yes.

10   Q.   If somebody files an application and it turns out they

11   didn't live in one of those counties, they're filing in the

12   wrong place, right?

13   A.   Yes.

14   Q.   But that application, that's not a fraud, it can just be

15   transferred to another jurisdiction?

16   A.   Yes.

17   Q.   And there are procedures in place for that, right?

18   A.   Yes.

19   Q.   Because that happens from time to time?

20   A.   Of course.

21   Q.   People make mistakes?

22   A.   Yes.

23   Q.   They file in the wrong courts?

24   A.   Yes.

25   Q.   They relocate and they move?

```
 1   A.  Yes, all of --
 2   Q.  And that court might lose jurisdiction over them?
 3   A.  That is true.
 4   Q.  It gets transferred, that's not a fraud?
 5   A.  No.  If they just happen to move, no.
 6   Q.  Or they just, they listed their real address and they filed
 7   in the wrong place by accident, that could happen, right?
 8   A.  I mean, if it was an accident, yes, of course, then I would
 9   say that's not fraud.  I guess if there was evidence it's
10   intentional, it could be.  I'm not sure.
11   Q.  You said earlier that some lies are okay, that it may not
12   cause an applicant to be denied, right?
13   A.  I wouldn't say they're okay, but they may not have a
14   bearing on their legal eligibility.
15   Q.  So they won't have an impact on the application process?
16   A.  That's true, yes.
17   Q.  And that's why the person's there?
18   A.  Yes.
19   Q.  If they lie to you, but it's not really right on point for
20   what the interview's about, you can forgive it?
21   A.  Yes.
22   Q.  So it doesn't matter.  As an asylum officer, you're sitting
23   there and somebody just lies to your face, you're okay with it
24   as long as it doesn't go to the credibility of their claim, is
25   that the position?
```

1   A.  People lie for a variety of reasons.  If it's truly

2   irrelevant to the legal requirements under the law, then, no,

3   there's, it's disregarded.

4   Q.  So people lie for a variety of reasons?

5   A.  Yes, some of which could be nefarious and some of which

6   could be just embarrassment.  There's a lot of reasons people

7   may lie.

8   Q.  These applicants, according to you, some of them at least

9   lie to asylum officers, right?

10  A.  That's true.

11  Q.  They've lied to the government?

12  A.  That's true.

13  Q.  They've lied to paralegals and lawyers?

14  A.  I, I, I would presume people lie to a variety of

15  individuals.  I don't know.

16  Q.  They lie to get into this country, perhaps?

17  A.  Perhaps.

18  Q.  Let's just say they've been lying in order to pursue their

19  claim for asylum, some of them, right?

20  A.  Certainly some may, yes.

21  Q.  And they're desperate, right?

22  A.  Yes.

23  Q.  They're fleeing a country that they don't want to go back

24  to and they're willing to do whatever it takes to stay here,

25  right?

E3oWliu4                          Caudill- Mirillo - cross

1    A.  Yes.

2    Q.  And that's because they don't want to go back to China,

3    right?

4    A.  Yes.

5    Q.  But they swear an oath to tell the truth?

6    A.  Yes.

7    Q.  I think we're at six occasions, right?

8    A.  I think so, yes.

9    Q.  They subject themselves to going to prison, right?

10   A.  Yes.

11   Q.  But they still do it even though they're warned, right?

12   A.  Yes.

13   Q.  And they're told if we catch you, if it's fraudulent, if

14   you lie, if it's fake, you'll be barred from ever applying

15   again, right?

16   A.  Yes.

17   Q.  Lin Chen is a witness that may testify in this court that

18   you testified you reviewed her, you're aware of her status,

19   correct?

20   A.  I am aware of her status.

21   Q.  She's on fraud hold right now, right?

22   A.  Yes.

23   Q.  That's because she committed a fraud, right?

24   A.  It's because she's suspected.  She has not, in fact, come

25   to the immigration officials and acknowledged a fraud, but it,

E3oWliu4                         Caudill- Mirillo - cross

1    yes, we have very good reason to suspect that she has committed

2    fraud.

3    Q.   Good reason to suspect because she's a cooperating witness

4    who's admitted to engaging in the fraud to these people from

5    the government that you're working hand in hand with, is that

6    the good reason to suspect it?

7    A.   I'm personally, yes, I understand that to be the case,

8    though I'm not exactly sure what role she's playing with

9    cooperating or not.  I don't know that.

10   Q.   But you're aware she's a cooperator, yes?

11   A.   Yes.

12   Q.   You're aware that she admitted she engaged in a fraud?

13   A.   Yes.

14   Q.   So her application's on fraud hold, right?

15   A.   That's correct.

16   Q.   And when you commit a fraud against the government, your

17   asylum application can be terminated, right?

18   A.   Well, the status can be terminated.  She does not currently

19   have asylum status at this point in time because she's on hold.

20   Q.   When you don't have asylum status, you can be deported?

21   A.   We do not have the authority to do that.  It would have to

22   go to an immigration judge and they would have a separate

23   hearing to make that determination.  That's not something my

24   agency can do.

25   Q.   But that can happen while she's on hold, right?

E3oWliu4                          Caudill- Mirillo - cross

1   A.  That is correct.

2   Q.  And she's on a hold at the request of Special Agent Dan

3   Park for the government because she's cooperating; that's why

4   no action's been taken, correct?

5   A.  Yes, that's correct.

6   Q.  So she's still in this country with no proceedings to send

7   her out of this country at the request of the government,

8   correct?

9   A.  She -- yes.  She's --

10  Q.  Thank you.

11  A.  -- in a.

12          THE WITNESS:  May I finish my answer.

13          THE COURT:  You can finish your answer.

14          THE WITNESS:  Thank you.

15  A.  Her case is one of thousands of cases that are on have

16  various stages of hold.  We aren't moving on any cases at this

17  time because it has to be handled on a national level and it's

18  being run out of our headquarters, so we actually cannot take

19  action on her case until all cases have been reviewed and

20  vetted and they decide how to proceed as a whole.

21  Q.  That's what's been decided as a whole, right?

22  A.  Yes.  On a national level, yes.

23  Q.  But on a national level, you have thousands of applications

24  that you're reviewing for possible fraud, right?

25  A.  That's correct.

1    Q.  You haven't investigated them yet?

2    A.  We are -- typically, we don't take the action until there

3    have been convictions and at -- once all the convictions have

4    been taken and we can verify all of the evidence, then our

5    agency will begin initiating procedures.

6    Q.  So those thousands of applications, those are all

7    proceeding in criminal courtrooms around the country?

8    A.  No, no, no.  Thousands of asylum applications that are in

9    various stages.

10   Q.  So you haven't proven them to be false yet?

11   A.  That's true.

12   Q.  Lin Chen admitted hers was?

13   A.  Unfortunately, that's not enough.  We actually have to call

14   her in front of us like all of the other applicants that we

15   would need to call and have an individual hearing.  That's the

16   way the regulations and the law's set up, so we can't just take

17   the testimony alone and make a decision.  We still would need

18   to give her an opportunity to come and speak to us and

19   acknowledge that on the record.

20   Q.  And the reason it hasn't been done --

21   A.  Is --

22   Q.  -- is because Special Agent Dan Park put in that request,

23   did he not, to put the proceedings against Lin Chen on hold?

24   A.  No.  No cases -- the decision was, we have not taken action

25   on her case because we've taken action on no cases nationally.

1   Q.  Are you saying that Special Agent Park didn't make that

2   request?

3   A.  He asked for her case to be placed on hold, but he hasn't,

4   his request for hold is something in the past.  Our decision in

5   terms of how we move forward is irrelevant to his request.

6   Q.  He made a request to put her on hold?

7   A.  Yes.

8   Q.  Right?

9   A.  Yes.

10  Q.  She remains on hold, right?

11  A.  Through, through the conviction process for any cases that

12  are involved, yes.

13  Q.  Has the government asked you to put on hold the removal

14  proceedings for people that aren't cooperating with the

15  government?

16  A.  I'm not aware of any, no.

17  Q.  Right.  So what you're doing is you're investigating to see

18  whether or not fraud was, fraud occurred in thousands of

19  applications, right?

20  A.  Yes.

21  Q.  But you haven't come to the conclusion of the

22  investigation?

23  A.  No.

24  Q.  Lin Chen's admitted her guilt, but you're still not doing

25  anything with it?

E3oWliu4                         Caudill- Mirillo - cross

1   A.  Again, we don't move on any case --

2   Q.  It's a yes or no.

3   A.  It's a no.  I think I explained why.  Thank you.

4   Q.  Now, with regard to the applicants that came in, they swore

5   the oath and they continued to lie and fool your officers,

6   right?

7   A.  Yes.  It's happened, yes.

8   Q.  And some of these people, as we said, are unsophisticated

9   and uneducated, and they still fooled your officers?

10  A.  Yes, it's possible.

11  Q.  And they did so because they didn't want to be deported?

12  A.  I would assume so, yes.

13  Q.  And they did so because they wanted to stay in America?

14  A.  Yes.

15  Q.  And they did so because they wanted to live free, correct?

16  A.  I don't know their motivation.

17           MR. BOONE:  Objection.

18           THE COURT:  Was there an objection?

19           MR. BOONE:  I'm not sure what he means by live free.

20           THE COURT:  Sustained.

21  BY MR. FRANZ:

22  Q.  They didn't want to go to prison, right?

23  A.  I don't know why they, why they didn't -- I don't

24  understand.  I guess I'm not understanding your question.

25  Q.  Well, one, people came in, according to you, and they lied

1    to your officers, right?

2    A.  Yes.

3    Q.  If they went in and told your officer, Hey, my

4    application's a fraud, I lied to you, right, they could go to

5    prison for making that admission, right?

6    A.  Yes, they could.

7    Q.  So they continue with their lie to avoid making that

8    admission?

9    A.  Oh, yes.

10   Q.  So they don't want to go to prison, right?

11   A.  Yes.  I'm sorry.

12   Q.  They don't want to be deported.

13   A.  I thought you were speaking in China.  Sorry.  Yes.  That's

14   the case.  Yes.

15            MR. FRANZ:  Thank you.

16            THE COURT:  Is there any other cross-examination?

17            MR. MAHER:  Yes.  May I have a moment to set up.

18            THE COURT:  Yes.

19            MR. MAHER:  Thank you.

20            MR. FRANZ:  Your Honor, could I ask a couple of

21   follow-up real quick?

22            THE COURT:  Yes.

23   BY MR. FRANZ:

24   Q.  With regard to the database search with regard to the

25   number of applications that were filed --

E3oWliu4                              Caudill- Mirillo - cross

1    A.  Yes.

2    Q.  Who has -- do you have access to the database?

3    A.  I have access to the database, yes.

4    Q.  Would you give us a printout of all of the cases that you

5    claim were filed on our behalf that compile the 900

6    applications so we can look at it?

7    A.  I would personally have no problem with that.  I don't know

8    if there's any --

9              MR. BOONE:  Objection.

10   A.  -- proprietary restrictions on that regulatory, regulatory

11   or statutory-wise.

12   Q.  Well, you provided us with a number based on data --

13             MR. BOONE:  Objection.

14   BY MR. FRANZ:

15   Q.  -- that you say you reviewed?

16             THE COURT:  Let's just hold on for a second.

17             Are these public documents?

18             THE WITNESS:  No.

19             THE COURT:  And for you to figure out if those are

20   documents you could turn over, what would that entail?

21             THE WITNESS:  I would need to speak with our agency

22   attorneys related to public information, technology, security,

23   and also the asylum division attorneys for confidentiality

24   reasons.  But certainly I could ask.

25             THE COURT:  You may proceed, Mr. Franz.

1   BY MR. FRANZ:

2   Q.  If you were to redact the names of the applications, we'd

3   be able to see at least the ones that you claim are from

4   signed, is that right?

5   A.  Yes.  I would believe so.  It should show, yes.

6            MR. FRANZ:  We'll take this up later, your Honor.

7            THE COURT:  Okay.

8            MR. MAHER:  Your Honor, we're going to need the

9   courtroom deputy.

10           THE COURT:  She'll be right back.

11           MR. MAHER:  May I proceed.

12           THE COURT:  You may.

13  CROSS-EXAMINATION

14  BY MR. MAHER:

15  Q.  You have never met Vanessa Bandrich?

16  A.  No, I have not.

17  Q.  You've never seen Vanessa Bandrich at the Rosedale office?

18  A.  No, I have not.

19  Q.  And you don't have any records of her appearing at any of

20  these asylum interviews, right?

21  A.  I'm not aware of them.

22  Q.  And, again, your office does keep track of who appears at

23  the interviews?

24  A.  Yes, we do.

25  Q.  You're aware that a number of cases were filed either

1    through the asylum office or in immigration court from the

2    Bandrich & Associates firm, correct?

3    A.  Yes.  I am aware of that, yes.

4    Q.  But you just testified earlier that you thought there was

5    408 or something, correct?

6    A.  Yes.  I'm definitely aware of our office.  I would presume

7    that there are filings in the immigration court, but I don't

8    know that information specifically.

9    Q.  Just like you answered Mr. Franz, you did not review those

10   documents yourself in regard to Bandrich & Associates?

11   A.  That is correct.

12   Q.  That's not based on your personal knowledge?

13   A.  No, it is not.

14   Q.  You also know that there is something that's called an E28

15   form, right?

16   A.  A G28?

17   Q.  E28 and there's a G28.

18   A.  Yes.

19   Q.  It's a notice of appearance, right?

20   A.  Yes, we use the G28.

21   Q.  What this is is a simple form when an attorney shows up at

22   immigration proceeding, they fill out the form saying they're

23   here, right?

24   A.  Yes.

25   Q.  And the court or the officer makes sure that's filed before

 1   the lawyer can speak?

 2   A.  That's correct.

 3   Q.  And these notices also have to be filed if an attorney

 4   covers a case, say, for a colleague?

 5   A.  That's correct.

 6   Q.  So they might not even be appearing on their own case, but

 7   that form will show up in the file, right?

 8   A.  Well, the form, they will have both copies of the form, but

 9   the normal attorney of record will remain the attorney of

10   record.

11   Q.  Right.  But you're also going to have a record of the G28

12   for the attorney who came just to cover the case?

13   A.  Yes, that's correct.

14   Q.  And that form is called a notice of appearance, right?

15   A.  Yes, that's correct.

16   Q.  To this day, you're not aware of any former Bandrich &

17   Associate client whose asylum has been terminated because of

18   suspected fraud, right?

19   A.  I'm not aware of any, no.

20   Q.  Zero?

21   A.  No.

22   Q.  I want to, if we can, summarize the process of the asylum

23   office.  I know you talked a little bit about it, but I want to

24   really boil this down and I think we're going to do this

25   quickly.

E3oWliu4                          Caudill-Mirillo - cross

1   A.  Okay.

2   Q.  Basically for an undocumented person, there's a number of

3   ways they can get into the country, right?

4   A.  Yes.

5   Q.  And asylum is one of these ways?

6   A.  That's not how they get into the country.

7   Q.  To stay in the country?

8   A.  Yes.

9   Q.  On one hand, we can think of citizenship as something

10  probably everyone wants?

11  A.  I would think so, yes.

12  Q.  And asylum isn't quite citizenship?

13  A.  No, it is not.

14  Q.  But it's a way to stay in the country?

15  A.  That is correct.

16  Q.  Now, when someone wants to do this, they have to start

17  with --

18            JUROR:  Are we supposed to be able to see this,

19  because we can't?

20            MR. MAHER:  How's this?

21            JUROR:  We have black screens.

22            THE COURT:  Jurors raise your hand if you cannot see

23  any writing.  All right.  There's a consensus.  Just a second,

24  please.

25            MR. MAHER:  We'll work on that.

E3oWliu4                    Caudill-Mirillo - cross

1              THE COURT:  Now can you see it?

2              JUROR:  Yes.  It's blurry.

3    BY MR. MAHER:

4    Q.  This is a very blurry picture, but it says I589.  That's

5    how you start the process for asylum?

6    A.  Yes.

7    Q.  Once that form is filed, it goes to the service center,

8    correct?

9    A.  Yes.

10   Q.  And that's when the 589 is reviewed?

11   A.  Yes.

12   Q.  And then if it looks like it's in order, it's assigned to

13   an asylum office?

14   A.  Yes.

15   Q.  Rosedale is one of the eight asylum offices in the country?

16   A.  Yes.

17   Q.  And that's the office that you work at?

18   A.  Yes.

19   Q.  From service center it's going to go to the asylum office.

20   The asylum office then will send out an interview notice?

21   A.  Yes.

22   Q.  Right?  And if the applicant has someone prepare this form

23   for them, the notice goes to the person who prepared the form,

24   right?

25   A.  A copy of it, yes.

E3oWliu4                              Caudill-Mirillo - cross

1    Q.   They're notified?

2    A.   Yes, both people, both parties would be notified.

3    Q.   Then we have our interview notice.  I'm trying to use my

4    best handwriting.  Can everyone see the screen still?

5            Now, the interview notice is for the applicant then to

6    come for the asylum interview?

7    A.   Yes.

8    Q.   Right.  So that's the next phase, interview notice, then

9    asylum interview?

10   A.   Yes.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3o0liu5                              Caudill-Mirillo - cross

1    BY MR. MAHER:

2    Q.  Now, at this interview, that's where the applicant is

3    allowed to bring a translator?

4    A.  Yes.

5    Q.  You don't provide a translator?

6    A.  No.

7    Q.  They have to bring their own?

8    A.  Yes.

9    Q.  You can imagine that many people might need help finding a

10   translator?

11   A.  Yes.

12   Q.  And there is nothing wrong with bringing a translator?

13   A.  Absolutely not.

14   Q.  This interview is not adversarial?

15   A.  No, it is not.

16   Q.  Typically it's the assylum officer.

17   A.  Yes.

18   Q.  The applicant.

19   A.  Yes.

20   Q.  And a translator, if one is there.

21   A.  Yes.

22   Q.  Usually the lawyers aren't even there, correct?

23   A.  Often, yes, that's the case.

24   Q.  Often they are not there?

25   A.  Often they are not there.

1   Q.  And the government doesn't have a lawyer there?

2   A.  No, there is no lawyer for the government.

3   Q.  No lawyer from the government saying don't believe this

4   person, it is just one-on-one, officer and applicant.

5   A.  Yes.

6   Q.  So at that point -- put this down a little bit -- the

7   assylum officer can make an assessment and say this person

8   deserves assylum?

9   A.  Yes.

10  Q.  And if that's approved by the supervisor, those channels,

11  assylum, can be granted right then?

12  A.  Yes.

13  Q.  Right.  So this is, I'm going to say, granted; they get

14  assylum, right?

15  A.  Yes.

16  Q.  That doesn't happen in the majority of cases?

17  A.  No.

18  Q.  It's way less than the majority of cases --

19  A.  Yes.

20  Q.  -- right?

21  A.  That is correct.

22  Q.  So it happens, if it's not granted, it's denied?

23  A.  It will -- well, it can either be denied or referred to

24  court.

25  Q.  Let's put it this way, they are not granted, they are

1    likely going to be referred.  And by referred, we mean to

2    removal proceedings, correct?

3    A.  Yes; that's correct.

4    Q.  Okay.  So removal proceedings, that's another pipeline,

5    now, correct --

6    A.  Yes, it is.

7    Q.  -- so to speak?

8            So people can come to removal proceedings in different

9    ways.

10   A.  That is correct.

11   Q.  One, is if they have had an asylum application denied;

12   right?

13   A.  Yes.

14   Q.  Now, in this first line, on the left, the green line, that

15   is called affirmative assylum; correct?

16   A.  Yes, that's correct.

17   Q.  And basically means a person is taking the steps saying,

18   here I am, I want assylum --

19   A.  Yes.

20   Q.  -- right?

21           Now, on the red side, over here, this is what your

22   office is gonna call defensive assylum.

23   A.  Yes.

24   Q.  That means now the person is being put into removal or

25   deportation proceedings, and they are allowed, as a defense, to

E3o0liu5                              Caudill-Mirillo - cross

1    say don't kick me out, I deserve assylum --

2    A.   Yes; that's correct.

3    Q.   -- right?  And that's called defensive, most likely because

4    the government is trying to remove them?

5    A.   Yes.

6    Q.   All right.

7          Other people get placed in removal proceedings, as

8    well, correct.

9    A.   Yes.

10   Q.   For instance, someone who is apprehended trying to cross

11   our border without the proper papers can be arrested?

12   A.   Yes.

13   Q.   They are detained.

14   A.   Yes.

15   Q.   And they are placed immediately into removal proceedings?

16   A.   Yes.

17   Q.   And those people, if they hire one, can have a lawyer

18   represent them?

19   A.   That's correct.

20   Q.   But they are in the same proceeding now as the person who

21   tried to get assylum, but lost.

22   A.   Yes; that's correct.

23   Q.   And people who are lawyers, who handle immigration cases,

24   may handle removal proceedings for both types of people?

25   A.   Absolutely.  That's correct.

1    Q.  And it's probably very common for people who specialize in

2    immigration law to handle both types of assylum cases?

3    A.  Yes.

4    Q.  So with removal proceedings, the very first step is --

5    lawyers love jargon.  You are familiar with NTA, right?

6    A.  Yes.

7    Q.  That means Notice to Appear, correct?

8    A.  Yes.

9    Q.  And so what happens is the government knows that the person

10   is in removal proceedings, so they send out a notice to that

11   person that they are required to appear in immigration court.

12   A.  Yes.

13   Q.  And if there is an attorney, they are also notified to

14   appear in immigration court?

15   A.  Yes.

16   Q.  This is not voluntary for the applicant, correct?

17   A.  That is correct.

18   Q.  If they do not show up to the immigration court that, in

19   and of itself, is a basis for removal?

20   A.  Yes.

21   Q.  For deportation.

22   A.  Yes.

23   Q.  And potentially inadmissibility?

24   A.  Yes.

25   Q.  And the term inadmissibility means you are not allowed to

E3o0liu5                                Caudill-Mirillo - cross

1  come back in our borders, right?

2  A.  Yes.  It technically means you are not permitted to enter,

3  even.  It's kind of a legal term of art, yes.

4  Q.  It means you are not to be admitted.

5  A.  Yes.

6  Q.  And that violating that is a federal crime in and of

7  itself?

8  A.  Yes.

9  Q.  So after the NTA, the next step is immigration court,

10  correct?

11  A.  Yes.

12  Q.  So the notice to appear is to go to immigration court, yes?

13  A.  Yes.

14  Q.  And for people in Queens and the counties that are handled

15  by your Rosedale office, that means 26 Federal Plaza, usually,

16  right?

17  A.  Yes.

18  Q.  That's about two blocks away from here?

19  A.  Yes.

20  Q.  Now, immigration court, the first time you show up, there

21  is something called a master hearing?

22  A.  Yes.

23  Q.  Right.  So the first step is master hearing.  That's

24  basically the first time the parties show up?

25  A.  Yes.

1  Q.  And the immigration judge -- there is an immigration judge

2  there, right?

3  A.  Yes.

4  Q.  And the judge verifies with the parties that that's the

5  right person who is there?

6  A.  Yes.

7  Q.  That that's the attorney handling the case?

8  A.  Yes.

9  Q.  And the charges are given to the person, correct?

10  A.  Yes.

11  Q.  Basically, there is maybe a set of four charges where the

12  person either has to admit or deny?

13  A.  Yes, I believe so.

14  Q.  And if you admitted all of the charges at that first master

15  hearing, you would be deported?

16  A.  To be honest, I have never worked in immigration court.

17  And I have never worked for that agency, so I'm not exactly

18  sure how -- what number of charges you would have to admit to

19  be removable.  I really can't answer that question.

20  Q.  But, again, this is an adversarial proceeding now --

21  A.  Yes, it is.

22  Q.  -- right?  There is a government lawyer who is like a

23  prosecutor.

24  A.  Yes.

25  Q.  There may be an immigration lawyer for the person?

E3o0liu5                    Caudill-Mirillo - cross

1  A.  Yes.

2  Q.  There may not be.

3  A.  That's true, yes.

4  Q.  Many people in immigration court go without counsel, don't

5  they?

6  A.  I, again, I don't know.  I have never worked in immigration

7  court.  And I don't work in that agency, so I don't know what

8  their representation rates are.

9  Q.  You have -- you're a deputy director at the assylum office?

10 A.  Yes.

11 Q.  And you are telling us, you are testifying that you don't

12 know that there are tremendous numbers of people in immigration

13 court who are without counsel?

14 A.  I know that there are.  I don't know exactly what the

15 percentage is, no.  We don't share that type of data,

16 interagency.

17 Q.  You're a lawyer?

18 A.  Yes.

19 Q.  You went to law school?

20 A.  Yes.

21 Q.  You have heard of the sixth amendment?

22 A.  Yes.

23 Q.  You have heard about the six amendment right to counsel?

24 A.  Yes.

25 Q.  Does the sixth amendment right to counsel apply to

E3o0liu5                          Caudill-Mirillo - cross

1    immigration proceedings?

2                MR. FISCHETTI:  Objection.

3                THE COURT:  Overruled.

4                Do you know the answer to that question?

5                THE WITNESS:  To be honest?  No, I never practice.  I

6    never chose to practice any type of law, I immediately went

7    into my job, so I -- it's been a long time since I took the

8    bar.  I couldn't say off the top of my head.

9    Q.  You're saying deputy directors of the assylum office under

10   USCIS, you don't know whether a person is entitled to have a

11   lawyer or not in immigration court?

12   A.  I know they are.  They have a right to have an attorney,

13   but they are not -- it's not like in a criminal context where

14   they have a right to have the government afford them an

15   attorney.  That's the extent of my knowledge in terms of the

16   representation.

17   Q.  Are you saying you know that they are not entitled -- by

18   entitled, I mean that if they say they want one, the government

19   has to provide one.  Or are you saying you don't know whether

20   the government has to provide --

21   A.  I know the government does not have to provide one.

22   Q.  They don't, do they?

23   A.  No.  The government doesn't have to provide counsel, right.

24   Right.

25   Q.  And so the logical extension of that, is if someone can't

E3o0liu5                         Caudill-Mirillo - cross

 1   afford a lawyer, they won't have counsel there, will they?

 2              MR. BOONE:  Objection.

 3              THE WITNESS:  Unless they are pro bono.

 4              MR. BOONE:  Calls for speculation.

 5              THE COURT:  I'm going to allow it.

 6   A.  Unless a pro bono organization takes their case, no.

 7   Q.  Right.  So unless this applicant, who has come from another

 8   country, who knows how to find a pro bono lawyer, unless they

 9   find one, they wouldn't have one, right?

10   A.  That's correct.

11   Q.  You would concede --

12              THE COURT:  If they can't afford one.

13              THE WITNESS:  If they can't afford one, the government

14   does not provide one.  If they can find a pro bono organization

15   that will accept them, then presumably -- that will accept

16   their case, then they would have an attorney.  But if they

17   cannot pay for one themselves, they are not going to have an

18   attorney themselves.

19              THE COURT:  You may proceed.

20              MR. MAHER:  Thank you.

21   Q.  Then you have a situation where you have a government

22   lawyer in an adversarial proceeding, right?

23   A.  Yes.

24   Q.  Who is trained in the law?

25   A.  Yes.

E3o0liu5                          Caudill-Mirillo - cross

1    Q.   Working for Homeland Security?

2    A.   Yes.

3    Q.   Against a person from another country; yes?

4    A.   Yes.

5    Q.   No law degree.

6    A.   Well, some may.  But, no, certainly many don't.

7    Q.   There is probably a lot of people in immigration court who

8    don't have law degrees, correct?

9    A.   There are, probably.

10   Q.   And there is probably even more that don't have a law

11   degree from an American law school, right?

12   A.   I -- yes, I'm sure that's the case.

13   Q.   Government lawyer, then, against the immigrant?

14   A.   Yes.

15   Q.   Correct?

16   A.   That's correct.

17   Q.   You would -- you do know the statistics regarding

18   immigration success rates for people who have counsel, versus

19   those who do not have counsel, correct?

20   A.   Yes.  They are higher, significantly higher, for people who

21   have counsel.

22   Q.   People who have counsel have a significantly higher success

23   rate in the immigration court process, correct?

24   A.   That's correct.

25   Q.   That doesn't mean that it comes through fraud.

E3o0liu5                         Caudill-Mirillo - cross

1   A.  That's true.

2   Q.  It comes because lawyers are good at some things, right?

3   A.  That's true.

4   Q.  One of the things that lawyers are supposed to be good at

5   is knowing the rules?

6   A.  Yes.

7   Q.  They are supposed to know what a factfinder is looking for?

8   A.  Yes.

9   Q.  They are supposed to know the law they are looking at.

10  A.  Yes.

11  Q.  And the facts that they are looking at?

12  A.  Yes.

13  Q.  And when they represent a client, they have that in mind?

14  A.  Yes, that's correct.

15  Q.  They should, at least, correct?

16  A.  Yes, they should.

17  Q.  Now, after the master hearing, the case is set for a trial,

18  correct?

19  A.  That's correct.

20  Q.  Now, just because it is set for a trial doesn't mean that

21  that's going to happen any time soon?

22  A.  No, it's definitely not.

23  Q.  Sometimes people can wait years for their trial?

24  A.  That is correct.

25  Q.  Sometimes people will show up in March of year X, and be

1    told we can't do your trial today, come back next March.

2    A.  Yes.

3    Q.  Right?  They could be told --

4    A.  That's my understanding.

5    Q.  -- they could be told come next year, right?

6    A.  That's my understanding, yes.

7    Q.  And then they may come back after that year and be told

8    come back next year, correct?

9    A.  Yes.

10   Q.  And as these cases then pile up, the lawyers still come to

11   court for clients, right?

12   A.  I -- I would presume so but, again, I don't work there, so

13   I don't know.

14   Q.  Well, we would hope that if a lawyer is representing a

15   person who is going to be showing up in one of these

16   proceedings where they can be deported, that they are going to

17   show up for the court hearings, right?

18   A.  I certainly hope so, yes.

19   Q.  So if one is a lawyer who has a number of clients whose

20   cases keep getting put off, they might have to go to a lot of

21   court hearings?

22           MR. BOONE:  Objection, your Honor.  She stated several

23   times she does not work for immigration court, she cannot speak

24   with personal knowledge about what happens there, what lawyers

25   do, what is typical.  He is going down a whole line of

E3o0liu5                          Caudill-Mirillo - cross

1   questioning that she has said, several times, she has not any

2   basis to answer.  She works in the assylum office.

3             THE COURT:  I'll sustain that.

4             If there are any questions you don't know the answer

5   to, you can say that.

6             THE WITNESS:  I'm --

7             THE COURT:  So you don't have to answer that question.

8             So we're going -- Mr. Maher is going to ask something

9   else.

10             THE WITNESS:  Okay.

11             MR. MAHER:  Thank you, Judge.

12   BY MR. MAHER:

13   Q.  During this trial, the immigrant can raise a number of

14   defenses?

15   A.  Yes, that's true.

16   Q.  And they raise these defenses in order to keep from being

17   deported; right?

18   A.  Yes.

19   Q.  And one of the defenses is, again, assylum?

20   A.  Yes.

21   Q.  Another potential defense is called withholding of removal

22   based upon an assylum claim; correct?

23   A.  Yes.

24   Q.  Another one could be withholding of removal based on the

25   convention against torture?

1    A.  Yes.

2    Q.  These are all different ways, potentially, to argue to an

3    immigration judge to allow you to stay in the country?

4    A.  Yes.

5    Q.  You would have a different status, potentially, depending

6    on the defense you raise?

7    A.  That's correct.

8    Q.  If you win in immigration court and you raise assylum, you

9    go back over to the left again, in the green, and you are

10   granted assylum and the benefits, right?

11   A.  Yes.

12   Q.  If you lose and you don't appeal, you are deported;

13   correct?

14   A.  Yes.

15   Q.  You can't appeal though?

16   A.  Yes, you can appeal.

17   Q.  You said before there is the BIA?

18   A.  Yes.

19   Q.  So you can appeal to the BIA.  If you lose there, you can

20   appeal to, at least in this jurisdiction, to the Second Circuit

21   Court of Appeals?

22   A.  That is correct.

23   Q.  So you lose again, you are going to go to the Second

24   Circuit.  If you lose then, your last court of relief is the

25   Supreme Court of the United States?

1   A.   That is correct.

2   Q.   There is no requirement that the Supreme Court hears the

3   appeal --

4   A.   That is correct.

5   Q.   -- right?  The Supreme Court decides what cases they want

6   to take?

7   A.   Yes.

8   Q.   And they take very, very few immigration cases per year,

9   correct?

10  A.   Yes.

11  Q.   So, basically, if you even make it up to the Sixth Circuit

12  and lose, it is over, practically speaking?

13  A.   Yes, practically speaking; yes.

14  Q.   So a loss in any of these other places leads back to

15  deportation?

16  A.   Yes.

17  Q.   Now, as the deputy director, you know that the government

18  keeps track of the number of assylum claims made per year in

19  this country, right?

20  A.   Yes.

21  Q.   They also keep track of the number of claims made by

22  different country base of the person, right?

23  A.   Yes.

24  Q.   You testified that you are aware that at least in this area

25  of the country, immigrants from China had the largest amount of

1    assylum claims, correct?

2    A.  Yes.

3    Q.  You're also aware that the United States government keeps

4    track of, we can say, the behavior of foreign governments?

5    A.  Yes.

6    Q.  And in particular, keeps track of their behavior in regard

7    to human rights violations?

8    A.  Yes.

9    Q.  They keep track of persecution based on religion?

10   A.  Yes.

11   Q.  Based on gender?

12   A.  Yes.

13   Q.  Based on political affiliation?

14   A.  Yes.

15   Q.  And the government keeps track of what types of claims

16   assylum seekers are raising, right?

17   A.  Yes.  Yes, that's correct.

18   Q.  And you have testified before that assylum officers can

19   accept country reports as part of an assylum application,

20   right?

21   A.  That is correct, yes.

22   Q.  And the U.S. State Department prepares country reports?

23   A.  Yes, it does.

24   Q.  And you are aware of that?

25   A.  Yes.

E3o0liu5                           Caudill-Mirillo - cross

1    Q.  And in fact, the U.S. government prepares specific country

2    reports, or a specific country report, concerning China?

3    A.  Yes.

4    Q.  They do that every year?

5    A.  Yes.

6    Q.  And that is something that assylum officers are permitted

7    to look at?

8    A.  Yes, definitely.

9    Q.  Definitely.  And as its base for knowing that there

10   actually is persecution in China, correct?

11   A.  Yes.  Yes, that's correct.

12              MR. MAHER:  Your Honor, I have a compact disk with the

13   State Department Reports on Human Rights regarding China for

14   the years 2010 through 2013.

15              THE COURT:  Why don't we -- actually, it's time to

16   take a break, in any event.

17              MR. MAHER:  Sure.

18              THE COURT:  So why don't we let the jury take a break

19   now.  We'll take a break until 4:00.  Please remember don't

20   discuss the case and keep an open mind.  Thank you.

21              THE DEPUTY CLERK:  All rise.

22              (Jury excused)

23

24

25

1              (In open court)

2              THE COURT:  Be seated.

3              Does the government have an objection.

4              And the witness will please remain here during course

5    of -- you can have a seat just for one more minute.  If anyone

6    would like to excuse the witness, let me know.

7              MR. MAHER:  Yes, I think that would be proper, your

8    Honor.

9              THE COURT:  You can step back.  Thank you.

10             (Witness temporarily excused)

11             THE COURT:  Mr. Boone.

12             MR. BOONE:  Yes, your Honor.

13             Mr. Maher has been on the case since his client was

14   initially charged and presented.  We have never had any

15   discussions about any CD, we don't know what is on this CD.

16   He proffers that it is some type of State Department report.

17   She does not work for the State Department.  She works for the

18   assylum office.  It is completely improper to, at the last

19   minute, spring this on us.  It's a disk that, I presume,

20   contains many pages.  Otherwise, he would have just given us

21   the pages.  And, then, to have a witness who has no affiliation

22   with the State Department testify to what is in this document,

23   on what is on this disk, your Honor.

24             THE COURT:  Mr. Maher.

25             MR. MAHER:  Judge, this is the Human Rights Report of

E3o0liu5                           Caudill-Mirillo - cross

1    the Department of State.  I would ask the Court take judicial

2    notice of it.  This is something that the assylum officers rely

3    upon in order to make a determination of persecution.

4           The government -- it's published by the government.

5    They are on notice.  It's a website.  All I have done is

6    download the public pdf document on the state department's

7    website regarding China.  That is what is on this CD.

8           MR. BOONE:  We don't know what is on the CD.  We have

9    not seen it.

10          MR. MAHER:  I'm cross-examining her.  If you want to

11   go through it, and you want to verify that's what on the CD, I

12   have no problem with that.  We're not going to give it to the

13   jury if it's admitted.  They're not going to have the CD in the

14   back.  I did that for convenience instead of killing a bunch of

15   trees right now.

16          THE COURT:  Why don't you ask her if, or something to

17   this effect and then you'll tell me what your views are on

18   this.  Ask her if the asylum office relies on these Department

19   of State Human Rights Reports or something.  I was going to

20   look back and see exactly the way you phrased it.

21          MR. MAHER:  I asked it to her two different ways.

22          THE COURT:  So you said:  You have testified before

23   that assylum officers, country reports -- this is a rough

24   transcript, but I'm reading from it.

25          Country reports as part of assylum application, right.

1    That is correct.

2              And the U.S. State Department prepares country

3    reports.  Yes, it does.

4              Are you aware of that.  Yes.

5              And in fact, the U.S. government prepares specific

6    country reports, or a specific country report concerning China.

7    Yes.

8              And they do take every year.  Yes.

9              And that is something the assylum officers are

10   permitted to look at.  Yes, definitely.  Definitely.

11             And as its base for knowing that there actually is

12   persecution in China.  Yes, that's correct.

13             What's the government's objection, you want to see

14   what is on the CD first?

15             MR. BOONE:  Several objection.

16             First it is irrelevant.  There is no question about

17   whether there is persecution in China or not.  That's not the

18   issue --

19             THE COURT:  I'm not going to accept the relevance

20   argument.  It is one of the bases upon which someone can be

21   granted assylum.  I think it is okay for the jury to see what

22   that basis is, but I'm happy to hear the rest of your

23   arguments.

24             MR. BOONE:  The rest is he cannot hand our witness a

25   CD and tell her what's on it and ask her questions about it.

E3o0liu5                        Caudill-Mirillo - cross

1          If there is something on the CD he wants her to see,

2    he should print it out and show it to her.

3          THE COURT:  I agree with that about the form.

4          If you want to print it out and show it to her and ask

5    her if she recognizes it.

6          Are you trying, actually, get it in through her, or

7    are you just going to ask her questions about it.

8          MR. MAHER:  First off, I think it is admissible, the

9    entire report on China.  I'm moving to admit.  I don't need

10   Burkina Faso or Ghana, I just want China.  And I think that's

11   perfectly admissible.  And it is also, under 901, it's

12   perfectly authenticated as well as a public record.

13         If I can just finish. As far as for efficiency

14   purposes, I am not going to read through the entire thing.  I

15   have a couple of highlights I would present to her on cross.

16   But I'm not going to go through the whole thing.  I think the

17   jury is entitled to have it as evidence of persecution, and the

18   basis of the claims that people are raising, and the fact that

19   this assylum officer, as an officer of the United States

20   government, relies upon this public document in making their

21   determination, which she has already acknowledged.

22         THE COURT:  Okay, Mr. Boone, anything else?

23         MR. BOONE:  Yes, I am a little lost as to how it is

24   not hearsay again?

25         THE COURT:  Well, I'm assuming it is 8038, which would

1   be public record, is that the basis upon which you are trying

2   to admit it?

3            MR. MAHER:  Yes.  And it is self-authenticating.

4            THE COURT:  Record or statement of a public office if

5   sets out the office's activities, a matter observed while under

6   a legal duty to report, but not including, in a criminal case,

7   a matter observed by law-enforcement.  And then it goes on.  I

8   think it would be a public record.

9            MR. BOONE:  We would like an opportunity to look into

10  that.

11           THE COURT:  I am going to give them the opportunity

12  look at it.  So, I don't know, how much cross-examination do

13  you have left for this witness.  Is she gonna be on the stand

14  tomorrow morning, or no.

15           MR. MAHER:  How long are we going today?

16           THE COURT:  Sorry?  We are going until five, so we're

17  going from 4:00 until 5:00, so there is hour left in this day.

18  I'm trying to give the government the opportunity to review

19  this.

20           MR. MAHER:  Right.  It's hard for me to say.  I could

21  be done before five.  If I could get to that point, if we could

22  maybe stop then and, not cut off my cross.  Or, we could go to

23  the next cross, and let me come back and finish tomorrow.

24           THE COURT:  That's fine.  I don't have an objection to

25  that.

1            MR. MAHER:  I have no problem --

2            THE COURT:  Let's move on from this issue right now.

3       To the extent that your cross is not completed, Mr. German will

4       have the --

5            MR. GERMAN:  Mr. Richland.

6            THE COURT:  Mr. Richland will have the opportunity to

7       do a little cross-examination.

8            The government will review the document tonight and

9       let me know if it has any objection, or what the basis of its

10      objection is tonight, or first thing in the morning.

11           MR. MAHER:  And as far as --

12           THE COURT:  Yes.

13           MR. MAHER:  -- I brought this up earlier.  As far as

14      the killing of the trees concern that I have, the problem with

15      printing out all of these hundreds of pages, when I'm just

16      going to use a couple of pages for illustrative purposes, I

17      don't think that we should really print it out.  What I was

18      going to do was highlight a couple of lines in the report and

19      ask her if she agrees with it.  The whole report is still in

20      evidence.  I have no problem -- I prefer to give it in visual

21      form to the jury, but if we need to print it out, I will.

22           But in terms of my cross, it doesn't have to be

23      printed.

24           MR. BOONE:  If I understand his point, it's that he

25      wants to see if the witness can answer as to whether or not

1    certain events that happened in China, it's their understanding

2    that they happened, why can't he just ask her that.

3           I mean the point of this, it seems to be, if it was in

4    a report that talks about persecution in China, have her say,

5    yes, there is persecution in China.  He can ask her that

6    question.

7           THE COURT:  He can ask her.

8           I'm going to, to the extent that there isn't a basis

9    upon which this is not properly admitted, I'm going to let him

10   use the document.  I'm happy to hear you out on your objection

11   to it first.

12          That being said, I am not gonna let you spend too much

13   time on conditions in China.  But I'll let you ask a little bit

14   about it as is relevant to being granted assylum in this

15   country.  But I'm not going to allow cumulative

16   cross-examination on that issue.  But I'm going to allow him to

17   ask some questions about it.

18          In terms of how much you print out, if the government

19   has a position on if you want the whole thing printed for

20   completeness, I'll have you print it for completeness.  To the

21   extent I'm going to allow it, but you want to print certain

22   sections, I'm happy to hear the government out on that.  If the

23   government has a position, I'll require the whole thing to be

24   printed and admitted in that form, again, to the extent that

25   there is no proper basis for keeping it out.

E3o0liu5                         Caudill-Mirillo - cross

1          MR. BOONE:  Yes, we would like it printed.

2          THE COURT:  All right.  So print it in its entirety.

3          MR. GERMAN:  I would just ask, are we going to, at the

4    end of the case, be submitting printed copies, or putting

5    everything on a disk and give them a laptop.

6          MS. MERMELSTEIN:  It's the government's view in hard

7    copy, everything but the recordings.

8          THE COURT:  I think so, too.

9          MR. GERMAN:  Okay.

10         THE COURT:  So yes.

11         MR. MAHER:  So I'm clear, at this point, I understood

12   your Honor to tell me to kind of move on from this topic, and

13   then we will deal with that after we hear more from the

14   government about the form that they want the reports.

15         THE COURT:  That's right.

16         MR. MAHER:  Okay.

17         THE COURT:  If you're defining the topic as utilizing

18   the State Department report in your cross-examination, that's

19   correct.

20         MR. MAHER:  Okay.  But as far as continuing the cross

21   about persecution, you are not telling me to defer that until

22   the State Department --

23         THE COURT:  No, you can ask questions.  And I think

24   the government thinks it's perfectly proper, if I heard the

25   last comment made, for you to ask about the basis of

E3o0liu5                         Caudill-Mirillo - cross

1    persecution in China that would constitute a basis for

2    obtaining assylum here.

3              MR. MAHER:  Thank you.

4              THE COURT:  All right.  I'll see you all just in five

5    minutes.

6              MR. FISCHETTI:  Maybe save a little time.

7              I have another inquiry of the Court with regard to

8    this witness.  This witness said that my client, from the years

9    2007 to 2009, filed 900 assylum applications.  Now, our

10   computers, as I understand it when the search took place, they

11   have the computers.  My client, from what I understand from

12   talking to him, filed much less than 900 applications.  The

13   only way we have of challenging the witness as to the 900

14   applications is from the data base that she said she reviewed,

15   and it had that number.  I am not interested in the names, the

16   addresses or anything about the application.  I just want to

17   see the data base where it says 900.  But that's the only way I

18   can challenge it.  I don't know if that's accurate.

19             THE COURT:  Is there --

20             MR. FISCHETTI:  Nothing to do with privilege or

21   anything like that.  I just want to see the numbers.

22             THE COURT:  Is there a form you can print out that you

23   can see the search terms and the number of responses so that

24   they can know that, for example, one assylum application was

25   not somehow counted twice, or there isn't some other reason so

1    they can see how that 900 figure --

2             MS. MERMELSTEIN:  Can we have one moment, your Honor?

3             THE COURT:  Yeah.

4             MR. KOVACS:  One other answer is --

5             THE COURT:  Let's just's wait for the's government.

6             MR. BOONE:  Your Honor, first of all, I think what the

7    witness testified to was that particular law firms filed

8    certain numbers of applications, not particular individuals.

9             MR. FISCHETTI:  Law firms.

10             MR. BOONE:  Law firms.  Wanted to make that clear.

11   Not Feng Ling Liu in particular.

12             MR. FISCHETTI:  I believe said the law offices of Feng

13   Ling Liu between 2007 and 2009 filed 900 applications.

14             MR. BOONE:  That's correct.  So the law office --

15             THE COURT:  Okay.

16             MR. BOONE:  -- in terms of where those numbers come

17   from, our understanding is there is a data base that you can

18   search by putting in different search terms; lawyer names

19   addresses, things like that.  We'll have to do some research on

20   our own to see if there is some sort of printout or some type

21   of something physical that we can give them that shows how

22   those numbers came to be.

23             MR. FISCHETTI:  I would be happy to work it out with

24   the government.  As long as the government and your Honor

25   understand my problem.  She says I looked at documents.  They

1    filed 900 applications from the Feng Ling Liu law firm.  We

2    think that number is entirely inaccurate.  And the only way I

3    can check it is if you give me some information so I can count

4    them.  I'll work it out with the government.

5            THE COURT:  I understand.  Try and work it out.  If

6    there is an issue, I'm happy to hear you out on it.

7            MS. MERMELSTEIN:  When we produced discovery in this

8    case, we demanded reciprocal discovery.  We produced the

9    exhibits and 3500 early.  We are not -- I understand that the

10   government and defense counsel are not equal parties in this

11   particular regard, but on the day that defense lawyer is going

12   to offer an exhibit, I think it's fair for that to be given to

13   the government to see.

14           THE COURT:  I agree with you.  And it's why I'm

15   putting the cross off until tomorrow.  And I'm really asking

16   all of you, if you have discovery that you are using, I mean

17   you know produce it to the government so that we can avoid any

18   delays.  So I agree with that, generally.

19           In terms of, you know, the 900 figure, I mean I know

20   this is not the point that you were making, but I understand

21   their desire to get at how that number was reached.  And so

22   that's a separate issue and that figure may not have been

23   produced in any fashion in discovery.  I don't know if it was

24   or wasn't.

25           MR. FISCHETTI:  No.

 1              MR. MAHER:  No.

 2              THE COURT:  I understand their desire to get more

 3     information on that.  I know that is not your point.

 4              MS. MERMELSTEIN:  The number was produced.  The data

 5     was not produced.  This witness' 3500 indicated that she would

 6     give that testimony.

 7              THE COURT:  Okay.

 8              MR. MAHER:  All.

 9              MR. KOVACS:  All it indicated was that she had gotten

10     an e-mail from somebody else from the department telling her

11     the numbers, which was my basis for the objection, that it was

12     not her own personal knowledge.

13              THE COURT:  Right.

14              MR. KOVACS:  And now we are in a position where we

15     can't, based upon the data that we have.  The only challenge we

16     have is it's not 900.  But how do we get to the bottom of it.

17              THE COURT:  We are going to get to the bottom of it.

18     The government is going to look into if there is anything

19     printed out.  If need be, we'll have the appropriate witness to

20     come in here and testify about who put the actual search terms

21     in, so that we don't have the hearsay problem that you have

22     identified.  Okay.

23              MR. FISCHETTI:  Thank you, Judge.

24              MR. MAHER:  Thank you.

25              MR. GERMAN:  Thank you.

E3o0liu5                          Caudill-Mirillo - cross

1              THE COURT:  Why don't we just take a one-minute

2      break --

3              Yes, Mr. German.

4              MR. GERMAN:  No, no.

5              (Recess)

6              THE COURT:  Are we ready?

7              MS. MERMELSTEIN:  Frankly, it never occurred to us

8      that this was going to take so long today.  We have two very

9      brief witnesses who are both FBI photographers whose testimony

10     are essentially that they took pictures during the search.  I

11     assume there is not going to be tremendous cross, as two out of

12     three defense lawyers had been willing to stip to the

13     admissibility of those photos.  So I assume they don't have a

14     lot of questions about them.

15             They have operational obligations both tomorrow and

16     the next day.  There are, as I just learned, only four FBI

17     photographers in all of New York so they are heavily booked.

18     Given that we are going to have to do a weird breaking up of

19     the cross --

20             THE COURT:  Do any of the lawyers have any objection

21     to taking these witnesses out of order?

22             MR. MAHER:  Not my preference, I'm in the middle of my

23     cross, obviously.

24             THE COURT:  Do you have a real objection to it, given

25     that we're going to change course in your cross-examination

1    anyway.

2              MR. MAHER:  Just looking back at the clock.

3              THE COURT:  It's already 4:10.

4              MR. MAHER:  Right.  I -- no, if your Honor wants to do

5    that.  I do want your Honor to know, at least for the witness

6    who took photographs of the Bandrich & Associates law firm, I

7    might have 15 minutes or so of cross.

8              THE COURT:  So what would you like to do?

9              MR. MAHER:  It looks like we are discussing that the

10   government will call the photographer who took photographs at

11   the Bandrich & Associates firm.

12             I will stipulate as to the photographs for Moslemi

13   firm.  But then, at that point, are we done for the day, so I

14   could --

15             THE COURT:  We are done for the day at 5:00.  But you

16   have two witnesses, right?

17             MS. MERMELSTEIN:  We have two witnesses.  If we have a

18   stipulation as to one set of photographs, we only have one

19   witness.  And even with 15 minutes of cross, I think we should

20   more than be able to finish that witness today.

21             THE COURT:  And if not, you had more cross anyway on

22   this witness.  We'll tell this witness to wait.  You'll call

23   the photographer, or if you need to call two, you'll call two.

24   And we'll try and finish them by the end of the day.

25             MS. MERMELSTEIN:  If Mr. Maher says he'll stipulate,

E3o0liu5                          Caudill-Mirillo - cross

1    we'll take his word for it, until we get him the stipulation.

2              THE COURT:  Fine.  Do that now.  And can we bring the

3    jury in?

4              MR. MAHER:  Can we just --

5              THE COURT:  Yeah, sure, go ahead.  Go ahead.

6              Mr. Maher, are we taking witnesses out of order?

7              MR. MAHER:  I will do that, Judge, if I can

8    recalibrate.

9              THE COURT:  Okay.  Okay, let's bring the jury in.

10             THE DEPUTY CLERK:  All rise.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2              (Jury present)

 3              THE COURT:  I want to apologize for keeping you

 4    waiting.  I assure you we're in here working to try and ensure

 5    that we resolve as many issues as we can, so the trial goes as

 6    quickly as it can.

 7              We are going to take a witness out of order.

 8    Sometimes we do that, just to accommodate someone's schedule.

 9    We are going to do that, turn to a different witness.  We'll

10    hear again from Ms. Caudill-Mirillo first thing in the morning,

11    okay.

12              Mr. Boone.

13              MR. BOONE:  Yes.  The government calls Daniel

14    Piszczatoski.

15     DANIEL PISZCZATOSKI,

16         called as a witness by the government,

17         having been duly sworn, testified as follows:

18              THE DEPUTY CLERK:  State your name and spell it for

19    the record.

20              THE WITNESS:  Daniel, P-i-s-z-c-z-a-t-o-s-k-i.

21              THE DEPUTY CLERK:  Thank you, you may be seated.

22              THE WITNESS:  Thank you.

23              THE COURT:  You may proceed.

24    DIRECT EXAMINATION

25    BY MR. BOONE:

E3o0liu5                        Piszczatoski – direct

1    Q.  Where do you work?

2    A.  I work for the FBI in the New York office.

3    Q.  Is that the Federal Bureau of Investigation?

4    A.  Yes, it is, sir.

5    Q.  Do you have a particular title?

6    A.  I'm a photographer.

7    Q.  And how long have you been a photographer with the FBI?

8    A.  Exactly ten years today.

9    Q.  Congratulations.

10   A.  Thank you.

11   Q.  Could you please describe, generally, what your duties are

12   as a photographer for the FBI.

13   A.  I support any photographic needs that are required in the

14   office, from anything from a diplomate arrival, to a search, to

15   a crime scene, and some surveillances.

16   Q.  You mentioned you participate in searches?

17   A.  Yes, sir.

18   Q.  What role do you play in searches?

19   A.  I'm a photographer of the search.

20   Q.  And what is it that you are photographing?

21   A.  Basically, what we do, is we photograph the scene that

22   we're going to search so that we can show what it looked like

23   when we enter.

24   Q.  Approximately how many searches have you participated in

25   throughout your career with the FBI?

1    A.  My career?  I would say I average 20 to 25 a year.

2    Q.  Have you received any training on how to properly take

3    pictures during searches?

4    A.  Yes, I have gone to Quantico, Virginia for photography

5    courses.

6    Q.  And, first of all, what is Quantico, Virginia?

7    A.  It's our training facility.

8    Q.  The FBI's?

9    A.  Yes, sir.

10   Q.  And what types of things did you learn there in regards to

11   photography?

12   A.  Well, I was already a photographer with 28 years

13   experience.  They taught me the basics on how to process a

14   crime scene, or how to do a surveillance.

15   Q.  Is there a particular method that is generally followed

16   when taking pictures at a search?

17   A.  Yes.  Well, what we do is, the search team or the arrest

18   team will enter the facility to make sure it is secured of any

19   weapons or personnel.  And then what I do is I'll make entry,

20   I'll post -- say I do the front door.  I'll do the overall door

21   before entering, say, an office.  And then I'll photograph the

22   lock to show whether we had to breach the lock or whether

23   somebody actually opened it for us.  And then I will make entry

24   into, say, the foyer or to the office or whatever we're

25   searching.  And, usually, I process it with the four corners.

E3o0liu5                        Piszczatoski – direct

1    If it's not a homicide scene, I just do the four corners.  So

2    if I was to do this area here, I would make entry in the door,

3    do this corner and shoot diagonally across.  Then I would go to

4    that corner and shoot diagonally across, so on and so forth.

5    We get an idea of what the area that we're going into looks

6    like.

7    Q.  Okay.  And I want to direct your attention to

8    December 18th, 2012.  Were you working that day?

9    A.  Yes, sir.

10   Q.  Did you have a particular assignment?

11   A.  I was assigned to cover a search for investigative squad,

12   C-6.

13   Q.  And for the jury, what is C-6?

14   A.  Investigative squad that does, I believe, organized crime.

15   Asian organized crime.

16   Q.  A squad within the FBI?

17   A.  Yes, it is.

18   Q.  And do you remember what type of place that you were

19   scheduled to search that day?

20   A.  If I recall correctly, it was a -- it was an office down

21   the hallway, but it was above a bank.  And I believe in the

22   East Broadway area.

23   Q.  What area -- that is in what area of town?

24   A.  Basically around the corner from me, it was in Chinatown

25   area.

1  Q.  And did you know anything about what type of establishment

2  that place was?

3  A.  Sometimes we do.  At the time, no, we -- we get briefed.

4  Sometimes I can make the briefs.  There is a safety brief and

5  they discuss what they are doing.  I don't recall until I made

6  entry.  It was some kind of office.

7  Q.  Okay.  Could you generally describe the office, the layout?

8  A.  If I recall, it was sort of an open area.  I -- I believe

9  there was some kind of office in the corner that was closed.

10 And I do remember a map or two on the wall.

11 Q.  Okay.  I want to show you what's been marked for

12 identification as government exhibit 800.

13 A.  Yes, sir.

14 Q.  Do you recognize that document?

15 A.  I did not draw this, but it looks like the area.  It shows

16 an office down in the corner that I thought I remembered, but I

17 did not draw this document.

18 Q.  Is it a fairly and accurate depiction of the layout of the

19 office that you remember searching that day?

20 A.  I -- I believe so.

21         MR. BOONE:  Your Honor, the government offers

22 government exhibit 800 into evidence.

23         THE COURT:  Any objection?

24         MR. FISCHETTI:  No.

25         MR. GERMAN:  No.

1          MR. MAHER:  No.

2          THE COURT:  It will be admitted.

3          (Government's Exhibit 800 received in evidence)

4    BY MR. BOONE:

5    Q.  Now, I want to show you what's been marked for

6    identification as government exhibits 802 through 823,

7    number 825, numbers 833 through 848, and number 859.

8          MR. GERMAN:  If we can have those numbers again,

9    sorry.

10          MR. BOONE:  Sure.  802 through 823.  Then it's 825.

11    Then it's numbers 833 through 848.  And then it's number 859.

12          MR. GERMAN:  Thank you.

13          THE WITNESS:  Yes, sir.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1

2     BY MR. BOONE:

3     Q.  Do you recognize those documents?

4     A.  I believe they're mine.  I see the Post-it notes, as I told

5     you that we mark it off and that looked like to be in my

6     handwriting, and it is the front door, and we moved in to the

7     close, close-up of the lock and we proceeded into the area.

8     Q.  Do those photographs fairly and accurately depict the

9     office you searched?

10    A.  Yes.

11    Q.  At the time you searched it?

12    A.  Yes, they do.

13              MR. BOONE:  Your Honor, the government offers

14    Government Exhibits 802 through 823, 825, 833 through 848, and

15    859 into evidence.

16              THE COURT:  Any objection?

17              MR. GERMAN:  No.

18              THE COURT:  They'll be admitted.

19              (Government Exhibits 802-823, 825, 833-848, and 859

20    received in evidence)

21    BY MR. BOONE:

22    Q.  I want to go over a few of those photos.

23              MR. BOONE:  Ms. Geier, if you could, publish first

24    Government Exhibit 859.

25    A.  I have 859 right here on paper.

1   Q.  We're going to wait to see if we can get it on the screen.

2   This is No. 859.  What is that a picture of?

3   A.  Appears to be the front door of the office that we made

4   entry into.

5   Q.  Okay.  I'm showing now Government Exhibit 804.  What is

6   that a picture of?

7   A.  Well, that would be the entrance.  If you look in the

8   right-hand corner, you'll see a yellow Post-it note with an A.

9   That would be an area A we were moving in.  That would be the

10  first area that we went into.

11  Q.  Okay.  I want to show you now Government Exhibit 807.  What

12  is that a picture of?

13  A.  That is not very clear to me, but it looks to be an angle

14  back to the front door in area A, if, if I'm seeing it clearly

15  enough.  I'd have to see the print back, if you'd want.  But in

16  the center it looks like the front door is right there.

17  Q.  Okay.

18  A.  So, as I said, we process, we would go around and shoot

19  back on an angle, so that, if what I'm seeing here, that would

20  be the front door shooting back.

21  Q.  Now I want to show you Government Exhibit 810, and to make

22  it easier for you, I'm going to give you a copy of 810.

23  A.  Okay.

24  Q.  What is that a picture of?

25  A.  That's a photograph of area B.  If you look on the

1   right-hand side, you'll see a postie that has the initial B.

2   So that would be B entry.

3   Q.  Now I want to show you Government Exhibit 818.  What is

4   that a picture of?

5   A.  It's a little difficult to see, but it looks like area D,

6   in the Post-it note.

7   Q.  And that's the Post-it note on the right-hand side of the

8   picture?

9   A.  Yeah, there's a Post-it note.  Sometimes I, I write on the

10  postie and then the glue's on the other side so it would have

11  to be upside down, sometimes.

12  Q.  Now I want to show you Government Exhibit 840.  What is

13  that a picture of?

14  A.  I do not see the postie in there, unless it's in this lower

15  right-hand corner being clipped off.

16  Q.  Is that one of the offices you took a picture of that day?

17  A.  Yes, sir.

18  Q.  Now I want to show you Government Exhibit 814.  Can you see

19  that clearly?

20  A.  That also looks to be area C.

21  Q.  Is that also one of the offices you took a picture of that

22  day?

23  A.  Yes, sir.

24  Q.  Now I'm going to show you a picture of Government Exhibit

25  822.  What is that a picture of?

1   A.   That's a picture of a United States currency that was found

2   in one of the offices, C1.

3   Q.   Was it found in a bag in one of the offices?

4   A.   It would be photographed exactly where, what it was in, if

5   we possibly can do that.   The fact that there's a postie that

6   says C1, it was in office C.

7   Q.   I want to show you Government Exhibit 825.   What is that a

8   picture of?

9   A.   That appears to be American currency.   It is shot in room

10  C1, or area C, I meant.

11  Q.   Now I want to show you Government Exhibit 832.   What is

12  that a picture of?

13  A.   It's a checkbook that was found in area A.   That's why it

14  would have a Post-it A1.

15  Q.   Can you read, you said it's a checkbook.   Can you read

16  whose checkbook it appears to belong to?

17  A.   I would have to see a better photograph.   It's not, the

18  resolution on this monitor's not proper.   It says something

19  associates.   Sandrich Associates, Incorporated.

20  Q.   Let me see if I can get you a copy.

21  A.   Maybe a B or an S.   Hopefully it's much clearer on my

22  original photograph.

23  Q.   Let me just show you.

24  A.   I would assume it would be.   Sorry about that.   Bandrich

25  Associates, Incorporated.   B-A-N-D-R-I-C-H.   I believe so.

E3oWliu6                     Piszczatoski - direct

1    Q.  Thank you.  Now I'm going to show you what's been marked

2    for identification as Government Exhibits 826 through 831.  Do

3    you recognize those documents?

4    A.  Those are photographs of a monitor that I would take, I

5    took at the office.

6    Q.  Do those photographs fairly and accurately depict how

7    those -- when you say monitor, you're referring to a computer

8    monitor?

9    A.  A computer monitor.

10   Q.  Do those photographs fairly and accurately depict how those

11   monitors appeared at the time you took the pictures?

12   A.  Yes, sir.

13           MR. BOONE:  Your Honor, the government offers 826

14   through 831.

15           THE COURT:  Any objection?

16           MR. GERMAN:  No.

17           THE COURT:  They'll be admitted.

18           (Government Exhibits 826-831 received in evidence)

19           MR. BOONE:  If I could just take those back, thanks.

20   Q.  After you finished taking photographs at the office, what

21   did you do next?

22   A.  When we finalize the process of the search, we do what we

23   call exit photographs.

24   Q.  What are those?

25   A.  Basically, we retrace our steps from when we made entry.

E3oWliu6                         Piszczatoski - direct

1    This way we can show that, how we left the facility.

2    Q.  And after you finish -- sorry.

3    A.  We would basically close down, no one else enters.  I

4    remove the Post-its, and then more times than not we photograph

5    the warrant, close to the last photograph, and then we back off

6    and secure the facility, or the people that are, if there are

7    personnel inside, they'll secure the facility.  They'll get a

8    receipt for what was taken from the search team, and we leave.

9    Q.  Prior to participating in this search, did you have any

10   involvement in the investigation of a law firm named Bandrich &

11   Associates?

12   A.  No, I do not.

13   Q.  After having finished taking pictures at the search you

14   just described, did you have any involvement in the

15   investigation of a law firm called Bandrich & Associates?

16   A.  No, I did not.

17           MR. BOONE:  No further questions, your Honor.

18           THE COURT:  Cross-examination.

19           MR. MAHER:  I have some.  Thank you, your Honor.

20           May I inquire, Judge.

21           THE COURT:  You may.

22           MR. MAHER:  Just so the courtroom deputy knows, I'll

23   have to go back and forth between the Elmo and our trial tech.

24   Could we put it on the computer monitor for the defense table

25   right now, and if we can have it on clear right now, please.

E3oWliu6                          Piszczatoski - direct

1    Thank you.

2    CROSS-EXAMINATION

3    BY MR. MAHER:

4    Q.  You did not prepare any written reports in this case,

5    right?

6    A.  No, I have not.

7    Q.  Just took photographs that day?

8    A.  Yes, sir.

9    Q.  And that's your involvement?

10   A.  Yes, sir.

11   Q.  There was someone who was in charge at the scene though,

12   correct?

13   A.  Yes, sir.

14   Q.  Who was in charge?

15   A.  I don't recall.  It would be a team leader.  I don't recall

16   the name.

17   Q.  You don't know who the team leader was?

18   A.  I don't recall the name.

19   Q.  What did the team leader look like?

20   A.  Don't recall.

21   Q.  Was the team leader a man or a woman?

22   A.  My TL, I think, was a female.

23   Q.  By TL, do you mean team leader?

24   A.  Team leader.  Yes.

25   Q.  Can you tell us anything else to describe who the team

E3oWliu6                          Piszczatoski – cross

1    leader was that day?

2    A.  I believe it, I believe it was an Agent Vanessa Tibbetts.

3    Q.  Did you receive any instructions before going into the

4    premises?

5    A.  As per?

6    Q.  From the team leader.

7    A.  We, we get a safety briefing.

8    Q.  Did you receive any specific instructions about what you

9    were supposed to photograph?

10   A.  No, sir.

11   Q.  You know though when you walk into a scene, in this type of

12   situation, you really don't know what's going to be behind the

13   door when you walk through, right?

14   A.  The scene is secured before I make entry.

15   Q.  I'm not talking about safety.  Obviously it's been secured

16   that way, correct?

17   A.  Yes.

18   Q.  And you had no reason to feel that you were in any type of

19   danger at this point, right?

20   A.  No, sir.

21   Q.  It's a law office, correct?  Correct?

22   A.  It was an office.

23   Q.  You knew it was a law office you were going into, right?

24   A.  I do now.

25   Q.  At the time --

264

1    A.  It was an office.

2    Q.  If I could just finish my question.

3        Are you saying that that day you didn't know it was a law

4    office you were taking photographs of?

5    A.  I don't recall.  I don't recall if that was transmitted to

6    me.

7    Q.  But when you, in general, go to a scene, you understand

8    once you walk through the door, you don't necessarily know

9    what's going to be behind the door, correct?

10   A.  I guess you could say that, sir.

11   Q.  You're not clairvoyant, right?

12   A.  Right.

13   Q.  And your job is to document what's at the scene?

14   A.  Correct.

15   Q.  Right?

16   A.  Yes, sir.

17   Q.  To memorialize it for the future?

18   A.  Yes, sir.

19   Q.  And you took photographs, yes?

20   A.  Yes, sir.

21   Q.  That was your role?

22   A.  That's my job.

23   Q.  And there were other people on the team there as well?

24   A.  Yes, sir.

25   Q.  There was a person there who was a specialist in computers,

1   correct?

2   A.  I believe there was.

3   Q.  There were other agents there as well?

4   A.  Yes, sir.  And I'll do it myself.

5   Q.  How many agents were there total?

6   A.  I don't know.  I don't recall.

7   Q.  Fair to say it's close to ten?

8   A.  Don't recall.

9   Q.  You just testified about some photographs you took of a

10  computer monitor?

11  A.  Yes, sir.

12  Q.  Do you recall that?

13  A.  Yes.

14  Q.  You don't know who had touched that computer last before

15  you took those photographs, right?

16  A.  That's correct.

17  Q.  If I could turn your attention to what's been marked as

18  Government Exhibit 805?

19          MR. MAHER:  Could we put that up, please.

20          THE DEPUTY CLERK:  You want this for the witness and

21  the jury as well?

22          MR. MAHER:  For everyone.  Thank you.  And if we could

23  make that full size, please.

24  Q.  This is Government Exhibit 805, and this is in that area

25  that you called area A, right?

1   A.  I don't see the Post-it, but if you're saying that --

2   Q.  Well, there's the main area --

3   A.  Right.  Main area's area A.

4   Q.  Where all the desks are kind of lined up?

5   A.  Yes.

6   Q.  In the open bull pit.  What do you call it?  Bullpen,

7   right?

8   A.  Open area.

9   Q.  What Mayor Bloomberg used to call it, right?

10          MR. MAHER:  And so if I could ask Ms. Cavale, can I do

11  the thing where I make it red?  Yes.  Thank you.

12  Q.  What we're going to do here is if you look at your screen,

13  I'm going to circle on my monitor something on the picture that

14  should show up on the monitor for you to look at as well.

15  Right?  If all goes well here, right?

16          MR. MAHER:  So, no?  No.

17          THE DEPUTY CLERK:  Not working?

18          MR. MAHER:  No.  Try one more time.  No.

19  Q.  Sir, I'm going to ask you, on the right side of the page

20  where it's just kind of white, can you just run your finger on

21  the screen and see if a red mark shows up.  No.

22      Just one more moment.  Try and see if we can get this

23  annotation working?

24  A.  That's all right.

25  Q.  I'm just going to have you look, if you look in the middle

1   of this picture, all right, and go straight up where the

2   ceiling meets the back wall in the corner, see there where it

3   looks like kind of a black dot.

4           MR. MAHER:  Can you move the cursor up, Ms. Serrano.

5   Q.  See where the arrow is pointing?

6   A.  Yes, sir.

7   Q.  That's a Web camera, correct?

8   A.  I have no idea what that is.

9   Q.  Did you notice Web cameras when you were there?

10  A.  Don't recall.

11  Q.  You don't recall?

12  A.  No, sir.

13  Q.  Were you directed to make note of where the Web cameras

14  were in the office?

15  A.  Not that I recall.

16          MR. MAHER:  If we could go to Government Exhibit 804,

17  on the left part of this picture, if you can move the cursor,

18  please, Ms. Serrano.

19  Q.  There's a window right there.  See that?

20          MR. MAHER:  Keep the cursor up there pointing at the

21  window.  Thank you.

22  Q.  See where the cursor is on the screen?

23  A.  Yes, sir.

24  Q.  That's a window, right?

25  A.  Looks like an opening.

E3oWliu6                         Piszczatoski - cross

1    Q.  Opening or -- okay.  Can't see the glass there.  That is to

2    an interior office, correct?

3    A.  Yes, it is.

4    Q.  Do you still have your Government Exhibit 800 diagram?

5    A.  I do, and it's very accurate.

6    Q.  Does that correlate to what is marked as office C?

7    A.  Yes, sir.

8    Q.  Right?  And on the diagram, it says window, right?

9    A.  Yes, sir.

10   Q.  Now, if we could move the cursor, there's something that

11   looks like a black rectangle with a tail hanging on that

12   window, right?  Do you see that?

13   A.  Yes, sir.

14   Q.  That's another Web camera, correct?

15   A.  Don't know.  If you say so.  I'm not sure, sir.

16   Q.  You don't know?

17   A.  No, I do not know.

18   Q.  But you see the black object with a wire, what appears to

19   be a wire hanging down from it, correct?

20   A.  I see that.

21   Q.  Okay.  If we could please go to Government Exhibit 807,

22   above, this is, make sure again area A, the main floor plan

23   area, right?

24   A.  Yes, sir.

25   Q.  And those doors are the front doors, right?

E3oWliu6                              Piszczatoski - cross

1    A.  Yes, sir.

2    Q.  And if we could have the cursor pointing right above the

3    doors, please, do you see that object the cursor's pointing at?

4    A.  Yes, sir.

5    Q.  Appears to be another Web camera, correct?

6    A.  I don't know what that is.

7    Q.  You don't know what that is.  Okay.  If we could move to

8    808, these are the same doors, correct?

9    A.  Yes, sir.

10          MR. MAHER:  Point to the same object, please, Ms.

11   Serrano.

12   Q.  Same object, correct.

13   A.  Appears to be.

14   Q.  Can you tell from that perspective whether it's a Web

15   camera, or not, or security camera?

16   A.  No, I cannot.

17   Q.  Can't tell.  And these are the photographs you took, right?

18   A.  Yes, sir.

19   Q.  If we could go to Government Exhibit 809, please, and if we

20   go in the middle, a little to the right, you see there are two

21   open doors, correct?  To the right of the file cabinets.

22   A.  Yes, sir.

23   Q.  And above the door to the left, there's an object above the

24   left side of that door, see where the arrow is pointing?

25   A.  Yes, sir.

1   Q.  Do you recognize that as yet another camera in the office?

2   A.  I don't know what that is, sir.

3   Q.  If we could go to Government Exhibit 815, please, this is a

4   picture inside of what has been described already as office C,

5   correct?

6   A.  Yes, sir.

7           MR. MAHER:  And if we could, I'm trying not to make

8   life difficult, could we switch back to the Elmo for a moment,

9   please.

10  Q.  And again, just to remind, refresh our collective

11  recollection, this is area A, right?

12  A.  Yes, sir.

13  Q.  And the front doors that we were just looking at are right

14  here, right?

15  A.  Yes, sir.

16  Q.  Office C is this area right here, yes?

17  A.  Yes, sir.

18  Q.  The window we were just talking about is right there, yes?

19  A.  Yes, sir.

20  Q.  The file cabinets are right there, yes?

21  A.  Yes, sir.

22  Q.  And I showed you an object above the door a second ago

23  right around here, correct?

24  A.  Point to it again, sir.

25  Q.  Right about there.

1   A.  I would have to see the photograph.

2              MR. MAHER:  Okay.  Let us go back again to Government

3   Exhibit 809, please, if you could switch back.  Thank you.

4   Q.  Those are the two doors again of office B and C?

5   A.  So you were pointing at office B?

6   Q.  Right.  I was pointing to both doors of office B.

7   A.  That appears to be above office B.

8   Q.  Correct, yes.  All right.  Thank you.

9              MR. MAHER:  Could we go to Government Exhibit 815,

10  please.

11  Q.  Again, this is room C, yes?

12  A.  Yes, sir.

13  Q.  And there again is the object on the window, right?

14  A.  Yes, sir.

15  Q.  That black object, and you don't know what that is, right?

16  A.  I have no idea what that is, sir.

17  Q.  There's a bag on the chair in this photograph, right?

18  A.  Yes, sir.

19  Q.  And that's the same bag that later pictures show having

20  cash inside of it, is that correct?

21  A.  It appears to be.

22  Q.  And that bag was in that chair in office C when you took

23  the photograph, right?

24  A.  Appears to be.

25  Q.  You didn't see anyone moving it and putting it in there,

1    right?

2    A.  No, sir.

3    Q.  As far as you know, it was in that office C when you all

4    arrived there?

5    A.  Yes, sir.

6          MR. MAHER:  If we could go to 802, please, now, what I

7    would like to do, with the court deputy's assistance, if we

8    could take this next picture, the screen just for counsel and

9    the witness, and for identification purposes if we could do a

10   split screen and place No. 11 next to it, and these are of the

11   photographs that have been previously provided to the

12   government, file No. 11 that you already have.

13   Q.  So, you have the screen in front of you, I'm going to ask

14   you a couple questions.  The picture on the left is Government

15   Exhibit's 802 of that front door that you testified about,

16   right?

17   A.  Yes, sir.

18   Q.  Picture on the right side, all right, do you recognize

19   that?

20   A.  That's the door.

21   Q.  On the top left, do you see any objects?

22   A.  I see an exit sign and an object that's purple.

23   Q.  As far as your recollection, when you took the

24   photographs --

25          MR. BOONE:  Objection.  He can't testify to what he's

1    taking a picture of.

2              MR. MAHER:  That's not true, Judge.  I'm going to ask

3    him.

4              THE COURT:  Let's just hear the question.

5              MR. BOONE:  This is not in evidence.

6              MR. MAHER:  I'm laying the foundation.

7              THE COURT:  Let's just see what the question is.

8    BY MR. MAHER:

9    Q.  The photograph on the right, to your recollection, does

10   this fairly and accurately depict the front door area as you

11   saw it that day?

12   A.  I believe so.

13             MR. MAHER:  I move to admit what we'll call Defense

14   Exhibit 1, which is that photograph.

15             THE COURT:  Any objection?

16             THE WITNESS:  There is a difference on this though.

17   There's no writing on the front door.

18             MR. BOONE:  It appears he's saying it does not

19   accurately reflect what he saw.

20             THE WITNESS:  Right.  There's no type, there's no

21   lettering on the right side of the door.

22   BY MR. MAHER:

23   Q.  Except for what looks like a missing sign and maybe tape

24   marks where the sign used to be, does it fairly and accurately

25   depict the door that you looked at in that area?

1    A.  It says 4D.

2    Q.  So do you --

3    A.  I assume --

4    Q.  I'm not trying to put words in your mouth.  In your

5    recollection, does it fairly and accurately depict that area?

6    A.  It looks like door 4D.

7              THE COURT:  Does it represent fairly and accurately

8    the door as you saw it on that day that you took pictures?

9              MR. MAHER:  Without the sign.

10             THE WITNESS:  The day I took the picture has the sign

11   on it.

12             THE COURT:  Okay.  What about the purple object?  Do

13   you remember if that was there or not there?

14             THE WITNESS:  I don't recall that at all.

15             MR. MAHER:  Move to admit, with those caveats.

16             THE COURT:  I'm going to admit it.  I think his

17   testimony is clear that there were differences.  I'll admit

18   Defense Exhibit 1.

19             (Defense Exhibit 1 received in evidence)

20             MR. MAHER:  Thank you.  If we could publish that to

21   the jury then.

22             THE COURT:  Let me just ask one more question.  Do you

23   know when this photograph was taken?

24             THE WITNESS:  The one on the right?

25             THE COURT:  Yes.

E3oWliu6                        Piszczatoski – cross

```
 1                 THE WITNESS:  No, I do not.

 2                 THE COURT:  Did you take it?

 3                 THE WITNESS:  I would have to look at the photo log

 4     and the final.

 5                 THE COURT:  But not as far as you recall?

 6                 THE WITNESS:  I don't know.

 7                 THE COURT:  You don't know one way or the other?

 8                 THE WITNESS:  No.

 9                 THE COURT:  Okay.

10                 MR. MAHER:  Ms. Cavale, if we could publish both

11     pictures now to the jury.

12     Q.  The exhibits, so if we could, the purple object in the

13     middle above the door to the left, to the right of the exit

14     sign, correct?

15     A.  Oh, yes.  Yes.

16     Q.  And is it fair to say again that looks like another camera?

17     A.  I don't know what that object is, sir.

18     Q.  Okay.

19     A.  It's purple.

20     Q.  The photographs that were just admitted through you on your

21     direct testimony, were those the sum total of all the

22     photographs you took at that location on that occasion?

23     A.  I don't know the count that was given to me.

24     Q.  Do you know how many photographs total you took that day?

25     A.  That would be registered on a photo log.
```

E3oWliu6                          Piszczatoski – cross

1   Q.   On the photo log?

2   A.   Yes, sir.

3   Q.   Where is that photo log?

4   A.   That photo log would be forwarded with the files to the

5   case agent.

6   Q.   Are the photos with the photo log, or does the photo log

7   just delineate the number of photographs that you took?

8   A.   The photo log lists what photos were taken.

9                THE COURT:  Mr. Maher, it's 5:00.  Are you almost

10  done?

11               MR. MAHER:  No.

12               THE COURT:  How much longer do you have?

13               MR. MAHER:  I have more to go through, Judge.

14               THE COURT:  Approximately how long will it take for

15  you to finish your cross-examination?

16               MR. MAHER:  Maybe 15 minutes.

17               THE COURT:  I promised you all that you can leave by

18  five, so let me just ask you this.  Anyone who cannot stay

19  until 5:15, can you raise your hand now, please.

20               We're going to have to excuse the jurors at this time

21  and bring the witness back another day to complete his

22  cross-examination.  Okay?

23               MR. MAHER:  Thank you.

24               THE COURT:  All right.  I'm going to thank the jury

25  for its time.  I'll see you tomorrow morning.  Please try and

E3oWliu6

| | |
|---|---|
| 1 | be prompt at 9:30 so we can start on the dot at 10:00.  Please |
| 2 | don't talk about the case.  Keep an open mind and don't do any |
| 3 | research. |
| 4 | Lastly, I promised to let you know in advance about |
| 5 | Fridays.  We will not be sitting this Friday.  Have a nice |
| 6 | evening.  Thanks. |
| 7 | (Jury excused) |
| 8 | THE COURT:  You can step down. |
| 9 | (Witness excused) |
| 10 | THE COURT:  Why don't you all coordinate about when |
| 11 | this witness will complete his testimony. |
| 12 | MS. MERMELSTEIN:  Your Honor, we're just going to |
| 13 | inquire about scheduling.  We won't talk about anything |
| 14 | substantive since he's on cross-examination. |
| 15 | THE COURT:  That's fine.  Does anyone have any other |
| 16 | issues they'd like to raise tonight?  We have to address the |
| 17 | issue of the report in the morning. |
| 18 | MR. FRANZ:  We need to know who the witnesses for |
| 19 | tomorrow will be because obviously we will need to prep. |
| 20 | MS. MERMELSTEIN:  Given where we are, it's the same |
| 21 | witness list we anticipated for today. |
| 22 | THE COURT:  The same.  We're going slower than |
| 23 | anticipated. |
| 24 | MS. MERMELSTEIN:  Same witness order as we had |
| 25 | previously told you, including the first cooperator.  We won't |

E3oWliu6

1   get past that, I think, for sure.

2           THE COURT:  No other issues?

3           MR. MAHER:  This can be totally off the record.

4           THE COURT:  Okay.

5           MS. MERMELSTEIN:  Your Honor, just to be clear, the

6   attempt to call this witness today to avoid the problem about

7   tomorrow, I guess, didn't quite work, but he is on operations

8   tomorrow and the next day.  I gather there's basically no

9   flexibility, so we'll anticipate he'll be available to continue

10  cross-examination on Thursday.  I apologize.  We certainly

11  realize it's not ideal, but given his schedule, I'm not sure

12  what else we can do.

13          THE COURT:  Everyone heard that?  Thanks.

14          (Adjourned to March 25, 2014, at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

279

```
 1                    INDEX OF EXAMINATION
 2    Examination of:                        Page
 3    ASHLEY CAUDILL-MIRILLO
 4    Direct By Mr. Boone  . . . . . . . . . . . . 111
 5    Cross By Mr. Franz . . . . . . . . . . . . . 162
 6    Cross By Mr. Maher . . . . . . . . . . . . . 211
 7    DANIEL PISZCZATOSKI
 8    Direct By Mr. Boone  . . . . . . . . . . . . 250
 9    Cross By Mr. Maher . . . . . . . . . . . . . 262
10                   GOVERNMENT EXHIBITS
11    Exhibit No.                          Received
12     1  . . . . . . . . . . . . . . . . . . . 121
13     505,507,508,513,517,518,519, 521, 524, 525   153
14     800  . . . . . . . . . . . . . . . . . . 255
15     802-823, 825, 833-848, and 859 . . . . . . 256
16     826-831  . . . . . . . . . . . . . . . . . 260
17                   DEFENDANT EXHIBITS
18    Exhibit No.                          Received
19     1  . . . . . . . . . . . . . . . . . . . . 274
20
21
22
23
24
25
```