USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 12/22/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

VANESSA BANDRICH,

                Defendant.

No. 12-CR-934 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

    On April 14, 2014, a jury convicted Vanessa Bandrich ("Defendant") and her co-defendants of one count of conspiracy to commit immigration fraud pursuant to 18 U.S.C. § 371. The indictment had charged that Defendant, who worked for three years at two law firms in New York's Chinatown, was part of a multi-year conspiracy to submit fraudulent asylum applications to federal immigration authorities. Defendant now renews her motion for a judgment of acquittal under Fed. R. Crim. P. 29 and, in the alternative, she moves to set aside the jury's verdict pursuant to Fed. R. Crim. P. 33. As the Court stated at Defendant's sentencing, and for the reasons that follow, these motions are DENIED.

## I. BACKGROUND

    Defendant was one of nine individuals named in an indictment that alleged her participation in a widespread conspiracy to defraud the U.S. immigration authorities by submitting hundreds of fraudulent asylum applications on behalf of ineligible applicants (Dkt. 152). Three of the defendants, including Defendant Bandrich, proceeded to trial, at which they were found guilty. The initial locus of the conspiracy was the Feng Ling Liu Law Firm in Manhattan's Chinatown. Named for the purported mastermind of the conspiracy, the firm established itself among the city's most prolific, filing some 900 asylum applications on behalf of Chinese nationals between 2007

and 2009 (Tr. 154). The evidence at trial, however, established that little, if anything, about these hundreds of claims of persecution was grounded in fact.

By 2007, the firm had essentially become a well-oiled fraud machine. At initial interviews with applicants, the firm's employees would not inquire whether the applicants actually had a viable claim of persecution (Tr. 550, 552, 1225–26). Rather, claims were fabricated based on what employees determined was most likely to be successful in light of the applicant's background (Tr. 545–46, 976, 1225–26, GX 40T at 21). For example, a claim of persecution based on Christianity, which would likely require familiarity with the finer points of the faith, might make most sense for an educated client, while a family planning claim might be better suited to a female client (Tr. 546, 1228, 976, 1225; GX 40T at 21–22). Once employees had settled on a particular claim, it would fall to paralegals, or "storywriters," to craft a narrative to persuade immigration officials that a grant of asylum was appropriate (Tr. 552, 1229). These stories were often based either on ready-made templates maintained by the firm or on previous narratives that had been crafted for the same type of claim (Tr. 558–60, 1236). Virtually none of them, however, was based on actual persecution suffered by the applicant (Tr. 557, 1234). Applicants were coached by employees to treat their asylum interviews as if they were "actor[s]" in "a movie." (GX 141T at 55, GX 112T at 19).

Defendant began working as a lawyer at the firm in mid-2009 after a former colleague, Troy Moslemi, introduced her to Ms. Liu (Tr. 603). Moslemi himself had joined the Feng Ling Liu Law Firm in 2009, when the name of the firm changed to Moslemi & Associates (Tr. 600, 1262, 1271–72). The new name on the door notwithstanding, the firm operated as it had in the past, with Ms. Liu and her husband in charge (Tr. 609). Employees regarded the name change as little more than a superficial effort to draw attention away from Ms. Liu (Tr. 602–03, 1271–72).

2

Roughly a year later, Ms. Liu became concerned that the high volume of applications filed by her firm might attract unwarranted scrutiny from federal authorities (Tr. 605–06, 1272). She thus tasked her brother, Harry Liu, with opening a new firm across the street, hoping that the creation of a separate firm—with a separate name—might draw less attention to the conspiracy's activities (Tr. 605–06, 1271–72). Defendant was chosen as the face of the new firm—Bandrich & Associates—where she was also the sole attorney (Tr. 605). The evidence at trial established that the firm operated in essentially the same way as the Liu/Moslemi firm (see, e.g., GX 40, 44, 57, 110; Tr. 578; GX 302A-K). From the time it opened its doors in 2010 until the time it was raided by the FBI in December 2012, the Bandrich firm filed some 480 asylum applications (Tr. 155).

## II. DISCUSSION

**A.     Legal Standard**

To prevail on a motion for a judgment of acquittal under Rule 29, a defendant must show "the evidence is insufficient to sustain the conviction." Fed. R. Crim. P. 29. Rule 33 further provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. While a trial court has broad discretion to grant a new trial under Rule 33 in any case where "letting [the] guilty verdict stand would be a manifest injustice," United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001), where a defendant's challenge to her conviction rests solely on the sufficiency of the evidence, as it does here,[1] the focus of the Court's inquiry is, in essence, the same as under Rule 29: whether there is "competent, satisfactory and sufficient evidence" in the record to support the jury's verdict. Id. (quoting United States v.

---

[1] Defendant also joined the separate Rule 33 motion of her co-defendant Rachel Yang, which sought a new trial based on alleged juror misconduct. The Court has already denied that motion. See United States v. Feng Ling Liu, No. 12-CR-934 (RA), 2014 WL 6076571 (S.D.N.Y. Nov. 14, 2014) (Dkt. 402).

3

Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). Simply put, to grant a Rule 33 motion, a trial judge "must harbor a real concern that an innocent person may have been convicted." United States v. Guang, 511 F.3d 110, 119 (2d Cir. 2007) (internal quotation marks and citation omitted).

Whether under Rule 29 or Rule 33, "[a] defendant challenging the sufficiency of the evidence [supporting a jury's verdict] bears a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." United States v. Kozeny, 667 F.3d 122, 139 (2d Cir. 2011). This is an "exceedingly deferential standard of review." United States v. Hassan, 578 F.3d 108, 126 (2d Cir. 2008). "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Mi Sun Cho, 713 F.3d 716, 720 (2d Cir. 2013) (*per curiam*) (internal citations and quotation marks omitted). The evidence must be viewed "in its totality, not in isolation," United States v. Huezo, 546 F.3d 174, 178 (2d Cir. 2008), "as each fact may gain color from others." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999). Even in a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." United States v. Temple, 447 F.3d 130, 137 (2d Cir. 2006) (internal quotation marks and alteration omitted). In the end, while a defendant's burden is, of course, "not an impossible one," United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004), a judgment of acquittal can be entered or the verdict set aside "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (quoting Guadagna, 183 F.3d at 130).

**B.      The Evidence at Trial Was Sufficient to Support the Jury's Verdict**

Defendant's sole argument concerns the second element of the offense that the Government was required to prove at trial (that is, her membership in the conspiracy). See Mem. at 12 ("The government failed to marshal sufficient evidence to prove that Ms. Bandrich knowingly conspired to commit immigration fraud"; "[the evidence at trial] failed to establish Ms. Bandrich's knowing participation in a criminal conspiracy"). Defendant does not appear to quarrel with the sufficiency of the evidence as it relates to the other two elements of the offense (that is, the existence of the conspiracy and an overt act committed in furtherance of the conspiracy). And with respect to that second element, Defendant now essentially reiterates the arguments made—and rejected—at trial.[2]

The starting point for analysis is not, as Defendant would have it, what was *not* in evidence, but rather what *was*. More specifically, many of Defendant's arguments rest on the erroneous belief that the Government was obligated to introduce direct evidence of her participation in the conspiracy. This claim, however, overlooks the obvious: "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992) (internal quotation marks omitted). Indeed, in the context of a conspiracy, "the jury's verdict may be based on circumstantial evidence, and the Government is not required to preclude every reasonable hypothesis which is consistent with innocence." United States v. Ogando, 547 F.3d 102, 107 (2d Cir. 2008) (internal quotation marks and citation omitted); see also United States v.

---

[2] Defendant moved for a judgment of acquittal at the close of the Government's case (Tr. 2020). With Defendant's consent, a decision on the motion was reserved until the close of evidence (Id.). After hearing from Defendant's counsel, the Court denied the motion (Tr. 2104–08). As the Government rightly observes, Defendant argued then—and now—that (1) the tape recordings introduced at trial included no inculpatory admissions (Tr. 2104; Mem at 11; 13–14); (2) the documentary evidence failed to establish any kind of fraudulent activity (Tr. 2104–05; Mem. at 10–11; 13–14); (3) the testimony of the Government's cooperating witnesses was inadequate to establish Defendant's membership in the conspiracy (Tr. 2105–06; Mem at. 6–9; 12–13); (4) Defendant's client interactions were consistent with sound legal practice (Tr. 2105; Mem. 7, 13); (5) and the Government's case was built upon guilt by association (Tr. 2106; Mem. at 14). These arguments are no more persuasive today than they were at trial.

5

Glenn, 312 F.3d 58, 64 (2d Cir. 2002) ("[T]he prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt."). Thus "[a] defendant's knowing and willing participation in a conspiracy may be inferred from, for example, her presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others." United States v. Aleskerova, 300 F.3d 286, 293 (2d Cir. 2002) (internal citations omitted); accord United States v. Anderson, 747 F.3d 51, 60–61 (2d Cir. 2014). That is precisely the sort of evidence the Government introduced here.

As an initial matter, the evidence at trial that the two firms were engaged in persistent fraudulent activity was overwhelming. Two former employees testified at length about the activities of the firm and stated in plain terms that essentially all of the applications they worked on were fabricated (Tr. 510, 1206). To the extent Defendant now seeks to impugn the credibility of these and other Government witnesses, "the proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury," United States v. Roman, 870 F.2d 65, 71 (2d Cir. 1989) (internal quotation marks omitted), not a motion to set aside the verdict.[3] See also United States v. O'Connor, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony.") (internal quotation marks omitted). At this juncture, this Court must accept—and, in any event, does accept—the testimony of these witnesses as credible. Such reliance is well-

---

[3] Indeed, the record is clear that Defendant's counsel *did* seek to undermine the credibility of the Government's witnesses (see, e.g., Tr. 2242 ("Meng Fei Yu and Victor Y[o]u … entangle[d] [Defendant] in their web of deceit in order to save their own skin.")). Having ostensibly been unsuccessful in that regard, this motion provides no occasion for a second attempt.

6

founded, because the Government witnesses' testimony was corroborated by ample other evidence, including, for example, the recordings made between May 2011 and January 2012 at the Bandrich firm (GX 40, 44, 57, 110) and the blank receipts, health records, and church stationary used to create fake "one-year letters" found at the office in December 2012 (Tr. 578; GX 302A-K).

In the face of the unambiguous evidence of fraudulent activities at both firms, Defendant nonetheless argues that she was not aware of the pervasive deceit around her because client interactions and most conversations between employees were in Mandarin. See Mem. at 12 ("Ms. Bandrich, an earnest, hard-working, young lawyer did her best to represent clients who spoke a completely foreign language. Ms. Bandrich relied upon her Mandarin-speaking co-workers to accurately translate, interpret, and convey information back and forth between her and her clients.") Looking at the evidence in the light most favorable to the Government, however, this argument must fail. Meng Fei Yu, a former employee of the Bandrich firm who was trained by Defendant (Tr. 1263), testified at length about her interactions with Defendant. Of particular significance for present purposes, Ms. Yu testified about the "concerns" she expressed to a group that included Defendant, such as the fact that "a lot of these cases are fake" and "we know this job is illegal" (Tr. 1265–66). With respect to concerns specifically discussed with Defendant, Ms. Yu testified in relevant part:

> Q. Do you ever remember raising these concerns at a lunch where Vanessa Bandrich was?
>
> A. Her concern or my concern?
>
> Q. Your concerns.
>
> A. My concern. Yes. I talked about I'm afraid the office have been targeted by the government because we had many bad

7

> > 20 cases and before, in two, in the summer of 2011, the office had a very bad case. My signature in the form, I never reviewed. The asylum officers found out that case. The applicant just admit everything were prepared by the office, not her, and my signature was there, so I was very scared. I expressed my concerns many times.
>
> Q. Do you remember any specific response from her, from Vanessa Bandrich, when you expressed these concerns?
>
> A. She understood.
>
> Q. Do you remember her ever expressing her concerns?
>
> A. Yes. During one lunch, she also said she want to get out the office.

(Tr. 1266–67). Ms. Yu also testified as follows:

> Q. Did you ever warn Vanessa Bandrich about the job?
>
> A. Yes.
>
> Q. What did you say?
>
> A. I, I told her why I quit the job, basically, that's kind of worry, I'm worried about the safety of this job, fraud, everything, we made up mistake every day and I'm worried about this job. So when we talking, I, I said to her, maybe all, that's what I said. I said because we don't, we didn't have choice, so we work there. If we have a choice, we should leave there. And I think she agreed with me.

(Tr. 1674). This testimony, when viewed in the light most favorable to the Government, belies the notion that Defendant was ignorant of the rampant fraud that surrounded her—and of which the evidence showed she was an integral part.

Ms. Yu's testimony does not stand alone. The Court must also consider the additional evidence establishing Defendant's knowing or intentional participation in the conspiracy. The revisions made to particular applications at Defendant's behest are just one example of such proof.

8

The Government's witnesses testified that Ms. Liu would edit draft narratives at the Liu/Moslemi firm to make the claims of persecution more serious or credible, without regard to their truthfulness (Tr. 567–68, 1243–44). Similar edits were found at the Bandrich firm. In one case, a sentence that originally read, "If he returned to China, he would be sentenced because the police are now still looking for him," was bolstered as follows:

> My husband was detained in China for about one month during which time he was seriously mistreated. He now known by the Chinese government to be a Falun Gong follower, which is regarded as an evil cult organization in China. Also, he is require to report to the police station in China and therefore police began looking for him ever since he failed to appear for his reporting appointments.

(GX 416). The document included a Post-it® note with the notation, "I already typed Vanessa's handwritten revisions." The Government also introduced several letters, all of which were handwritten in English, attesting to the veracity of an applicant's asylum claim, with blanks where the purported author's names could be inserted later (see GX 400–02). Government witnesses testified that they would write such letters with blanks—"my name is XXX," "she met XXX," and so on—because they were unsure whom the client would eventually pick to write the false letters (Tr. 565–66, 1241–42). Ms. Yu testified that she recognized the handwriting of the letters found at the Bandrich firm as being that of Defendant (Tr. 1264). Again, when viewed in the light most favorable to the Government and taken together with the other evidence adduced at trial, such documentary evidence permits the rational inference that Defendant knowingly or intentionally participated in the conspiracy.

Finally, Defendant's knowing membership is also evidenced by the recordings Ms. Yu made of her conversations with Defendant. For example, in a conversation in May 2012, Ms. Yu describes her feeling "awkward" about going to court, because "[e]ven now they don't any good

9

new story, different ones … every time [a Christianity claim] comes, same thing" (GX 127T at 17). The conversation then proceeded as follows:

| | |
|---|---|
| Defendant: | Same thing. One of the girls in the office said she literally copied and pasted it. And I saw literally copied and pasted it. Sentence by sentence. I had a fit. |
| Ms. Yu: | Oh my god. Did you tell her to stop? |
| Defendant: | Yeah. And Harry. |
| Ms. Yu: | You just saw one time, you don't know what they did before. |
| Defendant: | Sure, I don't know. I saw it by accident. Like that one I saw it by accident. Like that, like copy and paste. |
| Ms. Yu: | When you translate, she doesn't ever try and do a new one. |
| Defendant: | Yeah, she wrote it, copied and pasted it. |
| Ms. Yu: | The first time hearing this. |
| Defendant: | Harry is so stupid, so stupid. |
| Ms. Yu: | They must know this. |
| Defendant: | Of course they know and they say yes to everything. |
| Ms. Yu: | You just review the English but in Chinese maybe they look more similar. |
| Defendant: | Right, of course. Whatever, I need to get out, but we will see. |

(Id.) In its summation, the Government, in a lengthy discussion of this particular exchange, explicitly urged the jury to conclude on the basis of this conversation that Defendant was a knowing

10

participant in the conspiracy: "If Bandrich knows what Harry Liu is allowing in the law firm, then Bandrich herself knows exactly what is going on" (Tr. 2087). That was a rational inference.

The jury, of course, was free to reject the Government's theory of the case and draw the alternative inferences urged by Defendant. But they chose not to, as was their prerogative. And on this record, the Court cannot say that "no rational trier of fact could have agreed with the jury." United States v. Clark, 740 F.3d 808, 817 (2d Cir. 2014) (quoting Cavazos v. Smith, ___ U.S. ___, 132 S. Ct. 2, 4 (2011) (*per curiam*)). Nor, in the circumstances of this case, and absent any further arguments, can the Court conclude that the interests of justice require a new trial.

### III.  CONCLUSION

For these reasons, Defendant's motions pursuant to Rules 29 and 33 are DENIED. The Clerk of Court is respectfully requested to close the motion at Dkt. 294.

SO ORDERED.

Dated:    December 22, 2014
         New York, New York

                                          Ronnie Abrams
                                          United States District Judge

11